**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:15-CR-00159-TWP-MJD |
| | ) | |
| v. | ) | |
| | ) | Judge Tanya Walton Pratt |
| JARED FOGLE, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant, JARED FOGLE, by and through his attorneys, JEREMY MARGOLIS and ANDREW DEVOOGHT, respectfully submits this memorandum for this Court's consideration in fashioning a sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

## I.     Introduction

As he will tell the Court himself next week, Mr. Fogle is profoundly sorry for what he has done.  He is painfully aware of the fact that he has impacted the lives of minor victims, hurt those closest to him, and, for all practical purposes, destroyed the life he worked to build over the last eighteen years.  Mr. Fogle also understands that he has certain medical issues that he must address.  Since law enforcement searched his house in July, Mr. Fogle has worked to take responsibility for his conduct, to assist the minor victims in this case, to make amends with his family, and to address his medical issues.  Mr. Fogle understands that he must remain focused on these tasks, *both during his incarceration and after*, so he can be the father, family member, and member of society he wants to be.  And he is fully committed to doing so.

Mr. Fogle understands that part of taking responsibility for his conduct includes going to federal prison for a significant period of time.  And he is ready to do so.  For the reasons set out below, Mr. Fogle respectfully submits that a term of imprisonment of 60 months is an appropriate sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

## II.      Presentence Investigation Report's Guidelines Calculation

Mr. Fogle does not dispute the accuracy of the Presentence Investigation Report's ("PSR") determination that pursuant to the United States Sentencing Guidelines, his total offense level is 33, and his criminal history category is I, such that his advisory guideline range of imprisonment is 135 to 168 months.  As described below, however, this advisory guideline range, which is just one of a number of factors this Court considers in determining Mr. Fogle's sentence, is entitled to little weight because it is the result of a flawed and widely criticized set of Guideline provisions.

## III.     Section 3553(a) Factors

When sentencing a defendant, this Court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)." *Nelson v. United States,* 555 U.S. 350, 351, 129 S. Ct. 890, 891-892 (2009); *United States v. Panice,* 598 F.3d 426, 441 (7th Cir. 2010).  Here, as the parties agree with the PSR's calculation of the advisory guideline range, "the primary issue involves the second step, the application of the criteria set forth in § 3553(a) to the facts and circumstances" of Mr. Fogle's case. *United States v. Biddle,* 2014 U.S. Dist. LEXIS 143733 at *10 (N.D. Ind. Oct. 9, 2014).  Mr. Fogle respectfully submits that consideration of the criteria set

forth in § 3553(a) demonstrates that a term of imprisonment of 60 months is an appropriate sentence in this case.

A.     The Advisory Guideline Range

The advisory guideline range is one factor this Court considers in determining Mr. Fogle's sentence.  *See Biddle,* 2014 U.S. Dist. LEXIS 143733 at *11 (citing 18 U.S.C. § 3553(a)).  In this specific instance, however, the Guideline provisions applicable to Mr. Fogle are uniquely flawed such that the resulting advisory guideline range does not warrant the same weight it might deserve in cases involving other Guideline provisions.  This is particularly true here, where a number of the enhancements that technically apply to Mr. Fogle have no rational bearing on his culpability.

The Guideline provisions applicable to Mr. Fogle have been widely and repeatedly criticized by courts, scholars, and, most tellingly, the United States Sentencing Commission itself.  *See, e.g United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011) (noting that "similar to the crack cocaine Guidelines, district courts may vary from the child pornography Guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case."); *United States v. Dorvee,* 616 F.3d 174, 184-188 (2d Cir. 2010) (stating that the child pornography "Guideline [ ] is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what *§ 3553* requires," and engaging in an in-depth analysis of the various flaws, including the "irrationality" of certain enhancements); *United States v. Gorber,* 624 F.3d 592, 609-10 (3d Cir. 2010); *United States v. Diaz,* 720 F. Supp. 2d 1039, 1041-1048 (E.D. Wis. 2010); *United States v. Brasfield,* 2011 U.S. Dist. LEXIS 96890 at *7 (E.D. Wis. Aug. 29, 2011) (referring to § 2G2.2 as "a seriously flawed provision

worthy of little deference" and citing substantial body of authority "explain[ing] these flaws in detail.") (citations omitted). A fundamental criticism that has led courts to give the provisions of § 2G2.2 little or no weight is the fact that unlike other components of the Guidelines, these provisions "did not result from careful study based in empirical analysis and national experience, *but are the result of congressional mandates.*" *Biddle,* 2014 U.S. Dist. LEXIS 143733 at *15 (emphasis added) (citing *United States v. Huffstatler,* 571 F.3d 620, 622-23 (7th Cir. 2009)).

Unfortunately, but not necessarily surprisingly, Guidelines based primarily on the directives of individuals seeking to maintain elected office resulted in a sentencing scheme that produces unduly harsh guideline ranges for many offenders. Indeed, seventy percent of ***639*** district judges surveyed in 2010 indicated that the guideline ranges for possession of child pornography are too high, and sixty-nine percent considered the ranges for receipt of child pornography too high. *Grober,* 624 F.3d at 606-07 (citing U.S. Sentencing Comm'n, *Results of Survey of United States District Judges January 2010 through March 2010* (June 2010).) This judicial condemnation is particularly damning given that only thirty percent of these same judges indicated that the guideline ranges for distribution offenses generally were too high. *Id.,* at 607. Thus, the strikingly high percentage of judges who indicated that the guideline ranges for possession and receipt of child pornography are too high is not simply the result of a judiciary that is somehow predisposed to be critical of lengthy guideline ranges in all child pornography related cases. Instead, it reflects an experienced-based awareness that the provisions related to non-production offenses are uniquely flawed.

District court judges have reiterated their disapproval of § 2G2.2 in courtrooms across the United States. Indeed, since "*United States v. Booker*, which made the guidelines 'effectively advisory' in 2005, there has been a steadily decreasing rate of sentences imposed within the

applicable guidelines ranges in non-production cases. . . . *to 32.7 percent in fiscal year 2011*." *United States Sentencing Commission Report to the Congress: Federal Child Pornography Offenses* (December 2012) ("Sentencing Commission Report"), Executive Summary at (ii) (emphasis added) (available at http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (last accessed November 12, 2015).)  As the Sentencing Commission explained, "[t]hese sentencing data indicate that a growing number of courts believe that the current sentencing scheme in non-production offenses is overly severe for some offenders." *Id.*

The Seventh Circuit has acknowledged this criticism of § 2G2.2 and recognizes the ability of the district courts to take that criticism into account when determining a defendant's sentence.  *See, United States v. Price,* 775 F.3d 828, 841 (7th Cir. 2014) (affirming below guidelines sentence for possession and production offenses, acknowledging that the district court "exercised her discretion to consider the scholarly and judicial criticism of the guidelines for child-pornography offenses," and explaining that "[w]e have said before that the concerns expressed in *Dorvee* 'can certainly be taken into account by district judges when exercising their sentencing discretion under the now advisory guidelines.'") (citations and quotations omitted).

The individual sentencing enhancements of § 2G2.2 have garnered particular criticism. Most of these enhancements, including several present in this case, have failed to evolve to reflect changes in and wide-spread use of technology.  Indeed, as this Court recently observed, "this guideline is arguably vulnerable to the criticism that the enhancements apply in nearly every case." *Lowe v. United States,* 2015 U.S. Dist. LEXIS 33902 at *7 (S.D. Ind. Mar. 18, 2015) (citing *Price,* 775 F.3d at 841).  As a result, these enhancements "produce a sentence

approaching the statutory maximum, even for an offender with no prior record, based solely on characteristics that are all but inherent to the crime of conviction, an approach fundamentally inconsistent with § 3553(a)." *Diaz,* 720 F. Supp. 2d at 1042 (citing *Dorvee,* 604 F.3d at 95-96); *see also Price,* 775 F.3d at 841 ("§ 2G2.2 … calls for the application of multiple enhancements that apply in almost every case, making inadequate distinctions between the worst offenders and those who are less dangerous.") (citing *Dorvee,* 616 F.3d at 186-87); *United States v. Burns,* 2009 U.S. Dist. LEXIS 100642 at *40 (N.D. Ill. Oct. 27, 2009) ("These Guidelines are flawed not only because they are duplicative and draconian but most critically because they apply to almost all offenders, allowing no distinction between aggravated and less aggravated behavior.")

As the Sentencing Commission explained:

> Innovations in digital cameras and videography as well as in computers and Internet-related technology, such as peer-to-peer ("P2P") file-sharing programs, have been used by offenders in the production, mass distribution (both commercial and non-commercial distribution), and acquisition of child pornography. These technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre that previously was not as widely circulated as it is today. As a result of such changes, entry-level offenders now easily can acquire and distribute large quantities of child pornography at little or no financial cost and often in an anonymous, indiscriminate manner.

> Several provisions in the current sentencing guidelines for non-production offenses--in particular, the existing enhancements for the nature and volume of the images possessed, an offender's use of a computer, and distribution of images--originally were promulgated in an earlier technological era. Indeed, most of the enhancements, in their current or antecedent versions, were promulgated when offenders typically received and distributed child pornography in printed form using the United States mail. As a result, enhancements that were intended to apply to only certain offenders who committed aggravated child pornography offenses are now being applied routinely to most offenders.

*Sentencing Commission Report* at 312-313 (footnotes omitted).

To its credit, the Department of Justice ("DOJ") agreed with the Sentencing

Commission's critique of these enhancements:

> [T]he Department agrees with the Commission's conclusion that advancements in technology and the evolution of the child pornography "market" have led to a significantly changed landscape--one that is no longer adequately represented by the existing sentencing guidelines. Specifically, we agree with the Report's conclusion that the existing Specific Offense Characteristics ("SOCs") in USSG § 2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness. The current guidelines can at times under-represent and at times over-represent the seriousness of an offender's conduct and the danger an offender possesses.

United States Department of Justice, *Letter to the Honorable Patti B. Saris, Chair of the United States Sentencing Commission,* 1 (Mar. 5, 2013)) ("DOJ Letter") (available at

http://sentencing.typepad.com/files/doj-letter-to-ussc-on-cp-report.pdf) (last accessed November 12, 2015).

## 1.      Use of a Computer Enhancement

The enhancement for the use of a computer applied in 96.3% of cases in fiscal year 2009. *Sentencing Commission Report* at 209.  Accordingly, this 2-level enhancement "applies in virtually every case and, thus, fails to differentiate among offenders with respect to their involvement in [online child pornography] communities."  *Id.,* at 323-24.  *See also, Diaz,* 720 F. Supp. 2d at 1042 ("[a]s the Sentencing Commission noted, the use of a computer enhancement fails to distinguish serious commercial distributors of online pornography from more run-of-the-mill users."); *United States v. Minor,* 553 Fed. Appx. 644, 645 (7th Cir. Feb. 13, 2014) (noting the district court had "concluded that the 2-level adjustment for using a computer was overkill (computers being a ubiquitous feature of child-pornography offenses)"); *Biddle,* 2014 U.S. Dist. LEXIS 143733 at *19-20 ("Although a computer can provide an effective means to transport material quickly in interstate commerce, it is distributors, traffickers, and those desiring to entice

children to engage in sexual activity who most exploit the technology and increase the market for child pornography.").   Indeed, the DOJ has recommended that "[b]ecause the vast majority of child pornography offenses now involve the use of a computer," the computer enhancement "be eliminated and replaced by others, . . . which better distinguish between different classes of offenders."  *DOJ Letter* at 4.

Mr. Fogle's case highlights the flawed nature of this enhancement.  Mr. Fogle essentially used his cellular telephone and a laptop computer like a slide projector, television, and VCR, to view the material he received from Mr. Taylor.  This use of a computer lies in stark contrast with computer use that serves to further proliferate or profit from child pornography.  Mr. Fogle was not commercially distributing child pornography, trafficking child pornography, or participating in online child pornography communities.  Yet his advisory guideline range receives the same increase as those individuals "who most exploit the technology and increase the market for child pornography."  *Biddle,* 2014 U.S. Dist. LEXIS 143733 at *19-20.  Mr. Fogle can and should be differentiated from such individuals.

### 2.      The Number of Images Enhancement

The maximum enhancement for possessing 600 or more images, *which is now a five level enhancement*, applied in 67.6% of cases in fiscal year 2009.  *Sentencing Commission Report* at 209 & 323, n. 58.   Courts have recognized that this enhancement is a poor predictor of comparative culpability because "offenders readily obtain the necessary number of images with minimal effort."  *Diaz*, 720 F. Supp. 2d at 1042; Burns, 2009 U.S. Dist. LEXIS 100642 at *24 (rejecting number of images enhancement because "the number and type of images received is frequently accidental"); *Brasfield,* 2011 U.S. Dist. LEXIS 96890 at *8-9 ("The number of images enhancement is also questionable because, as a result of internet swapping, offenders

readily obtain the necessary number of images with minimal effort.")  The DOJ recognizes that "in light of the technology-facilitated ease of obtaining larger child pornography collections, the numeric thresholds should be substantially increased for each offense level, so as to better distinguish between occasional and habitual collectors of child pornography." *DOJ Letter* at 4.

Mr. Fogle's case similarly demonstrates the flawed nature of this enhancement that has a dramatic effect on an offender's total offense level.  While Mr. Fogle received images and videos from Mr. Taylor on a number of occasions, he did not control, dictate or even request a given number of images or videos on any such occasion.  For example, Mr. Fogle received the bulk of the images and videos that caused him to receive this five level enhancement by way of a single thumb drive that Mr. Taylor gave to Mr. Fogle.  The thumb drive was accepted but had not been requested.  While Mr. Fogle does not dispute that he looked at the material on the thumb drive, he had no idea how many images or videos were on the thumb drive when he received it from Mr. Taylor.  Thus, Mr. Fogle's having possessed more than 600 images underscores the notion that "the number . . . of images received is frequently accidental." *Burns*, 2009 U.S. Dist. LEXIS 100642 at *24.  Indeed, the number of images Mr. Fogle received does not reflect an intentional effort to amass a collection of child pornography, and the dramatic, five-level enhancement is unjust.

### 3.    Age of the Children in the Material Enhancement

The enhancement for possession of material involving children under age twelve applied in 96.3 percent of all sentences under 2G2.2 in fiscal year 2009. *Sentencing Commission Report* at 209.  "[I]mages of very young children are sadly 'typical of this crime,' and do not indicate increased culpability for those receiving such images." *Biddle,* 2014 U.S. Dist. LEXIS 143733

at *22 (citing *United States v. Hanson,* 561 F. Supp. 2d at 1009; *Burns,* 2009 U.S. Dist. LEXIS 100642 at *42-43.)

Separate and apart from the Sentencing Commission's and courts' observations regarding the limitations of this enhancement, this enhancement is particularly flawed as applied to Mr. Fogle. Indeed, it is critical to note that Mr. Fogle never requested material involving prepubescent minors, such that this enhancement, "do[es] not reflect any atypical culpability on his part," underscoring the notion that the "type of images received is frequently accidental." *Burns,* 2009 U.S. Dist. LEXIS 100642 at *43, *24.

The severe consequences of a rote application of these three enhancements, which are flawed both generally and as specifically applied to Mr. Fogle, cannot be overstated. Their application results in a dramatic impact on his advisory guideline range, raising Mr. Fogle's total offense level by nine levels, and increasing his advisory guideline range from 41-51 months, to 108-135 months.

Given all of the above, Mr. Fogle would respectfully ask this Court not to give the advisory guideline range much, if any weight in determining his sentence.

**B.** **The Nature and Circumstances of the Offense**

Mr. Fogle has not, nor will he now try to minimize the troubling nature of his conduct. That said, in determining his sentence, it is important to recognize both what Mr. Fogle did *and what he did not do.* This complete picture demonstrates that a term of imprisonment of 60 months is an appropriate sentence in this case.

*Count 1: 18 U.S.C. § 2252(a)(2)(Child Pornography)*

Mr. Fogle readily admits that he received images and videos of child pornography from Mr. Taylor that Mr. Taylor secretly produced at his house. However, there are a number of

critical points Mr. Fogle would ask the Court to consider in assessing his conduct.  First, Mr. Fogle never engaged in any sexual conduct whatsoever with any of the minor victims Mr. Taylor recorded.  Second, Mr. Fogle played no role in producing any of the images or videos Mr. Taylor recorded.  Third, other than briefly showing certain of these images and videos on one occasion to an adult woman with whom Mr. Fogle was involved in a personal, romantic relationship, in the privacy of a locked hotel room, Mr. Fogle never shared any of these images or videos with anyone else.  Thus, Mr. Fogle is not like other defendants this and other courts have seen who actively traded images and videos of child pornography.  *See, e.g.*, *United States v. Richard Zachery Gardner*, 1:13-MJ-00251-TWP-MJD (S.D. Ind.), Judgment [Dkt. # 58] (Defendant sentenced to 72 months for receipt of child pornography admitted to installing and using P2P software to share and download such material).[1]  Indeed, Mr. Fogle discarded the thumb drive Mr. Taylor gave him that contained these images and videos shortly after Mr. Fogle displayed them on the one occasion.

Fourth, while Mr. Taylor secretly recorded twelve victims, Mr. Fogle "did not obtain access to all of the material [Mr.] Taylor produced."   (Information [Dkt. #1] at ¶ 16, https://ecf.insd.uscourts.gov/doc1/07314972746)  Specifically, Mr. Fogle can say unequivocally that he did not receive images or videos of at least four of these twelve Minor Victims.  Further, Mr. Fogle does not recall receiving and does not believe that he ever received images or videos of two additional Minor Victims that Mr. Taylor recorded.  While Mr. Fogle fully recognizes that his passivity and failure to report Mr. Taylor to law enforcement personnel enabled Mr. Taylor to subsequently victimize these individuals, it is important to note that Mr. Fogle did not receive any images or videos of them.

---

[1] Copies of case materials cited from the Gardner case and the Horner case cited below are attached to this Memorandum as Group Exhibits 1 and 2, respectively.

Finally, Mr. Fogle acknowledges that the images and videos Mr. Taylor surreptitiously recorded included, "a lascivious exhibition of the genitals or pubic area of the minors." (Information, [Dkt. #1] at ¶ 11.)   However, Mr. Fogle only recalls receiving one video Mr. Taylor produced in which a Minor Victim was engaged in any other form of "sexually explicit conduct" as defined in the Information.   Here again, Mr. Fogle does not downplay the disturbing nature of the images and videos he received.   Instead, he simply notes the that vast majority of the material Mr. Taylor produced and provided to Mr. Fogle did not include images or videos of minors engaged in "sexually explicit conduct" with Mr. Taylor, other adults, or other minors. This fact differentiates the material Mr. Fogle received from Mr. Taylor from much of the material at issue in many child pornography cases.   *See, e.g.*, *United States v. Mantanes,* 632 F.3d 372, 373-74 (7th Cir. 2011) (case involving graphic sadistic images, including sexually explicit conduct); *United States v. Pape,* 601 F.3d 743, 745 (7th Cir. 2010) (case involving depictions of prepubescent minors engaging in sexual intercourse).

Mr. Fogle also received child pornography from Mr. Taylor that Mr. Taylor obtained through Internet sources, which is classified as commercial material produced by other persons. Unlike the material Mr. Taylor produced, this material included unidentified victims as young as six years old engaged in sexually explicit conduct.   Most importantly, Mr. Fogle *never* requested material of this kind from Mr. Taylor.   Moreover, like the images and videos Mr. Taylor produced, Mr. Fogle only briefly shared certain of these images and videos on the single and limited occasion described above, and destroyed them shortly thereafter.

### Count 2: 18 U.S.C. § 2423(b) (Travel to Engage in Illicit Sexual Conduct with Minors)

Mr. Fogle traveled in interstate commerce to engage in sex acts with minors for money. Mr. Fogle does not dispute this fact.   But here again, there are important components of Mr.

Fogle's conduct he would ask the Court to consider in determining his sentence. First, Mr. Fogle arranged these encounters after seeing commercial advertisements on the internet related to Victim 13 offering sex acts for money. Mr. Fogle did not find these individuals by trolling chat rooms, lying about both his age and intentions. *See, e.g., United States v. Henzel,* 668 F.3d 972, 973-74 (7th Cir. 2012) (defendant guilty of traveling across state lines with the intent to engage in illicit sexual conduct under 18 U.S.C. § 2423(b) and sentenced to 135 months in prison after meeting a 12 year-old girl on an internet chat room about video games, telling her he was 14 instead of 29, traveling to Indiana to meet her and coercing her into having sexual intercourse in his hotel). Second, although the individuals with whom Mr. Fogle engaged in sexual intercourse for money were minors, it is worth noting that they were sixteen and seventeen years old, respectively. While Mr. Fogle's conduct is inexcusable, these individuals were far older than many victims of this same crime. *See, e.g., Henzel,* 668 F.3d at 973 (12 year-old victim). Indeed, the age of consent in New York is seventeen, N.Y. PENAL LAW § 130.05(3)(a) (Consol. 2015), and the age of consent in Mr. Fogle's home state of Indiana is sixteen. Ind. Code § 35-42-4-3. And while the plea agreement correctly notes that Mr. Fogle "asked Victim 13, as well as several other people, to provide him with access to minors as young as 14 years old for purposes of commercial sex acts with him," Mr. Fogle *did not* engage in any sex acts of any kind, commercial or otherwise, *with anyone below the age of sixteen*.

Finally, the plea agreement further describes the Government having "obtained information and audio recordings from witnesses" in several states "showing that the Defendant repeatedly discussed with them his interest in engaging in commercial sex acts with minors or stated that he has done so in the past." Mr. Fogle does not deny that such conversations occurred. He would note, however, that they occurred between Mr. Fogle and individuals with

whom Mr. Fogle was, at the time the conversations took place, involved in personal, sexual relationships.  Further, Mr. Fogle made these statements during the course of what he thought were consensual, intimate conversations between Mr. Fogle and these individuals.  Moreover, and most importantly, while Mr. Fogle's comments were clearly troubling, it is important to note that the "past" sex acts Mr. Fogle described during these conversations did not take place. Instead, Mr. Fogle made these comments during the course of what he thought were consensual, "fantasy" discussions between Mr. Fogle and these adult sexual partners.  These comments are similar to those the government and this Court have seen in other "fantasy" discussions, and ultimately did not hold against other defendants where there was no evidence of actual wrongdoing.  *See, e.g., Gardner*, 1:13-MJ-00251-TWP-MJD (Defendant sentenced to 72 months for receipt of child pornography engaged in email conversations in which he described having "recently had sexual intercourse with a minor child." (Complaint, [Dkt. #1] at ¶ 50a; Judgment [Dkt. # 58].)  Defendant later denied engaging in any unlawful sexual contact with a minor and such conduct was identified as an "excluded offense[]."  (Plea Agreement, [Dkt. # 24] at ¶ 15).)

These important aspects of Mr. Fogle's conduct differentiate him from other defendants and demonstrate that while he should be punished for his conduct, a term of imprisonment of 60 months is an appropriate sentence in this case.

## C.   History and Characteristics of the Defendant

Certain aspects of Mr. Fogle's history and characteristics demonstrate that a 60 month term of imprisonment is more than sufficient in this case.

### 1.   Medical Diagnosis and Treatment

Mr. Fogle does not offer discussion of his medical diagnosis and treatment as an excuse for his conduct.  That said, he does believe that it helps explain aspects of that conduct.  More

importantly, Mr. Fogle's prognosis and demonstrated commitment to treatment show that a term of imprisonment of 60 months is more than sufficient in this case.

After law enforcement searched his house in July, Mr. Fogle was finally forced to face the nature and extent of his conduct.  In addition to taking responsibility for his shameful conduct, Mr. Fogle knew he had a problem and needed help.  He sought the assistance of Dr. John Bradford, an internationally renowned forensic psychiatrist.  Dr. Bradford spent two days with Mr. Fogle, subjecting him to a number of tests and examinations to assess Mr. Fogle's mental condition and chart out an appropriate treatment plan for any condition from which Dr. Bradford concluded Mr. Fogle is suffering.  As this Court knows, Dr. Bradford also sent Mr. Fogle to Dr. Robert P. Granacher, a forensic psychiatrist and neuropsychiatric expert, to perform a neuropsychiatric evaluation.

As summarized in the PSR, and as Dr. Bradford will be able to discuss at Mr. Fogle's sentencing hearing, Mr. Fogle suffers from hypersexuality and alcohol abuse/dependence.  Dr. Bradford also identified weak evidence of erotic preference of a heterosexual pedophilia/hebephilia.  Thankfully and most importantly, according to Dr. Bradford, Mr. Fogle's conditions, if addressed properly, are very treatable:

> (F)rom a treatment perspective, hypersexuality would need to be treated with pharmacological treatment, and he would respond very well to the traditional treatments. The weak evidence of heterosexual pedophilia/hebephilia should be treated by the traditional psychological treatments and I believe that he would respond well to that type of intervention. If he accepts pharmacological treatment for hypersexuality this would also suppress any deviant sexual arousal. His evaluation is fairly typical of individuals who are found to be in possession of child pornography, but have no evidence of ever engaging in any hands-on contact with the child. They are at low risk for future sexual offense recidivism."

(Presentence      Investigation      Report,      [Dkt.      #      41]      at      23, https://ecf.insd.uscourts.gov/doc1/07315062292 )   Mr. Fogle understands that he has serious

medical issues that need to be addressed and he has been and will continue to be focused on getting healthy.  Indeed, while Mr. Fogle waited for feedback from Dr. Bradford, he voluntarily began the process of trying to get healthy.  Specifically, he attended weekly individual counseling sessions with Dr. Camille Sexton-Villalta, and weekly addiction counseling with Christopher Countryman, a licensed clinical social worker.  In addition, Mr. Fogle attended Sex Addicts Anonymous meetings twice per week in Indianapolis.  As this Court will see in a letter from Mr. Countryman, Mr. Fogle took this treatment very seriously.

Additionally, shortly after Dr. Bradford evaluated Mr. Fogle, with this Court's permission, Dr. Bradford helped arrange for Mr. Fogle to voluntarily undergo an intensive four week outpatient treatment program to address his medical issues under the care of Dr. Rick May. As Dr. May will explain in person at Mr. Fogle's sentencing hearing, Mr. Fogle demonstrated his total commitment to the program and showed that he is responsive to treatment.

Although Mr. Fogle knows he cannot undo what he has done, he hopes to demonstrate to the Court that he is taking every step possible to ensure that he never engages in any such conduct in the future.

### 2.     Positive impact and commitment to others' well-being

While Mr. Fogle understands that his selfish conduct has rendered him a social pariah, he respectfully requests that this Court consider the positive impact he has had on many lives and his demonstrated commitment to others' well-being.  After suffering the physical, mental, and emotional distress that can come with being morbidly obese, Mr. Fogle spent countless hours over the last eighteen years speaking with people around the world about his struggles to get healthy.  Mr. Fogle sought to use his status as a public figure to inspire others and motivate them to take control of their health.  The impact of Mr. Fogle's efforts is undeniable.  Mr. Fogle has

received feedback from literally thousands of people from all parts of the world thanking him for helping them focus on their health and well-being.  While Mr. Fogle recognizes that this positive impact does not undo his reprehensible conduct, he respectfully submits that it does help demonstrate that this conduct is only one part of Mr. Fogle, and that he has sought to, and in fact succeeded, in having made a significant, positive contribution to society.

### 3. Mr. Fogle's role as a father and family member

Mr. Fogle has deeply hurt those closest to him, betraying the trust of his family.  Along with getting healthy, a top priority for Mr. Fogle is trying to earn back this trust.  Although these family members are understandably upset with Mr. Fogle, they all, including, as the PSR notes, Mr. Fogle's wife, believe Mr. Fogle has been a good father to his children.  Mr. Fogle wants nothing more than to continue to be a positive influence in the lives of his children and he is willing to do whatever it takes to do so.  Mr. Fogle would ask the Court to consider Mr. Fogle's prior positive involvement in his children's lives and his desire to continue to provide such involvement in determining his term of imprisonment.

### D. The need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

Mr. Fogle has committed serious crimes and he understands that he must be punished for his actions.  However, in formulating a sentence that reflects the seriousness of the offense, promotes respect for the law, and constitutes "just punishment," Mr. Fogle would ask the Court to consider the PSR's observation regarding the uniquely severe consequences Mr. Fogle has already faced and will continue to face for the rest of his life:

> The defendant has suffered collateral consequences greater than that of a "typical" defendant facing sentencing for similar offenses. In addition to the loss of his income and marriage, he has lost his community reputation and anonymity of the details of the offense. He is a public figure known worldwide. Regardless of the Bureau of Prisons facility to which he is designated, he will be recognized, and

the details of his offenses will be known. Thus, the time served in prison may be more stressful than that of other inmates whose identities and offenses details are not known to others.

(Presentence Investigation Report, [Dkt. # 41] at ¶ 121.)   While the consequences the PSR identifies are undoubtedly the result of Mr. Fogle's own selfish conduct, they readily demonstrate that Mr. Fogle has and will continue to suffer in ways that other defendants who have committed similar crimes would not.   This fact further underscores that a term of imprisonment of 60 months will ensure that Mr. Fogle is "just[ly] punish[ed]."

**E.   The need to afford adequate deterrence to criminal conduct**

A term of imprisonment of 60 months will be more than sufficient to effectuate the goals of specific and general deterrence.   In terms of specific deterrence, as noted above, Mr. Fogle fully understands the harm he has caused.   And he will be painfully aware of this fact for the rest of his life.   Mr. Fogle is focused on getting healthy and trying to repair the damage he has done. He is committed to these goals and a term of imprisonment of 60 months will be more than enough punishment for Mr. Fogle to understand that he cannot, under any circumstances, return to his shameful conduct of the past.

In terms of general deterrence, the country, indeed the world, has witnessed Mr. Fogle's very public humiliation.   Anyone with a television or access to the internet has witnessed and will continue to witness Mr. Fogle lose everything he has worked for over the last eighteen years and go to federal prison.   Simply put, ***no one*** wants to be Mr. Fogle.   Thus, anyone considering engaging in similar conduct, who otherwise has the medical and mental wherewithal to resist such behavior, will clearly be deterred from doing so by seeing that Mr. Fogle, in addition to destroying his own life and subjecting himself to public humiliation, receives a term of imprisonment of 60 months.

**F.      The need to protect the public from further crimes of the defendant**

A term of imprisonment of 60 months is more than sufficient to protect the public from further crimes committed by Mr. Fogle.  As noted above, Mr. Fogle is experiencing and fully appreciates the painful consequences of his conduct.  And he will continue to do so.  These experiences will serve as more than enough motivation for Mr. Fogle to never commit such crimes again.  More importantly, Mr. Fogle is committed to doing everything he can to ensure that he never commits such crimes in the future.  For example, as noted above, Mr. Fogle has been pursuing the appropriate medical treatment to put himself in a position to succeed.  And, as noted above, and as this Court will hear at Mr. Fogle's sentencing hearing, not only is Mr. Fogle a prime candidate for successful treatment, Mr. Fogle has been pursuing this treatment with total commitment, and has demonstrated that he is, in fact, treatable.

**G.      The need to provide the defendant with needed medical care in the most effective manner**

As described above, Mr. Fogle is fully committed to receiving the treatment he needs to move forward with his life and be the father, family member, and member of society that he wants to be.  He has and will continue to work with medical professionals to identify and carry out exactly what he needs to do to reach these goals.  While Mr. Fogle understand that he must go to federal prison for what he has done, and he is prepared to do so, an unnecessarily long term of imprisonment will likely hamper or at least delay Mr. Fogle receiving the full benefit of such treatment.  To a certain extent this is of course the price Mr. Fogle must pay for his selfish conduct.  That said, it is a consequence that underscores the appropriateness of a term of imprisonment of 60 months in this case.

**H.      The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

While every case presents unique facts and circumstances, courts, including this one, have sentenced defendants who have engaged in conduct similar to that of Mr. Fogle to below-guidelines sentences.  *United States v. William Donald Horner,* 1:13-cr-00124-TWP-TAB (S.D. Ind.) is an instructive example.  In *Horner,* the defendant pled guilty to one count of possession of child pornography in violation of 18 U.S.C. 2252(a)(4)(B).[2]  Horner's final offense level was 28, resulting in a guidelines range of 78-97 months, and included enhancements for use of a computer and for the number images exceeding 600, among other enhancements.   (Plea Agreement [Dkt. 28] at 9-10.)  Despite the Government's request that he be given a sentence within the guidelines range (Government's Sentencing Memorandum, [Dkt. 48] at 5), he received a below guidelines sentence of 70 months.  (Judgment [Dkt. #52] at 2.)

Although Mr. Fogle's total offense level is higher than Mr. Horner's, the facts of Horner's case demonstrate that a term of imprisonment of 60 months is appropriate in Mr. Fogle's case.   Unlike Mr. Fogle, Mr. Horner actively sought and amassed images of child pornography from online sources. (Government's Sentencing Memorandum. [Dkt. 48] at 3.) Indeed, he had been searching and looking at child pornography on the internet for approximately 15 years.  (*Id.* at 14.)  Additionally, and in stark contrast to Mr. Fogle, Mr. Horner explicitly sought out images of "prepubescent children engaged in hardcore sex acts, including sadistic and masochistic conduct."   (*See, id.*)   Although Mr. Horner did not engage in commercial sex acts with sixteen and seventeen year old individuals, as this Court knows, it is Mr. Fogle's receipt of child pornography that is driving his advisory guideline range.  Moreover,

---

[2] While Mr. Fogle has pled to receipt as opposed to possession, this is a distinction without a difference when comparing actual conduct.  As Judge Posner stated in *Richardson*, because "possessors, unless they fabricate their own [child] pornography, are also receivers [at some earlier point in time]."  238 F.3d at 839-40.

Mr. Horner did admit to conduct beyond possessing and viewing child pornography, including stealing young girls' underwear from laundry-mats, driving around specific neighborhoods to watch people undressing from his car, and looking at girls inappropriately in shopping malls. (*Id.* at 3-5.)

The sentence in *United States v. Biddle* also provides useful comparison with Mr. Fogle's case. 2014 U.S. Dist. LEXIS 143733. In that case, Biddle pled guilty to possession of child pornography. The charges resulted from an FBI investigation of "communications involving the Defendant that included the transmission of child pornography."[3] *Id.* at *2. Like Mr. Fogle, Mr. Biddle's Guidelines range was 108 to 135 months after application of enhancements for depictions of prepubescent minors, use of a computer, and the five level enhancement for number of images.[4] *Id.* at *4. Unlike Mr. Fogle, Biddle had a criminal history category of II resulting from convictions that included domestic battery, impersonation of a public servant and criminal recklessness. *Id.* The court, observing the flaws of the Guidelines, both generally and as applied to Biddle, sentenced Biddle to 54 months, a sentence well below his Guidelines range. *Id.* at *2. The court's observations of the nature and circumstances of the offense bear striking similarity to Mr. Fogle's case:

> In consideration of the nature and circumstances of the offense, the Court finds that the Defendant did not seek pecuniary gain or exchange money in his acquisition of images; thus, he did not contribute to any commercial market for child pornography. Nor was the Defendant motivated to distribute images, but instead collected them for his personal use. In addition, the Defendant was not involved in the production of child pornography but rather was a run-of-the-mill user who viewed the images privately.

---

[3] This highlights Judge Posner's observation regarding the lack of true distinction between receipt and possession.

[4] Biddle also had an enhancement for material portraying sadistic conduct. *Id.*

*Id.* at *25.  While the court did take into consideration the lack of improper contact with minors, *id.* at *26-27, the nature of Mr. Fogle's contact is unique and should not result in a large disparity in sentencing.

Similar, below-Guidelines sentencing occurred in *United States v. Dittiway,* 2014 U.S. Dist. LEXIS 77908 (N.D. Ind. Jun. 9, 2014).  Dittiway pled guilty to possession of child pornography and was sentenced to 60 months, well below his Guidelines range of 97-120 months.  *Id.* at *2, 4.  Like Mr. Fogle, Dittiway had no criminal history, but was had substantial enhancements applied for possessing prepubescent images, possessing over 600 images and the use of a computer.  *Id.* at *3-4.  Unlike Mr. Fogle, he had further enhancements for distributing the material and for possessing material with sadistic conduct or other depictions of violence.  *Id.* In addition to critiquing the Guidelines and their particular application to Dittiway, the court observed the same nature and circumstances as in *Biddle* and as in this case, in that Dittiway did not seek any financial gain, did not pay for images and thus did not contribute to the market.  *Id* at *22.  Poignantly, many positive characteristics of Dittiway warranted a more lenient sentence, characteristics quite similar to Mr. Fogle.  *Id.* at *22-23.  These included his love and care for his children and his demonstration of an ability to turn his life around in the past.  *Id.*  Mr. Fogle has similarly shown that he is a loving father and also capable of significant and lasting change. Moreover, the court observed that Dittiway had shown genuine remorse and acceptance of the consequences of his actions as well as a high motivation "to address and correct the issues" that brought him before the court."  *Id.* at *24.  Mr. Fogle, in accepting responsibility, providing immediate and meaningful restitution and in seeking out and participating fully in treatment he shares these characteristics with Dittiway.

## I.       The need to provide restitution to any victims of the offense

Mr. Fogle has voluntarily provided each of the fourteen victims noted in the Information and Plea Agreement with restitution of $100,000, totaling $1,400,000.   Mr. Fogle fully understands that such financial assistance cannot undo his conduct.   He also recognizes that it will not, by itself, heal the pain and sorrow he has caused these individuals.   Instead, Mr. Fogle hopes that this financial assistance demonstrates both the genuine remorse he feels and his commitment to helping these victims work through this difficult time and move forward to live happy and productive lives.

Mr. Fogle provided financial assistance to all fourteen victims despite the fact that he did not receive images of at least four and he believes as many as six of the twelve victims Taylor secretly recorded.   Mr. Fogle does not mention this fact as a point of self-congratulation.   He does so because he wants the Court to know that he recognizes that his passivity, and failure to report Taylor to law enforcement personnel, enabled Taylor to subsequently victimize these additional individuals.   Recognizing as much, Mr. Fogle wanted to similarly try to help these individuals.

Mr. Fogle would ask the Court to consider these voluntary steps he has taken in determining his sentence.

WHEREFORE, defendant JARED FOGLE respectfully requests that this Court sentence him to a term of imprisonment of 60 months.


Dated:   November 12, 2015                    By:      /s/ Andrew DeVooght

                                              Jeremy Margolis
                                              Andrew DeVooght
                                              LOEB & LOEB LLP

321 N. Clark Street, Suite 2300
Chicago, IL  60647
Telephone: 312.464.3100
Facsimile: 312.464.3111

Attorneys for Defendant

## CERTIFICATE OF SERVICE

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 12th day of November.


November 12, 2015                    By:  /s/ Andrew DeVooght
                                          Andrew DeVooght