UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,          )
                                 ) Cause No.
        Plaintiff,            ) 1:15-CR-0159-TWP-MJD
                                 ) Indianapolis, Indiana
   vs.                      ) **November 19, 2015**
                                 ) 9:01 a.m.
JARED S. FOGLE (01),           )
                                 )
        Defendant.         )

**Before the Honorable**
**TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
CHANGE OF PLEA AND SENTENCING


**For Plaintiff:**               Steven D. DeBrota, Esq.
                            Assistant U.S. Attorney
                            United States Attorney's Office
                            Suite 2100
                            10 West Market Street
                            Indianapolis, IN  46204


**For Defendant:**              Jeremy Margolis, Esq.
                            Andrew Richard DeVooght, Esq.
                            Loeb & Loeb, LLP
                            Suite 2300
                            321 North Clark Street
                            Chicago, IL  60654

                            Ronald E. Elberger, Esq.
                            Bose, McKinney & Evans, LLP
                            Suite 2700
                            111 Monument Circle
                            Indianapolis, IN  46204


Court Reporter:              David W. Moxley, RMR, CRR, CMRS
                            United States District Court
                            46 East Ohio Street, Room 340
                            Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

# I N D E X

**DEFENDANT'S WITNESSES:**                                    **PAGE**

JOHN M.W. BRADFORD, M.D.

Direct Examination by Mr. DeVooght .............51
Cross-examination by Mr. DeBrota ...............72

RICK L. MAY, Psy.D.

Direct Examination by Mr. Margolis .............88
Cross-examination by Mr. DeBrota ..............100

**GOVERNMENT'S WITNESS:**                                     **PAGE**

DARIN ODIER

Direct Examination by Mr. DeBrota .............103

# I N D E X   O F   E X H I B I T S

**GOVERNMENT'S EXHIBITS:**                                    **PAGE**

1 ...........................................103
2 ...........................................103
3 ...........................................103
4 ...........................................103

 1                    (In open court.)

 2          THE COURT:  Good morning.  We are on the record.

 3   This is the United States of America versus Jared Fogle, Case

 4   No. 1:15-cr-159, and we are here for both a change of plea and

 5   sentencing hearing.

 6          And we will begin by having counsel state your names

 7   for the record and introduce those at your table.  And we'll

 8   begin with the government.

 9          MR. DeBROTA:  Steve DeBrota for the United States,

10   Your Honor.  This is Darin Odier with Indianapolis

11   Metropolitan Police Department, Kevin Getz of the Indiana

12   State Police, and Andrew Willmann of the Federal Bureau of

13   Investigation, Your Honor.

14          THE COURT:  Good morning.

15          MR. DeBROTA:  Chris Cecil.  I'm sorry.  I've

16   identified the wrong defendant -- detective.  The other one is

17   back here.

18          THE COURT:  All right --

19          MR. DeBROTA:  That's Chris Cecil.

20          THE COURT:  Thank you.  And at our defendant's

21   table?  Who is going to be lead counsel?

22          MR. MARGOLIS:  Good morning, Your Honor.  Jeremy

23   Margolis for Jared Fogle.  To my left is my partner, Andrew

24   DeVooght; and to -- I'm sorry.  To my right.  And to his

25   right, Ron Elberger, our local counsel, a well-known lawyer

1  here in Indianapolis.  And to my left is Jared Fogle.

2         THE COURT:  Good morning.  For the record, from the

3  United States Probation Office we have Stephanie Ivie, and the

4  court reporter today is David Moxley.

5         And, Mr. Margolis, it's the Court's understanding

6  that your client has waived indictment and he would like to

7  enter a plea of guilty to Count 1 of the information.  That

8  count is conspiracy to distribute and receive child

9  pornography in violation of Title 18 United States Code,

10  Section 2252(a)(2); and he would also like to enter a plea of

11  guilty to Count 2, traveling and attempting to travel in

12  interstate commerce to elicit sexual conduct with a minor in

13  violation of Title 18 United States Code, Section 2423(b) and

14  (e).  Is that correct?

15         MR. MARGOLIS:  That is correct, Your Honor.  That is

16  his intention.

17         THE COURT:  And, Counsel, you're also prepared to

18  proceed with sentencing today; is that correct?

19         MR. MARGOLIS:  We are, Your Honor.

20         THE COURT:  All right.  Mr. Margolis, would you and

21  your client come up to the lectern?

22         (Counsel and defendant approach the podium.)

23         THE COURT:  And while they are doing that,

24  Mr. DeBrota, are there identifiable victims of these offenses?

25  Has the government fulfilled their duty to notify those

1  victims of this hearing and their right to be heard?

2         MR. DeBROTA:  We have, Your Honor.  And just for the

3  record, we received a number of victim impact statements we

4  filed under seal.  The latest one was this morning.  We also

5  contacted victims and made available the Court's option of

6  having them watch the proceedings in a different room of the

7  courtroom -- of the courthouse.

8         THE COURT:  All right.

9         MR. DeBROTA:  So we think we've contacted everyone

10  that we could contact that would talk to us.

11         THE COURT:  Everyone that was identified?

12         MR. DeBROTA:  Correct.

13         THE COURT:  Okay.  And the Court has reviewed the

14  three victim impact statements, including the one that was

15  filed either this morning or last night.

16         MR. DeBROTA:  Thank you, Your Honor.

17         THE COURT:  Okay.  All right.  Before we get

18  started, Counsel, the Court has issued several orders

19  regarding decorum, as well as treatment of communications.

20  Does either party have any objection to the Court's format on

21  decorum or the treatment of those communications?

22         MR. DeBROTA:  No, Your Honor.

23         MR. MARGOLIS:  None, Your Honor.

24         THE COURT:  Very good.

25         Okay.  Mr. Fogle, sir, you've previously filed a

1 petition to enter a plea of guilty.  Are you prepared to go

2 forward?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  All right.  I need you to talk into the

5 mic.

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  Can it go any higher, Tanesa?  Because

8 he's very tall.

9            THE DEFENDANT:  I can duck down.

10            THE COURT:  Okay.  Well, we don't want you to have

11 to duck.

12            MR. MARGOLIS:  It's perfect for me, Your Honor.

13            THE COURT:  All right.  Okay.

14            THE DEFENDANT:  I'll hold it like that.

15            THE COURT:  All right.  Mr. Fogle, I need you to

16 raise your right hand.  I'm going to place you under oath to

17 ensure that your answers today are truthful.

18            (The defendant is sworn.)

19            THE COURT:  You may put your hand down.

20            Sir, you've filed a petition to enter a plea of

21 guilty.  Do you understand that you're now under oath, and if

22 you answer any of my questions falsely, your answers may later

23 be used against you in another prosecution for either perjury

24 or making a false statement?

25            THE DEFENDANT:  Yes, I do, Your Honor.

1                THE COURT:  What is your full name?

2                THE DEFENDANT:  Jared Scott Fogle.

3                THE COURT:  Why don't we let Mr. Fogle wear the

4    wired mic, because --

5                MR. MARGOLIS:  Your Honor, I was about to ask you.

6                THE COURT:  That's very uncomfortable to have to

7    bend down.  And it needs to go up pretty high.

8                THE DEFENDANT:  Is that better?

9                THE COURT:  That's better.

10               THE DEFENDANT:  Okay.

11               THE COURT:  All right.  All right.  What is your

12   full name?

13               THE DEFENDANT:  Jared Scott Fogle.

14               THE COURT:  And how old are you, sir?

15               THE DEFENDANT:  38 years old.

16               THE COURT:  How far did you go in school?

17               THE DEFENDANT:  I finished my undergraduate at

18   Indiana University.

19               THE COURT:  So you have a bachelor's degree?

20               THE DEFENDANT:  Yes, ma'am.

21               THE COURT:  Have you been treated recently for any

22   mental illness or addiction to alcohol or narcotic drugs?

23               THE DEFENDANT:  No, I have not.

24               THE COURT:  Are you currently under the influence of

25   any medication or other substance that might affect your

1    ability to understand today's proceedings?

2              THE DEFENDANT:  No, I'm not.

3              THE COURT:  Sir, have you received a copy of the

4    information?  That's the written charges that have been made

5    against you in this case.

6              THE DEFENDANT:  Yes, Your Honor, I have.

7              THE COURT:  And have you had an opportunity to fully

8    discuss the charges and this case in general with your three

9    counsels?

10             THE DEFENDANT:  Yes, I have, Your Honor.

11             THE COURT:  Mr. Fogle, you've indicated that you're

12   going to plead guilty to Counts -- both Counts 1 and 2 of the

13   information, and I need to make certain that you understand

14   the penalties that you face on these charges.  Again, you've

15   agreed to plead guilty to Count 1, conspiracy to distribute

16   and receive child pornography, which is a Class C felony and,

17   under statutory provisions, carries from five years up to 20

18   years' imprisonment, and a fine of up to $250,000, and five

19   years to life of supervised release?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  With respect to Count 2, traveling and

22   attempting to travel in interstate commerce to elicit sexual

23   conduct with a minor, that count is a Class B felony that,

24   under federal statutory provisions, carries a sentence of 30

25   years' imprisonment, a $250,000 fine, and five years to life

1   of supervised release.

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Do you understand that any prison

4   sentence for this charge will be followed by what's called

5   supervised release where you will be subject to supervision by

6   a federal probation officer, you will have to abide by a

7   number of rules and conditions?  If it is alleged that you

8   have violated those conditions, you would have a hearing.  And

9   if found in violation, you could wind up back in prison on

10  these exact same charges.  Do you understand?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Do you understand that, in addition to

13  being fined up to $250,000 on each count, you could be ordered

14  to pay restitution for any known victims?  And I understand

15  you have already paid some restitution.

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  And you will also have to pay a

18  mandatory special assessment fee of $200.  Do you understand?

19         THE DEFENDANT:  Yes, I do.

20         THE COURT:  And, Mr. DeBrota, are there any other

21  penalties that need to be mentioned on these charges?

22         MR. DeBROTA:  Just the forfeiture of the personal

23  items involved, and there's the forfeiture piece of it, as

24  well, but that would be it.

25         THE COURT:  Okay.  And you do understand your plea

1   agreement also contains a forfeiture provision?  We're going

2   to forfeit -- I believe he's going to forfeit cash rather than

3   items, correct?

4           THE DEFENDANT:  Yes, Your Honor.

5           MR. MARGOLIS:  $50,000, Your Honor.

6           MR. DeBROTA:  Well, mainly cash, but then some of

7   the electronic storage devices and so forth, as well.

8           THE COURT:  Correct.

9           MR. MARGOLIS:  Yes.

10          THE COURT:  Understand?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Okay.  Mr. Fogle, have you had

13  sufficient time to talk with your lawyers about the

14  government's evidence in this case?

15          THE DEFENDANT:  Yes, I have.

16          THE COURT:  And have you talked to your lawyers

17  about ways in which you might defend yourself when you were

18  making the decision whether to enter into a plea of guilty or

19  proceed with a trial?

20          THE DEFENDANT:  Yes, I have.

21          THE COURT:  Are you fully satisfied with the

22  counsel, the representation, and the advice that's been given

23  to you by your attorneys?

24          THE DEFENDANT:  I am satisfied, yes, Your Honor.

25          THE COURT:  Sir, you have reached a plea agreement

1   with the government in this case, and in just a moment we're

2   going to go through -- to discuss that agreement.  I do have a

3   copy, and I believe your attorneys have a copy at the lectern.

4           THE DEFENDANT:  Yes.

5           THE COURT:  And on the last few pages of this plea

6   agreement, Mr. Fogle, there is your signature.  And that was

7   back on August 19, 2015?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  Sir, did you read and fully discuss this

10  plea agreement with your attorneys before you signed it?

11          THE DEFENDANT:  Yes, Your Honor, I did.

12          THE COURT:  Do you feel that you understand the

13  terms of your plea agreement?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  Mr. Fogle, has anyone made any threats

16  or used any force to get you to plead guilty?

17          THE DEFENDANT:  No, they have not.

18          THE COURT:  Has anyone made any promises or

19  assurances, other than what's contained in your plea

20  agreement, to get you to plead guilty?

21          THE DEFENDANT:  No, Your Honor.

22          THE COURT:  Are you pleading guilty of your own free

23  will and because you are, in fact, guilty?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Sir, the offenses to which you're

1  pleading guilty are felony offenses.  If your plea is

2  accepted, you will be adjudged guilty of these offenses.  And

3  a federal felony adjudication may deprive you of very valuable

4  civil rights, such as the right to vote, the right to hold

5  public office, the right to serve on a jury, and the right to

6  possess any kind of firearms.  Do you understand?

7          THE DEFENDANT:  Yes, Your Honor, I do.

8          THE COURT:  And knowing all of these factors, do you

9  still wish to enter this plea of guilty?

10          THE DEFENDANT:  Yes, I do.

11          THE COURT:  Sir, you do have a right to maintain

12  your innocence and plead not guilty to any offenses charged

13  against you, but when you plead guilty, you give up that

14  right.  Do you understand?

15          THE DEFENDANT:  I do understand, Your Honor, yes.

16          THE COURT:  You have a right to a trial by jury, but

17  when you plead guilty, you give up that right.  There will be

18  no trial.  Do you understand?

19          THE DEFENDANT:  Yes, I understand.

20          THE COURT:  At trial, you would be presumed innocent

21  and the government alone would have the burden of proof.

22  Mr. DeBrota would have to prove your guilt beyond a reasonable

23  doubt.  But, because you're pleading guilty, the government no

24  longer has to meet that burden.  You're admitting your guilt.

25  Do you understand that you're giving up that right?

1          THE DEFENDANT:  Yes, Your Honor, I do.

2          THE COURT:  You have a right to the assistance of

3    counsel for your defense.  You have a right to have attorneys

4    furnished free of charge if you could not afford to hire your

5    own counsel, and you maintain your right to counsel at trial

6    and every other stage of a criminal proceeding.  Do you

7    understand?

8          THE DEFENDANT:  Yes, I understand.

9          THE COURT:  Had you proceeded to trial, you would

10   have been able to exercise your right to see and hear all of

11   the witnesses against you.  They would come up to this witness

12   stand over here and Mr. DeBrota would examine them.  And then

13   your attorneys would have an opportunity to cross-examine each

14   of the witnesses in your defense.  But, because you're

15   pleading guilty, you give up that right.  Do you understand?

16         THE DEFENDANT:  I understand, Your Honor.

17         THE COURT:  Sir, you have a right to testify on your

18   own behalf, but you also are able to exercise your right to

19   remain silent; and you have a right not to testify unless you

20   voluntarily elected to do so in your own defense.  Do you

21   understand when you plead guilty, you give up that right?

22         THE DEFENDANT:  Yes, I understand, Your Honor.

23         THE COURT:  Mr. Fogle, had you and your attorneys

24   gone -- had you gone to trial and you and your attorneys made

25   the decision that you would not testify, I would admonish and

1   instruct the jury that they're not allowed to discuss that

2   fact and they could not hold that against you in any way, but

3   because you're pleading guilty, you give up that right.  Do

4   you understand?

5             THE DEFENDANT:  I understand, Your Honor.

6             THE COURT:  You have a right to compel the

7   attendance of witnesses to come in and testify or provide

8   evidence in your defense, using the Court's power of subpoena,

9   but when you plead guilty, you also give up that right.  Do

10  you understand?

11            THE DEFENDANT:  I understand, Your Honor.

12            THE COURT:  Do you understand, sir, that by entering

13  a plea of guilty, if the plea is accepted by the Court, there

14  will be no trial and you will have waived, or given up, your

15  right to trial, as well as all of the rights associated with

16  trial as I've just described them?

17            THE DEFENDANT:  Yes, Your Honor.

18            THE COURT:  Okay.  We're going to go through your

19  plea agreement.  And, Mr. Margolis, you do have a copy at the

20  lecturn?

21            MR. MARGOLIS:  We do, Your Honor.

22            THE COURT:  All right.  Okay.  Let's see.  All

23  right.  You're pleading guilty to two counts, and your plea

24  agreement is pursuant to Federal Rule of Criminal Procedure

25  11(c)(1)(B), which means this is not a binding agreement for a

1  specific term.  So the ultimate determination of your sentence

2  is left to the discretion of the Court.  Do you understand

3  that, Mr. Fogle?

4          THE DEFENDANT:  I understand, Your Honor.

5          THE COURT:  All right.  We're going to talk about

6  the elements of the two offenses that you're pleading to.  The

7  elements of Count 1, the child pornography, are as follows:

8  The government must prove the following propositions beyond a

9  reasonable doubt:  One, that you knowingly distributed or

10  received, or conspired to distribute or receive, a visual

11  depiction using any means or facility of interstate or foreign

12  commerce or in or affecting interstate commerce or foreign

13  commerce by any means, including by computer;

14          Two, the production of such visual depiction

15  involved the use of a minor engaging in sexually explicit

16  conduct;

17          Three, such visual depiction was of a minor engaged

18  in sexually explicit conduct;

19          And, four, you knew that at least one of the persons

20  in such visual depiction was a minor and knew that the visual

21  depiction was of such minor engaged in sexually explicit

22  conduct.

23          Those are the elements of Count 1, and that's what

24  the government would have to prove beyond a reasonable doubt,

25  and what you are today admitting are the elements of what you

1  did.  Do you understand that?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  With respect to Count 2, travel to

4  engage in illicit sexual conduct with minors, to sustain this

5  offense, the government must prove the following propositions

6  beyond a reasonable doubt:  One, that you traveled in

7  interstate commerce;

8          And, two, your purpose in traveling in interstate

9  commerce was to engage in a commercial sex act with a minor.

10 A commercial sex act means any sex act for which anything of

11 value is given to or received by any person.  A sexual act

12 means penetration, however slight, of the vulva or anus by the

13 penis; or contact between the mouth and the penis, vulva, or

14 anus; penetration, however slight, of the anal or genital

15 opening by another -- of another by a hand, a finger, or any

16 object with an intent to abuse, humiliate, harass, or degrade,

17 arouse, or gratify the sexual desires of any person.  Do you

18 understand the elements of Count 2?

19         THE DEFENDANT:  Yes, I do, Your Honor.

20         THE COURT:  Okay.  The general provisions of your

21 plea agreement.  You agree and understand that I will use my

22 discretion to fashion a sentence within the statutory range

23 that we talked about earlier.  That's the up to 20 years on

24 Count 1 and up to 30 years on Count 2.  In determining the

25 appropriate sentence within the statutory range, I will

1  consult and take into account the United States Sentencing

2  Guidelines in determining the appropriate sentence within the

3  statutory range.  Do you understand, Mr. Fogle, that the

4  sentencing guidelines are not mandatory or binding on the

5  Court, but that they are advisory in nature?

6          THE DEFENDANT:  Yes, I do.

7          THE COURT:  Restitution may be imposed, and by

8  pleading guilty to more than one offense, I may order the

9  sentence to be served consecutively to one another.  Do you

10  understand?

11          THE DEFENDANT:  Yes, Your Honor, I do.

12          THE COURT:  The final determination concerning the

13  applicable advisory guideline calculation, your criminal

14  history category, and the advisory sentencing guideline range,

15  will be made by the Court.  Do you understand?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  By pleading guilty, the Court may impose

18  the same punishment as if you had pled not guilty, had stood

19  trial, and been convicted by a jury.  Do you understand that,

20  Mr. Fogle?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Do you also acknowledge, because your

23  plea agreement is governed by Federal Rule of Criminal

24  Procedure 11(c)(1)(B), that the determination of your sentence

25  is within my discretion?  If I decide to impose a sentence

1 either higher or lower than any recommendation that you and

2 your attorneys make or higher or lower than any recommendation

3 that Mr. DeBrota makes on behalf of the government; if I

4 determine a different advisory sentencing guideline range

5 applies in this case; or decide to impose a sentence outside

6 of the advisory sentencing guideline range for any reason, you

7 will not be permitted to withdraw your plea of guilty for that

8 reason, and you will still be bound by your plea of guilty?

9          THE DEFENDANT:  Yes, Your Honor, I do.

10          THE COURT:  Do you recognize and understand that

11 your plea agreement is based upon information presently known

12 to the United States Attorney for the Southern District of

13 Indiana?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  Do you acknowledge and agree that

16 nothing in your plea agreement will protect you in any way

17 from prosecution for any offense not specifically covered by

18 this plea agreement, that's not known to the United States

19 Attorney for the Southern District of Indiana at this time?

20          THE DEFENDANT:  Yes, Your Honor, I do.

21          THE COURT:  Do you further acknowledge and agree

22 that nothing in your plea agreement will protect you in any

23 way from prosecution for any offense committed after the date

24 of this plea agreement?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Do you understand, Mr. Fogle, that the

2    government has the right in a prosecution for perjury or false

3    statement to use against you any statement that you give under

4    oath during your guilty plea colloquy?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Do you also understand that you do have

7    a right to plead not guilty or have already pled -- the right

8    to persist in that plea, the right to a jury trial, to be

9    represented by counsel, to confront and cross-examine the

10   witnesses, to be protected from self-incrimination, to testify

11   and present evidence and compel the attendance of witnesses?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Okay.  And you understand that by

14   pleading guilty, if I accept your plea, you have waived all of

15   your Constitutional rights?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Other than your right to appeal the

18   conviction.  You do maintain that right.

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Okay.  All right.  Sentencing -- the

21   sentencing recommendation pursuant to Federal Rule of Criminal

22   Procedure 11(c)(1)(B), your agreement states that the parties

23   have not agreed upon a specific sentence.  The parties reserve

24   the right to present evidence and arguments concerning what

25   they believe is the appropriate sentence in this matter.  Do

1  you understand?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  The government has agreed not to ask for

4  a sentence greater than 151 months of imprisonment.  Do you

5  understand?

6          THE DEFENDANT:  Yes, Your Honor, I do.

7          THE COURT:  And you and your attorneys have agreed

8  not to ask for a sentence below 60 months of imprisonment.  Do

9  you understand?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Each party may present evidence and

12  arguments concerning the length of the period of supervised

13  release to follow your term of imprisonment.  The parties

14  understand that this period of supervised release may be

15  ordered for a period of at least five years and up to the rest

16  of your life.  Do you understand that, Mr. Fogle?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Each party may present evidence and

19  arguments for a specific period of supervised release in this

20  range.  Do you understand?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  The parties also understand and agree

23  that the Court will determine which standard and special

24  conditions of supervised release apply in this case, and

25  reserve the right to present evidence and argument concerning

1    these conditions.  However, to assist the Court -- hello?

2    However, to assist the Court -- I'm sorry, I touched the

3    button.

4          However, to assist the Court, the parties have

5    carefully considered the factors listed under Title 18 United

6    States Code, Section 3553(a) and jointly recommend that the

7    Court impose the special conditions that we're about to talk

8    about.  Do you understand?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  First of all, the parties are agreeing

11   to a pornography prohibition.  During the term of your

12   supervised release, you shall not possess any obscene

13   material, child pornography, child erotica, or nude images of

14   minors.  Any such material found in your possession shall be

15   considered contraband and may be confiscated by the probation

16   officer.

17          The parties agree that possessing such material will

18   be detrimental to your ability to avoid committing child

19   pornography or related sex crimes in the future.  And the

20   parties make this recommendation based upon their knowledge of

21   your history and the criminal conduct in this case.  Do you

22   agree?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  You are also agreeing to undergo sexual

25   disorders treatment.  The defendant shall participate in a

1  program of treatment for sexual disorders, including periodic

2  polygraph examinations as directed by your probation officer.

3  The Court should authorize the release of the Presentence

4  Investigation Report and available psychological evaluations

5  to the mental health provider as approved by your probation

6  office.  Do you understand?

7          THE DEFENDANT:  Yes, I do.

8          THE COURT:  And the parties agree that such

9  treatment will be beneficial to you and help you avoid

10 committing child pornography crimes and related sex crimes in

11 the future.  The parties make this recommendation based upon

12 their knowledge of your history and the criminal conduct in

13 this case.  Do you agree?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  There will be no unsupervised meetings

16 or communication with minors.  You shall not have any

17 unsupervised meetings, nonincidental communications,

18 activities, or visits with any minor unless they have been

19 disclosed to and approved by your probation officer.  In

20 determining whether to approve such activities involving the

21 members of your family, Mr. Fogle, your probation officer will

22 determine if you have notified persons having custody of those

23 minor children about your conviction in this case and the fact

24 that you are under sex offender supervision.  Do you

25 understand?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  If this notification has been made and

3   the person having custody consents to these activities, then

4   this condition is not intended to prevent approval of the

5   activity.  And the parties agree that this condition is

6   appropriate based on your history and criminal conduct.  And

7   this condition is also intended to protect the public.  Do you

8   agree?

9          THE DEFENDANT:  Yes, Your Honor.

10          MR. MARGOLIS:  Your Honor, could I be heard on one

11   brief point?

12          THE COURT:  Yes.

13          MR. MARGOLIS:  As the Court knows, the bond -- or

14   the conditions of bond that were agreed to by the government

15   in advance and then presented to the magistrate and discussed,

16   of course, with the supervising probation officer during the

17   period of that bond, made clear that there was a distinction

18   with respect to Mr. Fogle's own natural children.  As both

19   Mr. DeVooght and I and I believe Mr. DeBrota will discuss

20   later on after the break, there is, despite some belief out

21   there, no evidence whatsoever of inappropriate behavior with

22   respect to children.  Adolescents, yes; children, no.  And

23   certainly there was and is and will be no concern whatsoever

24   about Mr. Fogle's natural children.  So ultimately, despite

25   the fact that there was some boilerplate language which kind

1  of blurs one's children with one's relatives, we think in

2  Mr. Fogle's case, it would be fair and appropriate for that

3  not to include his natural two children.

4          THE COURT:  Do you agree, Mr. DeBrota?

5          MR. DeBROTA:  We agree, certainly, that there's no

6  evidence at all that he did anything inappropriate with either

7  of his two children.  There's simply no evidence of that at

8  all.  We looked.  So I think his point is taken.

9          There are also some Constitutional questions that

10  would arise on accessing children.  As a practical matter,

11  based on even the mandatory minimum sentence, they're going to

12  be substantially older before that would really be relevant.

13  So I think the Probation Office, with language from the Court,

14  can figure out how to manage that in a safe way and also

15  consult the people with custody of those children and so forth

16  in the future.

17          THE COURT:  Okay.  So do you care, Mr. DeBrota?  Is

18  it appropriate for the Court to state that this condition does

19  not prevent contact with the defendant's biological children?

20          MR. DeBROTA:  As long as everyone involved in that

21  process would consent, as well.  I mean, there would be --

22          THE COURT:  The mother?

23          MR. DeBROTA:  Exactly, and the family members.  But

24  if they were all on board with that, and if the Probation

25  Office thought it was safe, then we would defer to that

1  judgment.

2          MR. MARGOLIS:  And that's all we seek, Your Honor.

3          THE COURT:  Okay.  That is noted for the record.

4  There's an activity restriction that you're agreeing to,

5  Mr. Fogle.  You shall not be employed in any position or

6  participate as a volunteer in any activity that involves

7  unsupervised meetings, nonincidental communications,

8  activities or visits with minors, except as disclosed to your

9  probation officer and approved by the Court.  Do you

10 understand?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  And this condition is also based on your

13 history and offending in this case and intended to protect the

14 public.  You are agreeing to the sex offender registration.

15 You shall register as a sex offender with the appropriate

16 authorities of any state in which you reside, are employed, or

17 attend school, as required by both federal and state law

18 pursuant to Title 18 United States Code, Section 3583(d), and

19 the Sex Offender Registration and Notification Act.  The

20 parties agree that this condition is appropriate based upon

21 your history and offending in this case, and the sex offender

22 registration is required by law.

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  You are consenting to the search by your

25 probation officer of your person, vehicle, office/business,

1  residence, and property, including any computer systems,

2  telephones, and Internet-enabled devices whenever your

3  probation officer has a reasonable suspicion that a violation

4  of a condition of supervision or other unlawful conduct may

5  have occurred or be underway involving you, Mr. Fogle.  Other

6  law enforcement may assist as necessary.

7          You shall submit to the seizure of any contraband

8  found by your probation officer.  You shall warn other

9  occupants of the premises that they may be subject to these

10 searches.  And the parties agree that this condition is

11 appropriate based upon your history and criminal conduct in

12 this case.  This condition is also intended to protect the

13 public and reduce the chance that you will commit future

14 crimes.  Do you understand and agree?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  You have also agreed to computer

17 monitoring at the direction of your probation officer.  You

18 agree to having installed on your computers, telephones,

19 electronic devices, and any hardware or software systems to

20 monitor your use of these items.  This monitoring will occur

21 on a random and/or regular basis.  You are to warn other

22 occupants or users of the existence of the monitoring hardware

23 or software.  Do you understand?

24         THE DEFENDANT:  Yes, Your Honor, I do.

25         THE COURT:  To promote the effectiveness of this

1  monitoring, you shall disclose in advance any use of all

2  cellular phones, electronic devices, computers, and any

3  hardware to your probation officer, and you may not access or

4  use any undisclosed equipment.  The parties agree that this

5  condition is appropriate based upon your history and criminal

6  conduct in this case.  And this condition is also intended to

7  protect the public and reduce the chance that you would commit

8  future crimes.  Do you understand and agree?

9         THE DEFENDANT:  Yes, I do, Your Honor.

10         THE COURT:  You have agreed to provide a DNA sample

11  as directed by your probation officer.  This condition is

12  required by federal law and is appropriate based upon your

13  history of offending in this case.  This condition is intended

14  to protect the public and reduce the chance that you would

15  commit future crimes.  Do you understand and agree?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  The parties understand and agree that

18  the facts and circumstances of this case, including your

19  history, show that these terms should last for the entire term

20  of your supervised release.  However, the parties understand

21  that you may petition the Court to modify these conditions, as

22  described by statute.  And the final decision to modify these

23  terms would lie with the Court.  Do you understand?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  As discussed in greater detail in the

1   law, the parties reserve the right to present evidence and

2   arguments to the Court concerning the length and conditions of

3   supervised release.  This is not intended to be inconsistent

4   with the waiver of appeal that's included in your plea

5   agreement, which includes a waiver of the right to appeal the

6   length and conditions of the period of supervised release.  Do

7   you understand?

8           THE DEFENDANT:  Yes, I do.

9           THE COURT:  Your plea agreement contains certain

10  financial conditions.  You will pay the $200 mandatory special

11  assessment fee on the date of sentencing, which is today.

12          Do you have that, lawyers?

13          THE DEFENDANT:  Yes, we do.

14          THE COURT:  Okay.  The parties reserve the right to

15  present evidence and argument concerning the amount of any

16  fine.  However, the government will not ask for a fine greater

17  than that provided by the advisory fine range provided in the

18  sentencing guidelines and determined by the Court.  Do you

19  understand?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  You -- the parties understand that

22  federal law requires restitution to the minor victims of the

23  offenses charged in Counts 1 and 2, who are the victims in the

24  relevant child pornography, or were victims of travel for

25  commercial sex with minors.  You will pay $100,000 to each

1  minor victim, Victims 1 through Minor Victim 14, for a total

2  of $1,400,000 in agreed restitution.  These funds are intended

3  to allow these victims to obtain counseling, support,

4  treatment, or other assistance related to their victimization.

5  Do you understand and agree?

6           THE DEFENDANT:  Yes, absolutely.

7           MR. MARGOLIS:  Your Honor, if I may be heard briefly

8  on that point.  Mr. Fogle has already sent to the government

9  12 $100,000 cashier's checks, each payable to a particular

10 payee.  There were some issues with respect to the

11 transmission of the last two checks, and so I leave to

12 Mr. DeBrota and the Court a way to fashion an appropriate,

13 safe method of transmitting those funds.  But we have already

14 given to Mr. DeBrota this morning the final check for $200,000

15 for those last two restitution payments.

16           MR. DeBROTA:  That's correct, Your Honor.  We have

17 that.

18           THE COURT:  Okay.  Thank you.  And we will deal with

19 that in a separate matter.

20           MR. MARGOLIS:  Yes.

21           THE COURT:  But thank you.

22           Okay.  The parties understand that the government

23 has not yet determined through its investigation whether any

24 other victims in the relevant child pornography or victims of

25 travel for commercial sex with minors can be identified or

1  will seek such restitution.  Do you understand that some

2  additional victims, if identified, may also seek restitution?

3              THE DEFENDANT:  Yes, I do, Your Honor.

4              THE COURT:  To make restitution payments, you have

5  agreed to deposit in your attorneys' client trust account the

6  full amount of restitution.

7              And, Counsel, you've indicated that the full

8  $1,400,000 has been deposited?

9              MR. MARGOLIS:  It has either been -- well, it's all

10  been transferred to the United States government.

11              THE COURT:  Okay.

12              MR. MARGOLIS:  The checks have been given to the

13  government, one check in the name of the government and 12

14  checks in the name of other parties.

15              THE COURT:  Okay.

16              MR. DeBROTA:  That's right, Your Honor.

17              THE COURT:  All right.  I was just reading the term

18  of your agreement.

19              The government agrees to consider the amount of

20  restitution paid when it makes its fine recommendation.

21  However, the government retains the right to determine what

22  effect, in any, the amount of restitution will have on its

23  recommendation.  Do you understand?

24              THE DEFENDANT:  Yes.

25              THE COURT:  And, Mr. Fogle, nothing in this plea

1  agreement prevents any identified or unidentified victim of

2  these offenses from seeking additional restitution if they

3  choose to do so and can demonstrate losses higher than the

4  amount of the agreed restitution.  However, at the present

5  time the government does not have any such victims presently

6  identified.

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  You've agreed to forfeit $50,000 to the

9  United States on the date of sentencing as a substitute for

10  the seizure of any vehicles, personal property, or other

11  assets that you used in connection with these offenses.  Do

12  you understand?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  If you're unable to pay any financial

15  component of your sentence on the date of sentencing, then you

16  agree that the payment of the financial component will be a

17  condition of your supervised release, as well as an ordered

18  payment through the Inmate Financial Responsibility Program of

19  the United States Bureau of Prisons.  You will have a

20  continuing obligation to pay the financial component of this

21  sentence, and you have agreed to provide all requested

22  financial information to the Financial Litigation Unit of the

23  United States Attorney's office for use in the collection of

24  any fines and restitution that's imposed and that you're

25  unable to pay by today's date.  Do you understand?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And I assume he's able to pay everything

3  today?

4          MR. MARGOLIS:  Yes, Your Honor.

5          THE COURT:  Okay.  All right.  The factual basis for

6  the plea of guilty.  The parties stipulate and agree that the

7  following facts establish a factual basis for your plea of

8  guilty to the offenses that you're pleading to, and the

9  government would be able to establish the following facts

10 beyond a reasonable doubt in the event this case proceeded to

11 trial:

12         Count 1.  On multiple occasions between, in or about

13 2011 and in or about April of 2015, you received visual

14 depictions of numerous minors engaging in sexually explicit

15 conduct from Russell Taylor.  You knew that the minors

16 depicted in these images or videos were under the age of 18.

17 You also knew Taylor's relationship or association with such

18 minors, including, in many instances, their actual names.  In

19 some cases, you met the minors during social events in

20 Indiana.

21         You and Taylor discussed among yourselves the fact

22 that Taylor was secretly producing sexually explicit images

23 and videos of minors in Taylor's current and former residence

24 in the Southern District of Indiana.  You chose to benefit

25 from such production by obtaining access to a significant

1    amount of such material over a time period.

2          If you had promptly reported that you knew of these

3    activities, then the sexually explicit material involving

4    later victims would not have been produced.  However,

5    Mr. Fogle, you did not obtain access to all of the material

6    Taylor produced.

7          None of the minors in the images of videos were

8    aware that they were being filmed.  Rather, the images or

9    videos were produced using multiple hidden cameras set up in

10   Mr. Taylor's residence.

11         Taylor also obtained and provided you with child

12   pornography obtained through Internet sources, which may be

13   classified as commercial material produced by other persons.

14   The unidentified victims in these images and videos were as

15   young as approximately six years of age.

16         During the investigation, the child pornography was

17   recovered during a search of Taylor's Indianapolis residence

18   where it was found in computer equipment, storage devices,

19   cameras, and other media analyzed by the Cybercrime section of

20   the Indiana State Police.

21         All of the images and videos included a lascivious

22   exhibition of the genitals or pubic area of the relevant minor

23   while some material also included other sexually explicit

24   conduct, depending upon the minor involved.

25         Your distribution and receipt of images and videos

1   was accomplished by using a means or facility of interstate or

2   foreign commerce and in or affecting interstate or foreign

3   commerce by any means, including by computer.  On one

4   occasion, you displayed the child pornography to another

5   person.

6          On multiple occasions, you obtained access to the

7   images or videos by viewing them on a computer provided by

8   Taylor.  You also received some images and videos through text

9   messages and on a thumb drive.  The visual depictions were

10  produced using camera equipment, computers, cell phones, and

11  storage media manufactured outside the state of Indiana.

12         The production of the visual depictions involved the

13  use of a minor engaging in sexually explicit conduct, and the

14  visual depictions were of a minor engaged in sexually explicit

15  conduct.  You knew that at least one of the minors in such

16  visual depiction was a minor and knew that the visual

17  depiction was of such minor engaged in sexually explicit

18  conduct.

19         Between, in or about -- with respect to Count 2,

20  between, in or about 2010 and in or about February of 2013,

21  Mr. Fogle, you traveled from Indiana to New York City in order

22  to engage in commercial sexual activity with minors under the

23  age of 18 years, including Minor Victims Number 13 and Number

24  14.  You repeatedly asked Minor Victim Number 13 and several

25  other persons to provide you with access to minors as young as

1  14 years of age for purposes of commercial sex acts with you.

2          You engaged in sexual intercourse with Minor Victim

3  Number 13 in exchange for an amount of United States

4  currency.  This occurred at the Plaza Hotel in New York City

5  on or about November 4th, 2012, when she was 17 years of age.

6          In or about January of 2013, you engaged in sexual

7  intercourse with Minor Victim 13 in exchange for an amount

8  of U.S. currency.  This also occurred at the Ritz Carlton

9  Hotel in New York City when she was then 17 years of age.

10          In an interview with the investigating agents, Minor

11  Victim 13 reported that before November 2012, you engaged in

12  commercial sex acts with her on three occasions in New York

13  City when she was approximately 16 years of age.  The meetings

14  between you and Minor Victim 13 were arranged through text

15  messages and interstate communications -- Internet

16  communications, which provided explicit details in each

17  instance.  Records of these activities were found in text

18  messages, travel records, images, and hotel records obtained

19  through the investigation, including the search of your

20  Zionsville, Indiana, residence.

21          During the investigation, Minor Victim 13

22  identified you as being the person engaging in the activities

23  during an interview by the investigation agents.  Her cellular

24  phone was also found to contain your contact information and

25  relevant communications.  She indicated that she discussed her

1  true age with you during your meetings and that you knew that

2  she was a minor.  In addition, at various times you asked her

3  to provide you with access to other underage minors for

4  purposes of commercial sexual activity.

5         In an interview with the investigating agents, Minor

6  Victim 13 stated that you also engaged in sexual intercourse

7  with Minor Victim 14 in exchange for an amount of United

8  States currency.  This also occurred at a hotel in New York

9  City when Minor Victim 14 was then approximately 16 years of

10  age.

11         During the investigation, the government obtained

12  information and audio recordings from witnesses in Florida,

13  Georgia, and Washington state, showing that you repeatedly

14  discussed with them your interest in engaging in commercial

15  sex acts with minors or stated that you had done so in the

16  past.  The recordings were produced beginning in or about 2007

17  and continued thereafter.

18         During the investigation, the government obtained

19  information from text messages and other documents in your

20  cellular phones, that you repeatedly discussed with numerous

21  prostitutes in other places, including Richmond, Virginia;

22  Kansas City, Missouri; and Las Vegas, Nevada, your interest in

23  paying them a finder's fee to provide you with access to

24  minors for commercial sex acts.  You did this only after

25  engaging in commercial sex acts with these prostitutes and

1  knowing that they were not police officers.

2         The information provided above is only a summary of

3  the government's evidence, and the government reserves the

4  right to present any additional evidence at the time of

5  sentencing.  This plea agreement is not intended to preclude

6  the presentation of such evidence.  Do you understand?

7         THE DEFENDANT:  Yes, Your Honor, I do.

8         THE COURT:  Now, Mr. Fogle, you are under oath, and

9  you've heard everything the Court just read to you about your

10 activities and what you did with respect to both Counts 1 and

11 Count 2; is that correct?

12        THE DEFENDANT:  Correct.

13        THE COURT:  Is everything that I have just stated

14 and read into the record the truth?  Are those the things that

15 you did, Mr. Fogle?

16        THE DEFENDANT:  Yes, it is the truth, Your Honor.

17        THE COURT:  All right.  We're going to continue with

18 your plea agreement.  The agreement indicates that you

19 understand that there's no limitation on the Court's

20 consideration of information concerning your background, your

21 character, and the conduct of you for the purpose of imposing

22 an appropriate sentence.  Do you understand?

23        THE DEFENDANT:  Yes, Your Honor.

24        THE COURT:  Do you also acknowledge and understand

25 that the government is not prohibited from providing

1  information concerning your background, your character, and

2  conduct for the purpose of recommending or advocating an

3  appropriate guideline calculation and sentence?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  You agree to fully comply with all

6  conditions of release imposed by the Court during all stages

7  of the case.  If you fail to fully comply with such

8  conditions, then the government may withdraw from your plea

9  agreement.  And I believe you have complied fully, and he's

10  had good behavior.  Correct?

11          MR. DeBROTA:  That's correct, Your Honor.

12          THE COURT:  Okay.

13          THE DEFENDANT:  Yes.

14          THE COURT:  Do you understand, Mr. Fogle, that the

15  obligations of the government in your plea agreement are

16  expressly contingent upon you abiding by federal and state

17  laws?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  Nothing in your plea agreement

20  supersedes or removes any provision or protection contained in

21  your proffer agreement, including the government's ability to

22  use the information derived directly or indirectly from the

23  proffer session in the event there was a breach or rejection

24  of the plea agreement.

25          THE DEFENDANT:  Yes, Your Honor.

1        THE COURT:  We're going to talk about the sentencing

2   guideline computations.  The parties reserve the right to

3   present evidence and argument concerning the appropriate

4   advisory sentencing guideline range for these offenses.  The

5   parties have discussed this computation, but have not agreed

6   upon the advisory calculation.  They agree that the Court will

7   make this determination.  Do you understand?

8        THE DEFENDANT:  Yes, Your Honor.

9        THE COURT:  To date, Mr. Fogle, you have

10  demonstrated a recognition and affirmative acceptance of

11  personal responsibility for your criminal conduct.  Based upon

12  your willingness to accept a plea agreement and enter a plea

13  of guilty to the criminal conduct noted in this agreement, the

14  government agrees that you should receive a two-level

15  reduction provided that you satisfy the criteria set forth in

16  Guideline Section 3E1.(a) -- Section 3E1.1(a) up to and

17  including the time of sentencing.  Do you understand?

18       THE DEFENDANT:  Yes, Your Honor, I do.

19       THE COURT:  You have timely notified the government

20  of your intention to enter a plea of guilty, thereby

21  permitting the government and the Court to allocate their

22  resources efficiently.  After you enter a plea of guilty, the

23  government intends to file a motion requesting that the Court

24  decrease the offense level by one additional level.  The

25  parties reserve the right to present evidence and arguments

1  concerning your acceptance of responsibility at the time of

2  sentencing.  Do you understand?

3          THE DEFENDANT:  Yes, I do.

4          THE COURT:  Your plea agreement contains a waiver of

5  the right to appeal.  You do have a statutory, as well as a

6  Constitutional, right to appeal the conviction and any

7  sentence that will be imposed, and the manner in which your

8  sentence will be determined.  However, in exchange for the

9  concessions made by the government in your plea agreement, you

10  expressly waive your right to appeal the conviction imposed in

11  this case on any ground, including the right to appeal

12  conferred by Title 18 United States Code, Section 3742.

13          You further agree that in the event I sentence you

14  to 151 months of imprisonment or any lesser term, regardless

15  of your criminal history category or how the sentence is

16  calculated by the Court, then you expressly waive your right

17  to appeal the sentence imposed in this case on any ground,

18  including the right to appeal conferred by Title 18 United

19  States Code, Section 3742.  Do you understand?

20          THE DEFENDANT:  Yes, Your Honor, I do.

21          THE COURT:  This waiver of appeal specifically

22  includes all provisions of the guilty plea and sentence

23  imposed, including the length and conditions of supervised

24  release and the amount of any fine.  Do you understand?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  You have also expressly agreed not to

2    contest or seek to modify your conviction or the sentence or

3    the manner in which either will be determined in any

4    proceeding, including but not limited to an action brought

5    under Section 3582 or Title 18 United States Code, Section

6    2255.  Do you understand?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  As it concerns your Section 3582

9    waiver -- and I know your attorneys have talked to you about

10   these statutes, 2255 and 3582.  Am I correct?

11         THE DEFENDANT:  Yes, Your Honor, they have.

12         THE COURT:  With respect to your 3582 waiver, should

13   the United States Sentencing Commission and/or Congress in the

14   future amend the sentencing guidelines to lower the guideline

15   range that pertains to your offenses and explicitly makes such

16   an amendment retroactive, the government agrees that it will

17   not assert this waiver as a bar to your filing a motion with

18   the district court pursuant to Title 18 United States Code,

19   Section 3582(c)(2).  Do you understand?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  If you file such a motion, the

22   government reserves the right to oppose the motion on any

23   other ground and reserves the right to assert this waiver as a

24   bar to an appeal from the district court's decision regarding

25   this motion.  Do you understand?

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  As it concerns your 2255 waiver, which

3   is a post-conviction relief, this waiver does not encompass

4   claims, either on direct or collateral review, that you

5   received ineffective assistance of counsel.  Do you

6   understand, Mr. Fogle?

7          THE DEFENDANT:  Yes, Your Honor, I do.

8          THE COURT:  Parties reserve the right to present

9   evidence and arguments in this -- to the Court concerning the

10  length and conditions of supervised release.  This is not

11  intended to be inconsistent with the waiver of appeal that we

12  talked about earlier, which includes a waiver of your right to

13  appeal the length and conditions of supervised release.  Do

14  you understand?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  All right.  We'll talk about the

17  Presentence Investigation Report.  You request and consent to

18  the commencement of a Presentence Investigation Report and

19  request and consent to the review of your Presentence Report

20  by a judge, your counsel, and the government at any time,

21  including prior to entry of your formal plea of guilty.  Do

22  you understand?

23         THE DEFENDANT:  Yes, Your Honor, I do.

24         THE COURT:  I'm going to notify you of the

25  immigration consequences.  Do you recognize that pleading

1  guilty may have consequences with respect to your immigration

2  status if you are not a citizen of the United States?  Are you

3  a citizen of the United States?

4          THE DEFENDANT:  Yes, Your Honor, I am.

5          THE COURT:  Okay.  Had you not been a citizen of the

6  United States, under federal law, this is one of the crimes

7  that are considered removable offenses.  And there would have

8  been a possibility that you would be removed from the United

9  States, deported, if you were not a United States citizen who

10  was convicted of this crime.  Do you understand?

11          THE DEFENDANT:  I understand.

12          THE COURT:  By signing your plea agreement, you have

13  acknowledged that you've read it, that you agree with the

14  terms and conditions, and other things that we've talked about

15  earlier.  Do you agree?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Okay.  That, sir -- those are the terms

18  and conditions of your plea agreement.  Mr. Fogle, do you have

19  any questions either for me or your attorneys about anything

20  that we've talked about in the plea agreement?

21          THE DEFENDANT:  No, Your Honor, I do not.

22          THE COURT:  Okay.  Now, Mr. DeBrota, we read a

23  factual basis in the plea agreement.  Is there anything that

24  the government needs to add to the factual basis?

25          MR. DeBROTA:  No, Your Honor.

44

 1          THE COURT:  Do you agree, Mr. DeBrota, that the

 2   factual basis that's been read into the record contains each

 3   of the essential elements of the offense that the defendant is

 4   pleading to?

 5          MR. DeBROTA:  It does.

 6          THE COURT:  Okay.  And, Mr. Fogle and counsel, is

 7   there anything that you believe needs to be added to establish

 8   a factual basis?

 9          MR. MARGOLIS:  No, Your Honor, we do not.

10          THE COURT:  The Court will find that a factual basis

11   exists for the plea of guilty.  An independent record of the

12   factual basis has been made, and that factual basis contains

13   each of the essential elements of the offense that Mr. Fogle

14   is pleading to.

15          Mr. Fogle, I'm just about done asking you questions

16   and ready to ask you, in a final and formal way, how you plead

17   to these charges.  Before I do that, any questions either for

18   me or your attorneys?

19          THE DEFENDANT:  No, Your Honor.

20          THE COURT:  In light of everything that I have

21   explained to you today, and upon advice from your attorney,

22   how do you plead to the charges, Count 1, conspiracy to

23   distribute and receive child pornography; and, Count 2,

24   traveling and attempting to travel in interstate commerce to

25   elicit sexual conduct with a minor as charged in this

1    information?

2              THE DEFENDANT:  Guilty.

3              THE COURT:  It is the finding of the Court in the

4    case the United States of America versus Jared Fogle, that

5    Mr. Fogle is fully competent and capable of entering an

6    informed plea, he is aware of the nature of the charges and

7    the consequences of the plea.  The plea of guilty is made

8    knowingly and voluntarily, that we have an independent basis

9    in fact that contains each of the essential elements of these

10   two offenses.  The plea of guilty is therefore accepted and

11   Mr. Fogle is now adjudged guilty of Count 1, conspiracy to

12   distribute and receive child pornography; and, Count 2,

13   traveling and attempting to travel in interstate commerce to

14   elicit sexual conduct with a minor.

15             And, Counsel, we've been going for about an hour.

16   My court reporter has been doing realtime stenography for me,

17   and so we're going to take a restroom and a hand break for the

18   court reporter.  We'll take about ten minutes and then we'll

19   be prepared to proceed with sentencing.

20             Is your first witness going to be the person that we

21   have to -- that will be testifying telephonically?

22             MR. MARGOLIS:  Yes, Your Honor.

23             MR. DeBROTA:  Sure.

24             THE COURT:  Okay.  So over the break, you can get

25   him -- well, maybe I'll -- do you think I should do the

1  sentencing calculations and then we can take a break?  And

2  then they can get the witness on the phone.  I think that will

3  be better.  No break yet.

4          All right.  We're going to go through the

5  calculation, go through the Presentence Report.  Has the

6  government reviewed the Presentence Report and the addendum?

7          MR. DeBROTA:  Yes, we have.

8          THE COURT:  Do you have any objections or

9  corrections to the Presentence Report and addendum?

10         MR. DeBROTA:  We do not, Your Honor.

11         THE COURT:  And, Mr. Margolis, are you going to

12  talk?  Did you have -- did you and your client review the

13  Presentence Report?

14         MR. MARGOLIS:  We did.

15         THE COURT:  Any objections or corrections to the

16  report?

17         MR. MARGOLIS:  No, Your Honor.

18         THE COURT:  Or the addendum?

19         MR. MARGOLIS:  No, Your Honor.

20         THE COURT:  I will accept the Presentence Report for

21  the record under seal.  In the event of appeal, counsel, on

22  appeal, will have access to the report, but not the

23  recommendation portion, which will remain confidential.

24         Based upon the United States Sentencing Guidelines

25  and consistent with the plea agreement, for the offense

1   charged in Count 1, conspiracy to distribute and receive child

2   pornography, the base offense level is 22.

3        I add two levels for the specific offense

4   characteristic that the images contained prepubescent minors

5   under the age of 12.  I add five levels for the specific

6   offense characteristic that the defendant engaged in a pattern

7   of activity involving the sexual abuse or exploitation of

8   minors.  Therefore, there's an increase of five levels.  I add

9   two levels for the specific offense characteristic that the

10  offense involved the use of a computer.  I add five levels for

11  the specific offense characteristic that the defendant

12  possessed over 600 images of child pornography, for a total of

13  a 14-level increase in specific offense characteristics, and

14  the adjusted offense level is 36.

15       Because Count 2 involves more than one victim, each

16  victim is treated as a separate count of conviction.

17  Therefore, there are two groups regarding Count 2.  Group two,

18  Count 2, with respect to Victim Number 13, based upon the

19  sentencing guidelines and consistent with the plea agreement,

20  for Victim Number 13, the base offense level is 24.  I add

21  two levels for the specific offense characteristic that the

22  offense involved the use of a computer or an interactive

23  computer service to entice the minor to engage in prohibited

24  sexual conduct.  I add two levels for the specific offense

25  characteristic that the offense involved a commercial sex act.

1    The adjusted offense level of group two under Count 2 is 28.

2              Group three with respect to Count 2, Victim Number

3    14, traveling and attempting to travel in interstate

4    commerce to elicit sexual conduct with a minor.  Based upon

5    the sentencing guidelines and consistent with the plea

6    agreement, for Victim Number 14 the base offense level is

7    24.  I add two levels for the specific offense characteristic

8    that the offense involved the use of a computer or an

9    interactive computer service to entice the minor to engage in

10   prohibited sexual conduct, and I add two levels for the

11   specific offense characteristic that the offense involved a

12   commercial sex act.  The adjusted offense level of group three

13   is 28.  The greater adjusted level of the three groups is

14   level 36.

15             Mr. Fogle is entitled to a two-level reduction for

16   acceptance of responsibility as he's admitted his involvement

17   and entered into a plea of guilty.  And, Mr. DeBrota, does the

18   government have a motion with respect to the additional

19   one-level reduction?

20             MR. DeBROTA:  He is entitled to that, Your Honor, by

21   timely notifying the Court of his intention to plead guilty.

22             THE COURT:  One additional level reduction is

23   awarded because the offense level is at least 16 and the

24   government's motion indicates that the defendant has assisted

25   authorities by his timely notification of his intent to plead

1  guilty, which has prevented these child victims from having to

2  testify in open court, and saved the time and resources

3  related to a trial, for a total three-level reduction.  The

4  total offense level is 33.

5          Mr. Fogle has no prior criminal convictions.

6  Therefore, he falls into criminal history category I, and that

7  produces an advisory guideline sentencing range of 135 to 160

8  months' imprisonment for Counts 1 and 2 of the information.

9          And at this time, we're going to go ahead and take

10  our break.  And when we come back, Mr. Margolis, you may

11  present any evidence and argument and witnesses.  And

12  Mr. Fogle will be allowed to make his statement of allocution,

13  which he's entitled to do.

14          So we'll take about ten, no more than 15 minutes,

15  and then we will resume.

16          MR. MARGOLIS:  Thank you, Your Honor.

17          THE COURTROOM DEPUTY:  All rise.

18          (Recess at 10:00, until 10:16.)

19          THE COURT:  We are back on the record.  And,

20  Counsel, at this time would you return to the lecturn?

21          MR. DeVOOGHT:  Yes, Your Honor.

22          THE COURT:  At this time, Counsel, you may present

23  any witnesses and evidence.  And Mr. Fogle is allowed to make

24  a statement of allocution.  How will you proceed?

25          MR. DeVOOGHT:  Yes, Your Honor, good morning.  My

1  name is Andrew DeVooght, D-E-V-O-O-G-H-T.  This morning we'll

2  have two witnesses the defense will present, Your Honor.  The

3  first will be Dr. John Bradford.  I will be asking him some

4  questions.  He's appearing telephonically this morning.

5          THE COURT:  Okay.

6          MR. DeVOOGHT:  After Mr. -- after Dr. Bradford, our

7  second witness will be Dr. Rick May.  Mr. Margolis will be

8  asking him some questions.  And then after that, Your Honor, I

9  will be covering five of the 3553 factors, which I'll

10 identify; and Mr. Margolis will then identify four of the 3553

11 factors; and then Mr. Fogle will speak.

12         THE COURT:  Okay.  Very good.

13         All right.  Dr. Bradford, are you on the telephone?

14         THE WITNESS:  Yes, I am.  Thank you.

15         THE COURT:  And, sir, would you raise your right

16 hand so that you may be sworn?

17         THE WITNESS:  I will.

18         (The witness is sworn.)

19         THE COURT:  All right.  You may put your hand down.

20         And, Counsel, you may examine your witness.

21         MR. DeVOOGHT:  Thank you, Your Honor.  And as Your

22 Honor notes, this -- we yesterday, just for the sake of

23 efficiency, submitted the CVs ahead of time for these two

24 individuals, so I will just very briefly ask him some

25 questions -- and, again, given it's telephonically -- about

1   his background just for the sake of context.

2          THE COURT:  That's fine, Counsel.

3      **JOHN M.W. BRADFORD, M.D., DEFENDANT'S WITNESS, SWORN**

4                     <u>**DIRECT EXAMINATION**</u>

5   BY MR. DeVOOGHT:

6   Q.  Good morning, Dr. Bradford.

7   A.  Good morning.

8   Q.  Dr. Bradford, can you give the Court just some description

9   of your educational background?

10  A.  Right.  I'm a physician.  I graduated in medicine at the

11  University of Capetown in South Africa.  I completed

12  psychiatry there.  I did an extra research degree.  I

13  subsequently went to the University of London and the Maudsley

14  Hospital, where I did a year as -- a specialty -- a

15  subspecialty in forensic psychiatry.

16          I then came to Canada where I completed both the

17  American Boards and the Royal College of Physicians and

18  Surgeons of Canada examinations.  And I joined the University

19  of Ottawa as a professor in psychiatry on the 23rd of

20  February, 1978, and have spent the whole of my career with

21  that university up until the present time.

22          I also have a subspecialty in forensic psychiatry

23  from the American Board of Psychiatry and Neurology, which I

24  first completed in 1999.  I've been involved in teaching and

25  research and clinical forensic work for about 35 years.

1  Q.  Great.  And can you just very briefly, then, give the

2  Court some sense of the focus of that research?

3  A.  Right.  So in 1980, I set up a sexual behaviors clinic.

4  This was related to some of the studies and work I had started

5  in London, England, and this was set up as a research clinic

6  where we had standardized evaluation of individuals who had a

7  sexual deviation, most commonly pedophilia.

8          And over the years, we've collected that

9  information, followed people who were in the database, some of

10  them for up to 20 years, doing recidivism studies.  The

11  database right now I'm not sure of the exact number, but it

12  would be between 4,000 and 5,000 people that we are currently

13  following.

14  Q.  Great.  And, Dr. Bradford, in addition to this research,

15  have you performed assessments of this nature in connection

16  with legal proceedings?

17  A.  Yes, I've done that many times.  In Canada we have

18  something called dangerous offender evaluations.  These are

19  individuals who are regarded as a high risk to the community

20  at large.  And there's a formal legal process where they could

21  be declared a dangerous offender on an application by the

22  Crown.  I've done many of those, probably over 100 of those,

23  some acting for the defense and some acting for the State or

24  the Crown.

25  Q.  In addition to that, have you done any work for

1  prosecution units or government entities in the United States?

2  A.  Yes, I have.  I've worked with the State of New York and

3  the State of Connecticut as a consultant when they were

4  considering sexually violent predator legislation.  My advice

5  to them was that they should probably increase the treatment

6  programs in prisons and have high -- a high level of

7  supervision when people were released as opposed to

8  specialized sexually violent predator programs.

9          Connecticut does not have a sexually violent

10  predator program.  New York -- when the governor was leaving

11  New York, I believe it was Governor Spitzer, he got that

12  legislation passed.  Since then, I've worked with the program

13  in New York to train the psychiatrists in that program in the

14  pharmacological treatment of sexual deviation.

15          And then, more recently, I've been working with

16  Chief Justice Tormey, who is in northern New York state, in

17  terms of the community supervision component of individuals

18  who come out of sexually violent predator programs in northern

19  New York.

20  Q.  Okay.

21  A.  I've also worked with the federal government of Canada and

22  provincial governments of Canada.  Most recently I worked with

23  the -- one of the retired Supreme Court justices of Canada,

24  the Honorable Frank Iacobucci, who was retained by the Toronto

25  police force to do a study of how the police interacts with

1  people in crisis.  That was published in June of 2014, and

2  I've been speaking about that publicly, including on Monday

3  this week.

4  Q.  Great.  Thank you.  Now, Dr. Bradford, did you have an

5  occasion to come and evaluate Jared Fogle?

6  A.  Yes, I did.

7  Q.  And can you --

8  A.  I --

9  Q.  Can you tell the Court, briefly, how you came to evaluate

10  Jared Fogle?

11  A.  Right.  Mr. Margolis and yourself had, I think, been

12  inquiring about somebody to do an evaluation, and I believe my

13  name came up related to some colleagues of mine in Chicago.

14  And you had both contacted me, and I agreed to meet with you

15  ahead of time.  And then, as a result of that, I arranged for

16  Mr. Fogle to come up and to be evaluated in the Sexual

17  Behaviors Clinic in Ottawa.

18  Q.  Great.  And we're going to talk about each specific

19  component a little more, but can you tell the Court, in the

20  first instance, generally what your evaluation of Mr. Fogle

21  consists of?

22          THE COURT:  When did you evaluate Mr. Fogle?

23          THE WITNESS:  On August the 17th of this year, 2015.

24          THE COURT:  Thank you.  I'm sorry for the

25  interruption.

1              MR. DeVOOGHT:  No.  Of course, Your Honor.

2    BY MR. DeVOOGHT:

3    Q.  And so can you just tell the Court, generally -- we'll

4    walk through the different steps, but can you tell the Court,

5    generally, what that evaluation consisted of?

6    A.  Right.  So I was provided with information related to the

7    charges that he was facing.  I was able to meet with you and

8    Mr. Margolis to go over more detail about relation to -- in

9    relation to those charges.

10             I then had the opportunity of meeting with

11   Mr. Margolis (sic) and interviewing him for probably about

12   five hours, at which point I had gone through with him about

13   his version of what occurred which leads to his current

14   charges; and also then took a history from him in relation to

15   his sexual behavior and other aspects of his development.

16             I then arranged for him to complete a sexual

17   behaviors evaluation, which really consists of three

18   components.  The first component involves blood testing of six

19   hormones.  These are the hormones within the body that are

20   responsible for sexual drive.  Secondly, he completed a number

21   of sexual questionnaires that were geared towards looking at

22   different aspects of sexual deviation.  And then, thirdly, he

23   completed -- I arranged for him to complete objective measures

24   of sexual interests.

25             And in this case, there were two that were

1   completed.  The one was visual reaction time evaluation; and

2   the second one was phallometric, or sexual arousal, testing,

3   using a penile plethysmograph.

4   Q.  Okay.  Great.  And the five-hour interview was of

5   Mr. Fogle, not of Mr. Margolis, right?

6   A.  Of Mr. Fogle, yes.

7   Q.  Right.  Okay.  And let's start with the interview and the

8   sexual history.  You mentioned, obviously, that you talked

9   with Mr. Fogle -- well, let me ask you.  When you conducted

10  the interview, did you advise Mr. Fogle about whether or not

11  the contents of the interview would remain confidential?

12  A.  Right.  I was very clear to say that it wouldn't remain

13  confidential, and that any tests that he completed or anything

14  he discussed with me could end up before the Court.  And he

15  accepted that limit of confidentiality and completed the

16  evaluation.

17  Q.  And did he, at any time during the course of your

18  interview or your questioning of his sexual history, decline

19  to answer any of your questions?

20  A.  No, he didn't.

21  Q.  Okay.  I want to talk to you for a little bit about some

22  components of that interview and sexual history.  In talking

23  about his sexual history, did Mr. Fogle talk to you about his

24  use of prostitutes and escorts?

25  A.  Yes, he did.  He gave me a fairly extensive history in the

*BRADFORD - DIRECT/DeVOOGHT*          57

1  sense of how this happened, how frequently it occurred, and, I

2  guess in his words, what kind of problem it was.  He certainly

3  engaged in sexual encounters with sex trade workers,

4  prostitutes, over a significant period of time.  And he had

5  engaged in this extensively when he was traveling while he was

6  working for the Subway Corporation.

7  Q.  And did he tell you that he had, in fact, committed -- or

8  engaged in commercial sex acts with 16 and 17-year-old

9  prostitutes?

10 A.  Yes, he did.  He said that he had engaged in those acts

11 with 16- and 17-year-olds.  And he had also attempted to

12 solicit younger prostitutes as young as 14 years of age, but

13 had never engaged in sex with them.

14 Q.  Okay.  And did he tell you -- did you talk with him about

15 individuals that he was attracted to and the ages of those

16 individuals?

17 A.  Right.  He was mostly attracted to females who were

18 teenagers.  And by "teenagers," usually our definition of that

19 is between 14 and 17 years of age.  His attraction was at the

20 high end of that age, without going into the details, but the

21 secondary sex characteristics of 17-year-olds, which obviously

22 would be much more developed and mature than, say,

23 14-year-olds.  And that was the principal focus of the sexual

24 interest in teenagers.

25 Q.  And then did Mr. Fogle also talk with you or acknowledge

1  that he had engaged in a number of extramarital affairs?

2  A.  Yes, he did.  He -- I don't remember how many there were,

3  but he had engaged in a number of them, some of which were

4  very brief one-night stand extramarital affairs; and some of

5  them were more involved or lasted for a longer period of time,

6  one of which was with a particular woman.  That lasted a

7  fairly lengthy period of time.

8  Q.  And, lastly, with respect to this discussion, did

9  Mr. Fogle talk with you or acknowledge his having viewed

10  pornography?

11  A.  Yes, he did.  He started to view pornography at college.

12  He had an extensive collection of pornography.  And then over

13  a period of time he had always viewed pornography to a certain

14  extent, and then at a certain part in his life he got exposed

15  to pornography which included child pornography.

16  Q.  Okay.  And I want to talk to you briefly now about the

17  second component of this examination, the sex assessment, the

18  sexual behavior assessment.  You gave the Court -- you

19  described the three subcomponents: blood test, sexual

20  questionnaires, and then objective measures.  Could you just

21  briefly describe for the Court the nature of the sexual

22  questionnaires?

23  A.  Well, the sexual questionnaires look at various things.

24  One particular questionnaire that he completed looks at the

25  type of sexual behavior that he admits to and compares it to a

1   sample of the general population.

2          What was important in that particular questionnaire,

3   known as the Derogatis, D-E-R-O-G-A-T-I-S, Sexual Functioning

4   Inventory, was that the sex drive component was at the 94th

5   percentile, which clearly showed evidence of hypersexuality.

6   There were also other questionnaires that related to

7   impulsivity and aggression.  These were average, or not

8   significant.

9          On the sexual activity scale and self-report of

10  sexual interest, which are again measures of sexual drive, he

11  clearly showed evidence of hypersexuality.

12  Q.  Okay.

13  A.  I also got him to complete something known as the Michigan

14  Alcohol Screening Test score, where his score was suggestive

15  of alcoholism.  A similar questionnaire related to drug abuse.

16  He doesn't abuse drugs, so that was not relevant.

17         I also got him to complete -- it's called the Bumby,

18  B-U-M-B-Y, Cognition Scale, which looks -- there are two

19  components to it.  One is related to something we call

20  cognitive distortions or rationalizations that either rapists

21  or child molesters use to justify their behavior.  And his

22  scores were below what you would expect with the controls.  So

23  he didn't have those type of cognitive distortions that you

24  would see in those individuals that have these.

25         So, for example, child molesters, many of them have

1   the cognitive distortions.  His score, for example, in that

2   scale was 45.  And the mean score for normals, or comparison

3   subjects, would be around about 60.  The score for child

4   molesters would be over 90 with a mean score of around about

5   90.  So, for example, he wasn't showing rationalizations or

6   cognitive distortions in the direction of pedophilia.

7   Q.  Okay.  And, Doctor, can you just briefly, then, with

8   respect -- and we'll come back and give you a chance to talk

9   about your conclusions to make sure we all understand we're on

10  the same page regarding those, but can you give the Court just

11  a brief description of what the objective measures were that

12  you administered and why you administered them?

13  A.  Right.  One of the -- one of the important issues when you

14  evaluate people who have sexual deviation is to go beyond what

15  self-report would give you, such as questionnaires or

16  inventory.  And there are two ways of doing this.  One is

17  something known as visual reaction time.

18          And the theory behind visual reaction time is that

19  when all of us look at something that we are drawn to or find

20  sexually exciting, we look at this longer than we would

21  compared to images that are not sexually exciting.  And the

22  fact that computers can measure this type of visual reaction

23  time, or look time, in micro seconds, it allows you to develop

24  a profile of what the person's sexual preference is.  So in

25  the case of Mr. Fogle, he completed that.

1          In addition to that, he also completed phallometric,

2   or sexual arousal, testing.  This is based on the testing that

3   we've been doing for -- since 1980.  And the sequence of that

4   testing is that it involves both visual stimulus sets.  These

5   would be slides of men and women, boys and girls of different

6   age groups.  These are just nudes.  They are not acting in --

7   they're not engaged in any type of sexual acts.

8          And then we use audiotape scenarios to look at

9   whether the person is attracted to sexual activity with young

10  girls or young boys.  So he completed both of those objective

11  tests.

12  Q.  Okay.

13  A.  And I can give you the results if you want.

14  Q.  Sure.  So why don't -- we'll talk about those in a second

15  in conclusions.  What I wanted then to understand is, there

16  was one additional set of tests that you did not administer;

17  is that right?

18  A.  Yes.

19  Q.  And can you tell the Court what those tests were and why

20  you wanted them administered, and then who you had administer

21  them?

22  A.  Right.  So one of the concerns that I had with Mr. Fogle

23  was that he had a significant eating disorder from when he was

24  a young child, and this went on until he was in university

25  until such time as he was able to lose a large amount of

1    weight.  So to put it in simple terms, it appeared that he had

2    a compulsive eating disorder.

3           Once he lost weight, it seems as though, within a

4    very short period of time, that he started to develop

5    compulsive sexuality, or hypersexuality, which is part of the

6    problem that I mentioned earlier.  So there are some brain

7    disorders that can be associated with increases in biological

8    drive, be it food or sex.  And that is looked at through

9    neuroimaging.

10          So I had arranged through you to -- for him to see a

11   colleague of mine, Dr. Robert Granacher in Kentucky, to do a

12   neuropsychiatric evaluation, which included neuroimaging, to

13   rule out any brain disorder that would or could be associated

14   with either compulsive overeating or hypersexuality.

15   Q.  And, in fact -- go ahead.  Excuse me.

16          And so did you receive the result -- did

17   Dr. Granacher, in fact, administer those tests?

18   A.  Yes, he did.

19   Q.  And did he provide you with the results of those tests?

20   A.  Yes, he did.

21   Q.  Okay.  And so now I would ask you, based on the interview

22   component that you conducted, on the sexual behavior

23   assessment component you conducted, and then the results that

24   you received from Dr. Granacher, did you formulate a diagnosis

25   regarding Mr. Fogle?

1  A.  Yes, I did.

2  Q.  And can you provide a summary of that diagnosis for the

3  Court, please?

4  A.  Right.  So Mr. Fogle had admitted that occasionally he had

5  fantasies of young females, so this would be around about 12

6  or 13 years of age, although his main interest was in teenage

7  females.  And, obviously, he was interested in adult females.

8        On the objective test of sexual interest, he did

9  show on visual reaction time an increase in his visual

10  reaction time towards prepubertal females, which is an

11  indication of pedophilia.  In addition, there was interest in

12  young females in the adolescent category, so that would be 14

13  to 17.  And there was obviously sexual interest in adult

14  females.

15        On the phallometric testing, what happened in

16  that -- and just to give you an explanation of how that works,

17  we use an index.  So, for example, any arousal towards young

18  girls would be compared to arousal towards adult females.  So,

19  for example, if somebody showed 50 percent of full erection to

20  young females and 25 percent of full erection to consenting

21  sex with adult females, if you divided 50 by 25, you would

22  have an index of two, which means that the sexual preference

23  or sexual interest that the individual has is in the direction

24  of pedophilia.

25        And in our particular laboratory, we've been able to

1  work out what level of sensitivity and specificity this would

2  give you when you looked at pedophiles versus normal controls.

3  So, to make that simple, if you took 100 pedophiles, about

4  85 percent of them would have an index greater than one.  If

5  you took 100 normal controls, about 92 of them would have an

6  index less than one.

7          In the case of Mr. Fogle, his index was less than

8  one, but on the sensitivity measure he certainly was closer --

9  although the probability was low, around about 30 percent --

10  to a population of pedophiles than he was to a completely

11  normal controlled population, where his probability was less

12  than one percent.

13          Looking at all of this and the history that I

14  received from him, I believed that he did suffer from

15  pedophilia, except that it was pedophilia which didn't involve

16  acting out behavior with a child.  So he never molested a

17  child.

18          I know that he's been extensively investigated by

19  the FBI.  He denies he had ever touched a child.  He admits

20  that he occasionally had fantasies of children.  And this

21  would then be a case of mild pedophilia, pedophilia which is

22  more measured by exposure to pornography and the objective

23  tests that I've just given you, rather than somebody who has

24  actually sexually acted out physically with a child by

25  molesting them.

1  Q.  And, Doctor, if I may, in talking with Mr. Fogle, did he

2  talk with you about conversations he had on the phone of a

3  sexual nature with a number of different individuals?

4  A.  Yes, he did.

5  Q.  And did he describe those as phone sex to you?

6  A.  Yes, he did.  He said that -- I'm summarizing, but he said

7  that he had engaged in sexual conversations with some

8  individuals, including a particular female.  And in that

9  sexual conversation either -- sex related to children came up

10 in the conversation.  His explanation of this was that he had

11 thought or believed that this would be something that the

12 person may have wanted to talk about or -- as opposed to

13 something that he actually planned to do or behavior he

14 planned to engage in.

15 Q.  Now, Doctor, at the same time, did Mr. Fogle tell you

16 whether or not, in his view, he had ever had fantasies

17 regarding prepubertal females?

18 A.  In part of my conversation, he said he occasionally had

19 done it.  When I was very specific and linked it to urges to

20 molest children, and whether he masturbated to those

21 fantasies, no.  So my assumption was there had been mild or

22 infrequent fantasies related to sex with prepubertal children,

23 much higher levels of fantasies and attraction to adolescent

24 children around about 17 years of age.

25 Q.  And let me ask you, if we were to consider those phone

1  calls, the phone sex as you described it, as in fact fantasies

2  of prepubescent children, sex acts with prepubescent children,

3  would that change your diagnosis that he has a case of mild

4  pedophilia?

5  A.  No, it would not.

6  Q.  Why not?

7  A.  Well, because, again, the background to that is that

8  there's no evidence, that I know of, that he has actually

9  engaged in sexual behavior molesting a child.  And that's the

10  hallmark or indicia of mild pedophilia.  People who might have

11  had fantasies or urges, but had never acted on it, would be --

12  and being exposed to child pornography are individuals that,

13  generally speaking, have mild pedophilia.

14  Q.  Now, Doctor, you explained that during the course of the

15  interview regarding Mr. Fogle's sexual history, that he

16  disclosed to you that he had engaged in commercial sex acts

17  with 16- and 17-year-old girls, right?

18  A.  Yes, he did.

19  Q.  Now, why doesn't that change your opinion that he has a

20  case of mild pedophilia?

21  A.  Well, 16- and 17-year-olds are not prepubertal children.

22  That's one issue.  The second issue, when we look at the

23  victims of men who engage in deviant sex, there are important

24  factors related to victimization.  He engaged in sexual acts

25  with 16- and 17-year-olds who were engaged in the sex trade.

1          Now, it's not justifying, or I'm not -- I'm not

2    saying that this -- these people were victims.  It should

3    never have happened.  But when you look at the victims in that

4    context compared to somebody who might seduce a child or act

5    against a stranger, be it an adolescent or a child, this is of

6    less concern related to risk than any of the other examples.

7    Q.  Okay.  So you've talked about a diagnosis of

8    hypersexuality and mild pedophilia.  Was there a third

9    diagnosis that you rendered based on the information either

10   that you collected or you were provided by Dr. Granacher?

11   A.  Right.  I think there's evidence of him abusing alcohol.

12   There's one biochemical test that would point towards some

13   level of alcohol dependency.  So alcohol abuse or dependency

14   is another part of his difficulty which needs to be treated or

15   dealt with.

16   Q.  Okay.  And can you explain to the Court, briefly, your

17   view on the possibility of treatment for hypersexuality first,

18   and mild pedophilia second, and what that treatment would look

19   like?

20   A.  Right.  So the treatment of hypersexuality, if I can just

21   deal with that, first of all --

22   Q.  Sure.

23   A.  -- that involves usually medication to reduce the sexual

24   drive.  And the first level of medication is something known

25   as serotonin reuptake inhibitors.  These would be medications

1  that, in layman's terms, would be similar to Prozac.

2  Serotonin levels, when they increase in the brain, reduce

3  sexual drive.  So that hypersexuality, as the first level of

4  treatment, would be treated by that type of medication or

5  that -- although the dosage would have to be beyond a certain

6  level.  So it's not simply giving the medication.  It would

7  have to be at a level where it would impact on sexual drive.

8          If that does not work, you can add a small dose of

9  what we call an antiandrogen, which is a medication that

10 reduces the testosterone in the body.  And that combination

11 would deal with probably 80 percent or higher of the cases of

12 hypersexuality.  There's also a psychological component to it

13 where the person can be treated psychologically to interrupt

14 the compulsivity of the behavior.  And the combination of both

15 the pharmacological and psychological treatment is the usual

16 approach.

17         In relation to pedophilia, you also have both

18 psychological and pharmacological treatments.  More recently,

19 the World Federation of Societies of Biological Psychiatry

20 have brought out an international algorithm for the treatment

21 of paraphilias or sexual deviation.  The first level of that

22 algorithm for treatment is psychological treatment.  And that

23 usually involves cognitive behavioral therapy, which would

24 correct some of the rationalizations or distortions.

25         Mr. Fogle doesn't have those.  I looked for them.

1   But, nonetheless, that would be dealt with in psychological

2   treatment and, again, train him to deal with any fantasies or

3   urges that he might have.  And then, again, there is a sliding

4   scale of pharmacological treatment that starts off with

5   serotonin reuptake inhibitors.  So there would be an

6   opportunity here for the treatment of mild pedophilia and

7   hypersexuality, to use the same pharmacological treatment

8   approach for both of those conditions.

9   Q.  And during the course of your career, are these both

10  treatment programs that you have either ordered to be

11  administered or overseen having been administered to patients?

12  A.  Yes.  I've been involved in the treatment of men with

13  pedophilia, and actually women with pedophilia, many times

14  using both psychological and pharmacological treatment.

15  Q.  Doctor, the last thing I want to talk to you about is, did

16  you conduct any sort of risk assessment regarding Mr. Fogle?

17  A.  I did.

18  Q.  Okay.  And can you tell the Court about that assessment?

19  A.  Right.  So one of the -- so when we consider risk in

20  relation to anybody who has engaged in deviant sexual

21  behavior, we're talking about the risk of a reoffend, so that

22  the person would commit this behavior again in the future.

23          In the case of Mr. Fogle, the fact that he has

24  offenses which involve child pornography and offenses that

25  involve prostitution, in the type of studies that we've looked

1   at, these are not offenses that carry with them a high risk

2   for future recidivism.  And, therefore, they're not in the

3   mainstream of recidivism research.

4        But, in order to try to be helpful, what I did was,

5   I assumed -- these are known as something called category B

6   offenses.  So what I did was I assumed they were category A

7   offenses, that these were the type of offenses where he may

8   have sexually acted out with a child.  Obviously, he didn't,

9   but by doing that, I was elevating the risk of recidivism.

10  And I did that and included that in my report as being an

11  artificially elevated risk based on the various tools that we

12  use.

13       And he would come out as a low or moderate risk

14  using that.  Now, obviously, because I've elevated it

15  artificially, it would be below that, but I thought that would

16  be helpful to try and come up with a measure of risk rather

17  than trying to say that -- using the usual instruments,

18  there's not a measure of risk that I could generate.

19  Q.  And, Doctor, just one clarification.  The studies that you

20  referred to, were any of the studies that you relied on

21  instances where conduct identical to Mr. Fogle's was the

22  feature of the study?

23  A.  No.  The --

24  Q.  And can you explain the difference to the Court?

25  A.  One of the problems with --

1  Q.  Can you explain the difference to the Court, please?

2  A.  Okay.  So part of the problem is that when -- and I'll try

3  and, instead of -- I'm trying to think about how to do this.

4          So that sex with minors, where clearly sex with

5  prepubertal children is clearly out of the norm.  And so when

6  men engage in sex with children, the recidivism studies have

7  all focused on that group.  It gets much more difficult when

8  there has been sex between men and teenage females.  That

9  is -- I'm not suggesting that it's normal, but it's certainly

10  more normal than what the situation is with somebody who might

11  have sex with an 11-year-old.  So there's no studies that I

12  know of that look at recidivism risk where a person has broken

13  the law by having sex with a 16- or 17-year-old young female.

14  Q.  And, Dr. Bradford, my last question is, does the lack of

15  such a specific study undermine, in your view, your risk

16  assessment of Mr. Fogle?

17  A.  No, I don't think it is, because, as I said, I've elevated

18  it artificially by doing what I did.  And regardless of risk,

19  the way of dealing with risk is with treatment, and treatment

20  reduces risk.  And, clearly, Mr. Fogle is not only prepared to

21  engage in treatment; he's already engaged in treatment.  He's

22  prepared to engage in pharmacological treatment.  And risk

23  evaluation is always offset by treatment and rehabilitation,

24  which he's prepared to engage in, and has engaged in.

25          MR. DeVOOGHT:  Your Honor, may I have just one

1  moment?

2          THE COURT:  You may.

3          MR. DeVOOGHT:  Thank you, Dr. Bradford.  I have no

4  further questions.

5          THE WITNESS:  Thank you.

6          MR. DeVOOGHT:  You may receive questions now from

7  the prosecution.

8          THE COURT:  And, Mr. DeBrota, you may cross-examine.

9          MR. DeBROTA:  Thank you, Your Honor.

10                    **CROSS-EXAMINATION**

11  BY MR. DeBROTA:

12  Q.  Can you hear me, Dr. Bradford?

13  A.  Yes, I can.  Thank you very much.

14  Q.  So in describing his pedophilia, you used the term "weak

15  pedophilia."  Is that term found in the DSM manual?

16  A.  No, it's not.

17  Q.  Okay.  So that's a term you had come up with to provide

18  scaling to the word "pedophilia"?

19  A.  Right.  So it's a descriptive term as opposed to a

20  diagnostic term.

21  Q.  Okay.  But it's not one that's generally accepted by

22  experts in your field at this point; they just have

23  pedophilia, yes or no?

24  A.  Yes.  Correct.

25  Q.  Okay.  Now, with regard to a diagnosis of pedophilia, is

1  it the case that a lot of people with that problem will

2  rationalize that their behavior is okay, is acceptable, maybe

3  even beneficial?

4  A.  Yes.

5  Q.  And part of that is what you would call a cognitive

6  disorder?

7  A.  A cognitive distortion, correct.

8  Q.  Distortion.  And you're saying that in your five hours of

9  interview with Mr. Fogle, he didn't demonstrate any of those?

10  A.  He -- what he did was, was he had sort of justified the

11  fact that when he did engage with sex with a 16- and

12  17-year-old -- these are not his words, these are my words --

13  the fact that they were sex trade workers made it -- again, my

14  words -- more acceptable than it would have been in any other

15  way.  That, to a certain extent, is a rationalization or a

16  distortion.

17  Q.  Okay.  But that would be a distortion relating to

18  teenagers; am I correct?

19  A.  Yes.

20  Q.  Okay.  Let's turn back to the question about distortions

21  relating to little kids, preteen kids.  Did he demonstrate any

22  of those cognitive distortions?

23  A.  No, he didn't; and he didn't in the questionnaire that

24  looks specifically at it either.

25  Q.  Okay.  So if you look at what his sexual attractions are,

1  you're saying he doesn't have any distorted -- any distortion

2  in how he views little kids, and no special reasons why he

3  might engage in fantasies involving little kids?

4  A.  Correct.

5  Q.  Okay.  So now in terms of when you did objective testing,

6  though, didn't your objective test results, the visual

7  stimulus tests, show he was more attracted to little kids than

8  teenagers?

9  A.  Correct.

10 Q.  Okay.  So that's inconsistent with that, what he's telling

11 you, isn't it?

12 A.  Right.  I guess the context of it would be that there are

13 individuals who clearly have sexual attractions to prepubertal

14 children.  And I always give the example of Lewis Carroll, who

15 wrote Alice in Wonderland, who clearly had this attraction.

16 He would go to camera or photographic clubs and he would

17 collect large numbers of images of prepubertal or peripubertal

18 children, but there was never any evidence that he sexually

19 acted out against them.

20         So they're clearly within the general population.

21 There are men who clearly have an interest or an attraction in

22 that way, but they may never have acted it out.  And from

23 everything that I have been able to look at, it seems as

24 though that that's the category that Mr. Fogle comes into.

25 Q.  Okay.  Are you aware of what he's accused of doing with

1  his co-conspirator, Russell Taylor?

2  A.  Yes, I am.

3  Q.  And what he was doing was, he was getting Zeroday produced

4  child pornography from Mr. Taylor involving about at least

5  eight victims.  Are you aware of that?

6  A.  Yes, I'm aware of that.

7  Q.  Do you know what ages those victims were at the time that

8  material was produced?

9  A.  I don't have it in front of me, but some of them were

10 quite young, I think 11 or 12 and onwards.

11 Q.  Okay.  So if he's getting that material, is that in the

12 category of material consistent with your diagnosis of weak

13 pedophilia or inconsistent with it?

14 A.  That's consistent with it.

15 Q.  Okay.  Now, in terms of the commercial material he

16 received, he had material down to age six.  Would the receipt

17 of that material be consistent or inconsistent with your

18 diagnosis of weak pedophilia?

19 A.  It's consistent with pedophilia.

20 Q.  Okay.  Is it fair to say, based on a lot of work, for

21 example, FBI profilers have done, like Kenneth Lanning, that

22 what a person collects and values, what they would want to

23 look at, is an objective measure of their true interest in

24 activities?

25 A.  Yes, it is.

*BRADFORD - CROSS/DeBROTA*          76

1   Q.  Okay.  What did you do to determine what he collected and

2   valued?

3   A.  I had reports of what the -- what I'm familiar with child

4   pornography is, having obviously worked in cases like that, so

5   I don't think there was any doubt that he had been exposed and

6   had been given child pornography.  And, again, this would fit

7   in with what I was able to see in the objective testing.

8   Q.  Did he indicate to you that he had received, for example,

9   a thumb drive of material that contained a wide range of

10  pornographic material from Russell Taylor?

11  A.  Yes, he did.

12  Q.  And that he looked at that on at least three occasions?

13  A.  Yes, he did.

14  Q.  And that included the material involving down to age six,

15  didn't it?

16  A.  Yes, it did.

17  Q.  And when he was looking at it, he was masturbating, wasn't

18  he?

19  A.  I'm not sure that he admitted to me that he was

20  masturbating, but he certainly looked at the material.

21  Q.  Okay.  You made reference to what you called phone sex, I

22  believe, in his communication with an adult female in another

23  state.  Can we go to that topic?

24  A.  Yes.

25  Q.  If that's phone sex, wouldn't there be a sexual component

*BRADFORD – CROSS/DeBROTA*          77

1  to it?

2  A.  I guess there could be, for sure.

3  Q.  Did you ask whether there was?

4  A.  I did.  I asked him whether that -- sorry.  Excuse me.

5           I asked him whether, again, in some of that

6  conversation there was discussion about actually having sex

7  with minors, with pre or peripubertal children.  He said that

8  wasn't his intention, that's something he would never do, and

9  that he talked about it because this was of some erotic value.

10 He -- whether -- in part, that might have been to the person

11 he was speaking to, or at least he thought that.

12           And he admitted to me that on occasions, he's had

13 some sexual fantasies related to pre or peripubertal children.

14 And for clarification, that would be 12 years of age or less,

15 or between 12 and 14.

16 Q.  Okay.  Well, let me make sure I can clarify that.  In the

17 report you wrote, on page 4, you include this sentence:

18 "Mr. Fogle clearly maintains that he has never had the urge or

19 fantasy to engage in sex with prepubertal females."  Did you

20 write that in your report?

21 A.  Yes, I did.

22 Q.  Okay.  And wouldn't phone sex involving sex with a

23 nine-year-old boy, or young girls seven and nine, be examples

24 of fantasies to engage in sex with prepubertal females?

25 A.  Yes, it could.  And when I was asking him in that way, I

1   was asking him in a very structured way as part of my general

2   interview.  He said he did have occasional fantasies of sex

3   with children.

4   Q.  Okay.  And that's part of why you say he's a weak

5   pedophilia?

6   A.  Well, the main issue about that is that -- not that he

7   doesn't have an interest in children, but there's no evidence

8   that I know of, and I don't think anybody else knows of, him

9   actually having laid a hand on or molested a child in a

10  physical way.

11  Q.  Okay.  So with regard to that, though, he's in a

12  conspiracy with someone that's producing child pornography

13  involving, it turns out, 12 kids; isn't that the case?

14  A.  Yes.

15  Q.  And he knew who some of those kids were, didn't he?

16  A.  Yes.

17  Q.  And he could have easily prevented that from occurring

18  unless he wanted to benefit by getting some of the results;

19  isn't that the case?

20  A.  Yes, I agree.

21  Q.  So how is he not then involved in the sexual abuse of

22  those children?

23  A.  I'm sorry.  I mean, yeah, he -- not directly, but by not

24  stopping the -- what was occurring.  But I was saying that I

25  have no evidence that he's actually, he, himself, has ever

1  touched a child or molested a child physically.

2  Q.  Okay.  In terms of your work in child pornography cases,

3  wouldn't it be fair to say that most of the time, the child

4  pornography collector has never met the child or would know

5  the offender?

6  A.  Yes, that's true.

7  Q.  So a distinguishing characteristic of this case is the

8  close nexus between Mr. Taylor and Mr. Fogle?

9  A.  Yes, that is a difference.

10  Q.  And in that they've conspired with each other together,

11  aren't they fueling each other's fantasies to engage in that

12  behavior?

13  A.  I don't know anything about Mr. Taylor, but certainly

14  that's possible.

15  Q.  They're going to be discussing, for example, what's in the

16  material?

17  A.  Yes, they could.

18  Q.  Okay.  Now, isn't that going to increase the likelihood

19  that either of them would offend based on what you've studied

20  throughout your career?

21  A.  It could.  Generally speaking, though, people who only

22  engaged in child pornography are at a lower risk for

23  reoffending than people who actually touch or engage in

24  physical contact with a child.  That's the general research

25  finding.

1  Q.  But that doesn't address the question of what happens when

2  we have one offender conspiring with another, and that other

3  person is producing material.  Those studies aren't addressing

4  that reality, are they?

5  A.  Right.  They don't address that reality, you're quite

6  correct.

7  Q.  Okay.  So if there's a category of pedophilia called "weak

8  pedophilia," as you've come up with, your belief is that since

9  Mr. Fogle is not a hands-on offender, it doesn't matter that

10  Russell Taylor is producing child pornography involving 12

11  children?

12  A.  Right.  I'm focusing on the sexual interests or preference

13  of Mr. Fogle.

14  Q.  Okay.  But isn't he also discussing and networking with

15  Mr. Taylor about Mr. Taylor's issues in that regard?

16  A.  Yes, he could be.

17  Q.  And Mr. Taylor gave him child pornography involving

18  six-year-old girls, a lot of it?

19  A.  Yes.

20  Q.  Okay.  Now, with regard to that, if we take Mr. Taylor out

21  of the equation, are you aware that Mr. Fogle, in a sexual

22  encounter with an adult woman, showed her child pornography

23  from Mr. Taylor?

24  A.  Yes, I'm aware of that.

25  Q.  Wouldn't that be an example of fueling sexual fantasies

1  directed at little kids in that instance?

2  A.  Yes, it could be.

3  Q.  And isn't that relevant behavior?

4  A.  Yes, it can be.

5  Q.  Now, in part of your work, you looked at risk factors in

6  his childhood; is that right?

7  A.  Yes.

8  Q.  And was there anything there indicating any elevated risk

9  at all for this behavior?

10  A.  No.

11  Q.  With regard to your diagnosis of hypersexuality, would

12  that affect his impulse control?

13  A.  Yes, it does.

14  Q.  And --

15  A.  And I think there's only one study that's looked at

16  hypersexuality and sexual offense recidivism.  And

17  hypersexuality, just so we're clear on the definition, is that

18  a person's sex drive is higher than what would be expected in

19  the general population.  Individuals with this type of

20  condition are preoccupied with things like prostitution,

21  pornography; not necessarily child pornography, but it could

22  be if there was a sexual interest in children.  And they spend

23  a considerable part of their day thinking about sex to the

24  point that it becomes dysfunctional to a degree.

25           In the case of Mr. Fogle, just on absolute measures,

*BRADFORD - CROSS/DeBROTA*          82

1  he's above -- he's at the 94th percentile of sex drive for men

2  of his age, which is obviously high.  The other issue is that

3  if there's any element of hypersexuality, the risk of

4  recidivism would be elevated to a degree.  Probably the

5  highest it would be elevated would be maybe by 25 percent.

6          So, for example, if there was a risk of ten percent,

7  this would be for individuals who were not hypersexual, but if

8  there was an individual -- if there was an individual who had

9  hypersexuality, the risk could be higher, so it would not be

10  ten percent anymore.  It would be 12 and a half percent, but

11  at least a 25 percent increase in the level of risk.

12  Q.  In terms of pulling that apart a little bit, is it the

13  case that some of the factors working against Mr. Fogle is he

14  has low impulse control?

15  A.  Yes.

16  Q.  And, indeed, the work from the doctor in Kentucky,

17  Dr. Granacher, you cite in your report, indicates alcohol use

18  disorder, hypersexuality, dysfunction in his frontal brain for

19  executive intentional emotional modulation and decisional

20  domains.  That's all fairly significant, isn't it?

21  A.  Right.  All of that -- you're quite correct.  All of that

22  can go towards impulsivity or difficulty controlling impulses.

23  Q.  Okay.  And we also know that he's engaged in illegal

24  sexual activity, if we take a broader sweep and include

25  adults, on hundreds of occasions, hasn't he?

1   A.  Yes.

2   Q.  Okay.  I think you said in your report he estimated

3   spending about $12,000 a year on prostitutes?

4   A.  Yeah.  That was the minimum amount.

5   Q.  The minimum amount, okay.  Now, of those, we know that on

6   at least six occasions, according to the evidence, five with

7   Minor Victim 13, one with Minor Victim 14, that would be

8   with a prostituted minor; is that right?

9   A.  Yes.

10  Q.  Now, you've used "sex workers" a few times.  You do

11  appreciate we don't refer to minors in the U.S. under 18 as

12  "sex workers"?  We don't use that term.

13  A.  Right.  I understand that.  I was using it more as a

14  description of somebody who engages in the sex trade for

15  commercial benefit.

16  Q.  Now, in addition to that activity, he did outreach to

17  other adult prostitutes and asked if they had underage friends

18  down to age 14; is that right?

19  A.  Yes, he did.

20  Q.  And in the course of that, are you saying the reason he's

21  doing that is because he's attracted to the secondary sexual

22  characteristics of those victims or is it that they're young?

23  A.  Right.  When I spoke to him about it, he -- yeah, he

24  reinforced that he's principally attracted to 17-year-olds.

25  And, in part, he didn't have a complete explanation about why

1  he was seeking that out, but he felt that it was more at times

2  that he pushes the envelope.  In other words, he's either

3  impulsive or does things that would be different, and that was

4  his explanation.  The alternative explanation is that he does

5  have some level or element of pedophilia.

6  Q.  Okay.  But in terms of the encounters he was trying to

7  arrange on those occasions, wasn't he trying to arrange the

8  type of encounters he actually had?

9  A.  Yes.

10  Q.  As well as ones where the victim would be even younger,

11  down to 14?

12  A.  Correct.

13  Q.  Are you aware that there's at least one set of text

14  messages where he made clear that he was more interested in

15  the youth aspect than he was in the secondary sexual

16  characteristics you're talking about?

17  A.  I was not aware of that, but if it did, it would fit in

18  with a pedophilic interest more than an interest in adolescent

19  females.

20  Q.  At the end of the day, the crimes when we talk about

21  recidivism studies that we're talking about here, contact

22  offenses, child pornography offenses, child sex trafficking,

23  are very hard to detect, aren't they?

24  A.  Yes.

25  Q.  Particularly child sex trafficking?

1  A.  Yes.

2  Q.  Okay.  And contact offenses are chronically underreported,

3  aren't they?

4  A.  Yes.

5  Q.  Mr. Fogle's case, I think you would agree with me, is an

6  example of hard-to-detect behavior, but that still went on for

7  a longstanding and persistent period of time?

8  A.  Yes.

9  Q.  Okay.  So the recidivism studies that you and others have

10  worked on diligently will always have the flaw that these are

11  difficult-to-detect crimes, so the numbers will always be

12  lower than they probably really are; is that fair?

13  A.  The numbers would be higher than they would normally, not

14  lower.

15  Q.  Okay.

16  A.  But --

17  Q.  The rate of recidivism is really higher than the reports

18  suggest?

19  A.  Right.  All recidivism studies, though, we compensate in

20  doing it by including charges, not convictions, as part of the

21  calculation.  That's the sort of standard criminological

22  research that we do.  But you're right, even taking that into

23  account, it could still be lower than what's actually

24  happening in society.

25  Q.  And with regard to his two sets of charges, a great deal

1  more is known about child pornography possessors than is known

2  about people who use prostituted minors; is that correct?

3  A.  Absolutely, yes.

4  Q.  And with regard to the studies, finally, that you're

5  citing, these are studies about collectors of child

6  pornography, are they not?

7  A.  Yes.

8  Q.  They're not studies about people who conspire with the

9  producer to get the collected material?

10  A.  No.  That's right.

11         MR. DeBROTA:  Okay.  I have no further questions,

12  Your Honor.

13         THE COURT:  Have you done any studies, Doctor, with

14  people who conspire with the producer to obtain the collected

15  materials?

16         THE WITNESS:  No.  I personally haven't; and I don't

17  think anybody has, to be honest, Your Honor.

18         THE COURT:  That's a rare thing that happens, isn't

19  it?

20         THE WITNESS:  I beg your pardon?

21         THE COURT:  Is that a rare incident?  I've never

22  heard of it before.

23         THE WITNESS:  I'm not sure that it's rare in the

24  context, though.  I think that there are people who are

25  producers of child pornography.  And if I can just simplify it

1   and say that there are people who are consumers of child

2   pornography.  But I think that the question really related to,

3   are there some persons who may not be producing it but may be

4   working closely with the persons that are producing it, the

5   answer is, yes, that does happen.  Are there any studies

6   specifically of those individuals?  And my answer is not that

7   I know of.

8              THE COURT:  Okay.  Thank you.

9              MR. DeBROTA:  Thank you, Your Honor.

10             THE COURT:  Any redirect?

11             MR. DeVOOGHT:  No, Your Honor.

12             THE COURT:  Thank you very much, Dr. Bradford.

13   We're going to hang up now.

14             THE WITNESS:  Thank you very much.

15             THE COURT:  Bye-bye.

16             THE WITNESS:  Bye-bye.

17             (Witness excused.)

18             THE COURT:  You may call your next witness.  Who

19   will that be?

20             MR. MARGOLIS:  Your Honor, we call Dr. Rick May.

21             THE COURT:  Dr. May, if you would come right up here

22   to the witness stand.  Right around here.  And if you would

23   remain standing and raise your right hand.

24             (The witness is sworn.)

25             THE COURT:  You may have a seat.

1          Mr. Margolis, as soon as your witness is

2     comfortable, you may begin your examination.

3          MR. MARGOLIS:  Thank you, Your Honor.

4          THE WITNESS:  I think I'm good.

5     **RICK L. MAY, Psy.D., DEFENDANT'S WITNESS, SWORN**

6              **<u>DIRECT EXAMINATION</u>**

7     BY MR. MARGOLIS:

8     Q.  Doctor, would you please state your name for the record

9     and spell your last name for our court reporter?

10    A.  Dr. Rick May, M-A-Y.

11    Q.  And, Doctor, where do you do your professional work?

12    A.  I practice in Colorado.

13    Q.  And the name of the entity with which you practice?

14    A.  My clinic is called Treatment and Evaluation Services.

15    Q.  Dr. May, could you briefly describe your educational

16    background for the Court?

17    A.  I have an undergraduate degree in psychology and

18    sociology, a master's degree in psychology, and a doctorate in

19    psychology.

20    Q.  And, Doctor, as you were amassing those degrees, were

21    there various entrees into the working world between the

22    earning of some of those degrees?

23    A.  After my master's degree, I worked for the 18th Judicial

24    District in Colorado, in a diversion program where we were

25    trying to help adolescents stay out of the adjudication

1   process and give them a treatment alternative.

2   Q.  Between your undergraduate work and your Ph.D., did you do

3   any work with respect to the District Attorney's office?

4   A.  That's when I worked --

5   Q.  That's the referral --

6   A.  -- with the DA's office, yes.

7   Q.  Okay.  Thanks.  And after you earned your Ph.D., did you

8   do work with the Denver Police Department?

9   A.  As my doctoral internship, I was a police psychologist for

10  a year with the Denver Police Department.

11  Q.  Have you had other involvement with policing, prosecuting,

12  or other government agencies?

13  A.  I continued to do pre-hire psychological evaluations for

14  police departments in the area.  I'm currently a member of the

15  Colorado Sex Offender Management Board, which is a board

16  created by the Colorado legislature to write standards and

17  oversee the treatment and containment of sex offenders in the

18  state.

19  Q.  Do you do any work with respect to the judges of your

20  state?

21  A.  We have judges that are part of the Sex Offender

22  Management Board.  I also do trainings, and we periodically

23  will train groups of judges or prosecutors, defense attorneys,

24  in the area of sex offending.

25  Q.  The title of your entity is Treatment and Evaluation

1  Services, correct?

2  A.  Correct.

3  Q.  With respect to the evaluation piece of that, could you

4  explain to the Court what is the extent and range of the

5  evaluation services that you conduct?

6  A.  We do evaluations very similar to Dr. Bradford.  I have a

7  staff of five or six, it depends on the day, psychologists who

8  work with me to do evaluations.  We're also a training site

9  for the American Psychological Association for Forensic

10  Practice, and so we have doctoral students who train with us

11  and work on those evaluations with psychologists on staff.

12  Q.  Could you estimate, sir, how many evaluations you do on a

13  monthly basis?

14  A.  We do approximately 50 a month.

15  Q.  What are the entities for whom you conduct these

16  evaluations?

17  A.  We do these for the district attorneys through the

18  five-county and the Front Range area in Colorado.  We do them

19  for probation departments, federal and state probation.  We

20  also do them for private counsel, human services.  And then we

21  also do fitness-for-duty evaluations for major corporations,

22  where there's been a crossing of sexual boundaries by an

23  employee.  We'll do a fitness-for-duty evaluation.

24  Q.  Dr. May, do you know Jared Fogle?

25  A.  I do.

1  Q.  And do you see him sitting here in court right across from

2  you?

3  A.  Yes.

4  Q.  Dr. May, in what capacity, in what way, did you meet Jared

5  Fogle?

6  A.  I worked with Jared in my office over a month's period

7  doing psychotherapy around the issues that have been discussed

8  earlier this morning.

9  Q.  Could you explain how it came to pass that you began to

10 treat Jared Fogle?

11 A.  I got a call from you, actually, asking about the type of

12 treatment that we offered and what type of treatment could be

13 available given the timeframe that we were working with.

14 Q.  Could you -- I'm sorry.

15 A.  No.  I'm sorry.

16 Q.  Fine.  Could you please describe for the Court, Dr. May,

17 the manner of treatment program that you designed for

18 Mr. Fogle?

19 A.  The treatment generally in our program lasts anywhere from

20 two years to ten years, depending on the needs of the

21 individual.  In this case, we knew that we had a very short

22 time before this sentencing, and looked at what treatment

23 possibilities there could be for him.

24       The goal was to build a foundation for him to

25 continue to work on as he progresses through the system.  So

*MAY - DIRECT/MARGOLIS*                    92

1   we developed a program where Jared was in the office for

2   approximately 100 hours over a four-week period.  We met for

3   five hours a day and went through our usual treatment protocol

4   with him.

5   Q.  Under normal treatment circumstances, how long would it

6   take for you and the person receiving treatment to go through

7   the paperwork and the scenarios that you packed into those

8   four weeks?

9   A.  It usually would be at least a couple of years.

10  Q.  Dr. May, are there various sorts of principles of

11  treatment foundation that you employ and utilize in your

12  treating work?

13  A.  Well, there are several things we do.  Some of those are

14  clinically based and some of those are legislatively mandated

15  as a provider in my state.  But, basically, we look at things

16  like initially assessing the treatability of the individual in

17  the office.  We look at their possible destructive nature as

18  in suicide potential.  And we look at -- we do a lot of work

19  with victim issues and victim empathy-type work.  We look at

20  foundations of their offending behavior.  We look at ways of

21  learning to manage their sexual behaviors, because individuals

22  are usually in the office for a lack of management, effective

23  management, of their sexuality.

24  Q.  Briefly, with respect to the question of a suicide

25  evaluation, how much focus is there, and how frequently do you

1  attempt to look at that eventuality?

2  A.   It depends on what the individual is facing.  I mean, it's

3  something we address initially with every client the first day

4  they walk in the door.  And we keep it as an open topic,

5  usually in every therapeutic session.

6  Q.   Let me ask you a couple questions, if I could, Dr. May,

7  with respect to some of these particular foundational elements

8  and your work with Jared Fogle in particular.  With respect to

9  acceptance of responsibility, could you briefly describe for

10  the Court how you focused on that foundational element and

11  what you learned from Mr. Fogle?

12  A.   Well, one of the things we do is have an individual

13  complete a sexual history.  They write -- basically write out,

14  from their very first sexual memory up to the present day, all

15  sexual experiences that they have had.  So with that, you

16  know, we're looking to assess just the extent of the problem,

17  the extent of their healthy sexual learning, as well as the

18  deviant part of that.

19  Q.   And specifically with respect to acceptance of

20  responsibility, explain how you focused on that foundational

21  element in the context of his sexual history.

22  A.   In looking at the sexual history, one of the things we

23  look for is, does the person acknowledge the behavior that has

24  been alleged?  Do they blame someone else for it, or do they

25  take responsibility for it themselves?  So that's what we're

1  looking for.

2  Q.  Do issues of minimization and denial factor into this

3  analysis?

4  A.  Yes, that's definitely part of it.

5  Q.  And what were your observations on those terms?

6  A.  Mr. Fogle came in the door the first day admitting to the

7  behaviors that have been stated here this morning, so we had

8  kind of a head start on the treatment, in my view, because he

9  was taking responsibility for the behavior.

10 Q.  You mentioned victim empathy.  Could you please describe

11 what that means?

12 A.  Well, what we're looking for is that an individual

13 understands the impact that their behavior has had on their

14 primary and secondary victims.  So one of the areas that we

15 focused on throughout his treatment with me was for Mr. Fogle

16 to have a good understanding of basically the damage that his

17 behaviors did.

18 Q.  Did you focus in your treatment session specifically with

19 respect to the damage done and his reaction to it regarding

20 the children in Russell Taylor's home?

21 A.  Yes.

22 Q.  And what were your observations there, sir?

23 A.  He had, in my view, a much better understanding of -- or,

24 yeah, a much better understanding of the potential damage done

25 to someone that young, who was, you know, beyond any control

1  of their own, brought into a sexual situation.  He had

2  probably less understanding of the damage done to adults

3  through all the prostitution involvement.  So we worked on

4  both of those areas.

5  Q.  This description is, by way of pegging it in time, at the

6  inception of Mr. Fogle's treatment with you?

7  A.  At the beginning, yes.

8  Q.  And could you capsulize for the Court, first with respect

9  to the children in Russell Taylor's home, as he entered

10  treatment, what was his level of victim empathy with respect

11  to those children?

12  A.  He was very ashamed.  He was very remorseful and really

13  seemed to have an understanding right away that -- how

14  damaging that kind of behavior could be to children.

15  Q.  And with respect to the less immediate complete

16  understanding you described with respect to the persons with

17  whom he engaged in commercial sex, could you explain to the

18  Court how that level of empathy and awareness unfolded over

19  time?

20  A.  Yeah.  Initially he was justifying a lot of that behavior

21  based on it being a commercial transaction.  There wasn't a

22  lot of empathy or understanding of these women as individuals,

23  about the potential damage in their lives that would bring

24  them to this type of situation, again seeing it more as he

25  paid for a service.  And so that was an area that we needed to

1  work on throughout the treatment.

2  Q.  And how did his awareness evolve over the course of that

3  month on that subject?

4  A.  He was able to verbalize much more effectively towards the

5  end an understanding that these weren't individuals who one

6  day woke up and said, "Should I go to graduate school or

7  should I be a prostitute?"  I mean, he really seemed to have

8  an understanding of what kind of damaged individuals a lot of

9  these women were, and that he took advantage of that.

10 Q.  In particular, did he, towards -- as his treatment

11 continued, did he demonstrate an awareness of the sociological

12 and economic factors that led children to become engaged in

13 this kind of commercial activity?

14 A.  Yes.

15 Q.  And what sort of things, that he expressed to you, did he

16 realize were involved in their coming to this activity?

17 A.  Well, again, with the underage individuals, he seemed to

18 really develop an understanding of, again, the type of damage,

19 potential damage, that these individuals had in order for them

20 to be engaged in this kind of situation, that they were

21 potentially abuse victims themselves or from, you know,

22 unstable environments, a lot of factors that we look at that

23 would bring somebody to that situation.

24 Q.  Did he have an understanding, in your view, an

25 understanding of -- did he develop an understanding of his

1   involvement and role in the actual victimization of these

2   children?

3   A.  Yes.  Yes.

4   Q.  Doctor, what is your prognosis as to the future of

5   Mr. Fogle, having spent this intensive four weeks with him at

6   your facility?

7   A.  I wish we would have had more time, okay?  I think he has

8   a lot of additional work that he can do therapeutically.  As I

9   heard that it's part of the court order, I was very pleased

10  with that, because I think that is a very necessary part of

11  him growing in the future and being able to be offense-free.

12  Q.  Doctor, could you please explain to the Court what kind of

13  personal motivation and characteristics are necessary for a

14  person in Mr. Fogle's situation to bring to the treatment

15  scenario that you undertook with him?

16  A.  Going through that level of intense therapy is absolutely

17  no fun.  It's emotionally -- emotionally very difficult.  It's

18  physically very difficult.  And so someone has to be very

19  motivated to go through the therapy and to benefit from it.

20          And he came in with a very good attitude, a

21  willingness to go through, you know, any of the therapeutic

22  exercises that I required, to talk about all of the issues

23  that we talked about, and to really delve into them with as

24  much depth as we could given the time constraint.

25  Q.  At any time, did you find him to be deceptive or unwilling

1  to answer your questions and engage fully?

2  A.  No, not at all.

3  Q.  Did he ever show any kind of hesitancy or minimization of

4  his desire to work with you fully to get well?

5  A.  No.  He was very cooperative the whole time.

6  Q.  Dr. May, you do your work not far from the Bureau of

7  Prisons facility at Littleton/Englewood, Colorado.  Do you

8  know if they have a sex offender treatment program there?

9  A.  My understanding is they do.

10  Q.  Do you know whether or not there are any similarities

11  between that sort of custodial program and the sort of program

12  that you engage in on an outpatient basis?

13  A.  Again, my understanding is based on one of my favorite

14  staff members getting a better offer from the Bureau of

15  Prisons and leaving me after ten years.  But I'm not bitter,

16  not at all.  But so we've talked in-depth about the types of

17  programs they have there.  And, conceptually, they are very

18  similar.  They go through a lot of the same concepts, the same

19  cognitive behavioral approach to therapy.

20  Q.  Can you briefly describe for the judge sort of the

21  differences, if there are any, between inpatient treatment at

22  a place like Littleton and outpatient treatment at a facility

23  like TES?

24  A.  The major difference is that clients in our program get

25  real-life everyday experience in managing their impulses and

1  controlling their sexuality, because they're out in the

2  community interacting with other people.  Now, the level of

3  their ability to interact is based on their risk level.  So

4  some individuals are able to be very active in the community

5  and some are really pretty housebound.

6           In an institutional program like this, the

7  individuals really don't get that real-life experience in

8  trying out the techniques, trying out the things they have

9  learned.  So that's the major difference I see.

10  Q.  Two more very related questions, Dr. May.  If Judge Pratt

11  allows Mr. Fogle to self-report, are you prepared to continue

12  your intensive treatment between now and the time that he

13  would report, if Littleton were to be designated as his

14  institution?

15  A.  Yes, I could do that.

16  Q.  And if Mr. Fogle is remanded today and Littleton is

17  designated as his institution, are you willing and prepared to

18  undertake a continued intensive therapy with him whenever it

19  is that he would be released from that facility and then be on

20  conditional release?

21  A.  Yes.

22           MR. MARGOLIS:  Dr. May, I have no further questions.

23  Thank you.

24           THE COURT:  Thank you, Counsel.  You may

25  cross-examine, Mr. DeBrota.

1    MR. DeBROTA:  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3  BY MR. DeBROTA:

4  Q.  Good morning, Dr. May.

5  A.  Good morning.

6  Q.  What you did in this particular case is clinical work with

7  Mr. Fogle, not a forensic examination of him for this Court;

8  is that right?

9  A.  Correct.

10  Q.  And that's a huge difference, isn't it?

11  A.  Yes.

12  Q.  You weren't asked to do that.  And that's the kind of

13  thing that Dr. Bradford just testified about, very different

14  than what you're trying to achieve there in the 100 hours of

15  meetings; is that right?

16  A.  Correct.

17  Q.  Okay.  Did you have a chance to listen to the testimony

18  and my questions for Dr. Bradford?

19  A.  Yes, I did.

20  Q.  At several times I asked him if he knew certain pieces of

21  information.  Did you hear those questions?

22  A.  Yes.

23  Q.  Did you hear anything in my questions of Dr. Bradford or,

24  for that matter, when -- did you listen when Her Honor took

25  his -- Mr. Fogle's plea, she read the factual basis of his

1   guilty plea?  Did you hear that, too?

2   A.  Yes, sir.

3   Q.  Did you hear anything new in there or did you know all

4   that information?

5   A.  That was all information I had heard from Mr. Fogle.

6   Q.  Okay.  So in terms of what you discussed with him, he told

7   you all that stuff?

8   A.  Yes.

9   Q.  Okay.  Now, you heard Dr. Bradford's diagnosis of weak

10  pedophilia?

11  A.  Yes.

12  Q.  Have you ever diagnosed anyone with weak pedophilia?

13  A.  No.  I think --

14  Q.  That's not a diagnosis, is it?

15  A.  Well, it's not a DSM diagnosis.  Again, it's, as he

16  mentioned, a descriptive term --

17  Q.  Okay.

18  A.  -- but not a diagnosis.

19  Q.  Okay.  But in your field, the diagnosis is either, is

20  someone a pedophile or not?  There isn't another word we put

21  in front of that in your field, is there?

22  A.  Well, actually, it depends on the context that we're

23  working in.  If we're talking strictly in clinical terms,

24  looking at somebody's, you know, treatment needs, then we

25  would use terms like that.

*MAY - CROSS/DeBROTA*                102

1  Q.  Okay.  But if we want to be precise and use the Diagnostic

2  and Statistical Manual, which your profession has put together

3  based on all kinds of peer-reviewed studies and meetings and

4  so forth, there isn't any such qualification in front of the

5  word "pedophile," is there?

6  A.  That's correct.

7          MR. DeBROTA:  Okay.  I have no further questions,

8  Your Honor.

9          MR. MARGOLIS:  No further questions, Your Honor.

10         THE COURT:  Thank you, Doctor.  I have no questions.

11 You may return to your seat.

12         (Witness excused.)

13         THE COURT:  Do you have any other witnesses?

14         MR. MARGOLIS:  No, Your Honor.

15         MR. DeVOOGHT:  No, Your Honor.

16         THE COURT:  Does the government have any witnesses?

17         MR. DeBROTA:  We do, Your Honor, briefly.

18         THE COURT:  You may.

19         MR. DeBROTA:  We would call Detective Odier, Your

20 Honor.

21         THE COURT:  We'll go ahead and hear from all the

22 witnesses before you make your argument.

23         MR. MARGOLIS:  Thank you.

24         THE COURT:  You can address those in the argument.

25         MR. DeBROTA:  And, Your Honor, this will bear on the

*ODIER - DIRECT/DeBROTA*                103

1   exhibits we tendered to the Court, Exhibits 1 through 4, that

2   we're going to have him talk about.  We've given copies of

3   those to the defense, as well.

4            THE COURT:  Okay.  All right.

5            Would you raise your right hand?

6            (The witness is sworn.)

7            THE COURT:  You may have a seat.

8            And, Defense, do you have any objection to

9   Government's Exhibits 1 through 4?

10            MR. MARGOLIS:  We do not, Your Honor.

11            THE COURT:  Government's Exhibits 1 through 4 are

12   admitted into evidence --

13            MR. DeBROTA:  I would so move, Your Honor.

14            THE COURT:  -- without objection.

15                    *(Government's Exhibits 1 - 4 were*

16                    *received in evidence.)*

17            **DARIN ODIER, PLAINTIFF'S WITNESS, SWORN**

18                    **DIRECT EXAMINATION**

19   BY MR. DeBROTA:

20   Q.  Can you tell us your name, please?

21   A.  My name is Darin Odier.  First name is D-A-R-I-N.  My last

22   name is O-D-I-E-R.

23   Q.  And where do you work?

24   A.  I'm a police officer for the City of Indianapolis, IMPD.

25   I'm also a cross-designated FBI task force officer.

1  Q.  In this particular investigation of Mr. Fogle and

2  Mr. Taylor, were you one of the detectives involved?

3  A.  Yes.

4  Q.  Along with personnel from what other agencies?

5  A.  Indiana State Police, FBI, and U.S. postal inspectors.

6  Q.  And in the course of that work, did the investigators read

7  a large amount of chat logs and recovered data concerning

8  communications involving Mr. Fogle?

9  A.  Yes, sir.

10 Q.  Do you think you're familiar with the places in those

11 communications where subjects involving sexual contact with

12 prostituted minors was discussed?

13 A.  Yes, sir.

14 Q.  And did you prepare Exhibits 1 through 4 as examples of

15 four such sets of text messages involving four different

16 people?

17 A.  Yes, sir.

18 Q.  Let me turn your attention first to Exhibit 1.  Do you

19 have that chat log?

20 A.  I do.

21 Q.  And is this recovered from Mr. Fogle's telephone?

22 A.  Yes, it was.

23 Q.  And does this relate to a communication with a person

24 we've identified as Person 5 --

25 A.  Yes.

ODIER – DIRECT/DeBROTA                    105

1    Q.  -- who is living in Las Vegas, Nevada?

2    A.  Correct.

3    Q.  The first line of this communication, is it dated

4    July 28th, 2011?

5    A.  Yes, sir.

6    Q.  And we haven't -- we've taken Person 5's name off here,

7    have we not, to preserve who they are?

8    A.  Yes, correct.

9    Q.  How old was Person 5 at this time?

10   A.  18.

11   Q.  And does this communication come after Mr. Fogle's already

12   had a sexual encounter with Person 5?

13   A.  Yes, sir.

14   Q.  When she was 18?

15   A.  Correct.

16   Q.  And she was working as an adult prostitute at that time;

17   is that right?

18   A.  That's correct.

19   Q.  She was just barely an adult, but she was 18; is that

20   correct?

21   A.  Correct, yes.

22   Q.  Okay.  The -- this particular chat log includes

23   communications on July 28th and then into August 1st of 2011;

24   is that right?

25   A.  Yes, sir.

ODIER - DIRECT/DeBROTA                106

1         MR. DeBROTA:  Your Honor, we can do this a couple of

2    different ways.  One way I would suggest is if I have him read

3    what Mr. Fogle said and I'll read what Person 5 said; we can

4    do it that way?

5         THE COURT:  You may.

6         MR. DeBROTA:  Okay.

7    BY MR. DeBROTA:

8    Q.  All right.  Why don't you read the communication starting

9    on July 28th, 2011.  You read what Mr. Fogle said and I'll

10   read what Person 5 said.

11   A.  Yes, sir.

12        "It's Jay again.  It was good seeing you at

13   Harrah's.  I'm horny again.  Is your Asian friend available?"

14   Q.  "Are you going to pay me, too, or can I come back?"  And

15   then a smiley wink.

16   A.  "I can pay you a little finder's fee.  I'll pay you big

17   for a 14- or 15-year-old."

18   Q.  "Babe, I lied to you.  I'm really 16 -- I'm really 16,

19   just turned it, but I thought you were a cop," so "first so

20   lied" -- "cop at first, so lied."

21   A.  "How do I know you are?"

22   Q.  "Well" -- then the symbols for I don't know -- "I don't

23   know.  I don't have any ID," but, "I'm only 16."

24   A.  "How do you prove it, sweetie?  How old is the Asian

25   girl?"

*ODIER - DIRECT/DeBROTA*                107

1   Q.   "17 N I don't know.  I can't prove it no neither can."

2   A.   "All I got left tonight is $150."

3   Q.   "I'm coming."  Smiley face.

4   A.   "Okay.  Where are now?"

5   Q.   "By Circus Circus.  I need condoms, right?"

6   A.   "Bring a condom!"

7   Q.   "I'm stopping now."  Hurry, "honey" -- "Hey, honey."

8   A.   Correct.  And then the next -- the following conversation

9   occurs on August 1st, 2011.

10  Q.   Okay.  So time has passed in between?

11  A.   Correct.

12  Q.   Okay.  Go ahead.

13  A.   "Hey, you, how are you?"

14  Q.   "In good.  How are you?"

15       And then a name we've redacted there, Your Honor.

16       Then "Honey."

17  A.   "I'm good!  I just landed in Vegas."

18  Q.   "How was your flight, honey?"

19  A.   "it was good.  Did you find me some young girls or boys?"

20  Q.   "No.  I've been looking, too!  Only me."  Smiley face.

21  "Will I be seeing you today?"

22  A.   "Can you find me some?"

23  Q.   "How much will you give me for doing it?"

24  A.   "Depends," on, "if they can prove their age.  If they can

25  and you get me 16 or below, I'll give you 400 at least."

1  Q.  "Okay.  I'll see what I can do.  How much you gonna pay
2  them?"
3  A.  "If they are good looking and 16 or younger, I'll give
4  them 300 for a session."
5  Q.  "Okay.  So for me 400 and give them 300.  Do you like
6  thicker girls?"
7  A.  "Yes on the dollars but not too thick.  I love big tits
8  but realize if they are younger that's hard to find."
9  Q.  "Okay.  I'll look around."
10 A.  "And don't try to fake it.  If you can't find any I'll
11 still see you but not for as much."
12 Q.  The next one, Exhibit 2, is this a communication between
13 Jared Fogle and Person 6 in Richmond, Virginia?
14 A.  Yes.
15 Q.  And in this case, Person 6 was an adult prostitute; is
16 that right?
17 A.  Correct.
18 Q.  She was in her late 20s, early 30s?
19 A.  Yes, sir.
20 Q.  Okay.  Starting on April 19th, 2012, why don't you read
21 Fogle's part and I'll read the Person 6's part.
22 A.  "I have an offer for you.  If you find me a young girl,
23 around 14 to 16, I would pay you a big finder's fee."
24 Q.  "I don't support that."
25 A.  "How come?"

1   Q.  "That's somebody's" -- and then, Your Honor, the F word,

2   "baby."

3   A.  "If they are already F'ing in high school?"

4   Q.  "Don't text me anymore."

5           Turning your attention now to Exhibit 3, is this a

6   communication between Jared Fogle and Person 7, a prostitute

7   who is an adult in Kansas City, Kansas?

8   A.  Yes, sir.

9   Q.  And is this on July 9, 2012?

10  A.  Yes.

11  Q.  Okay.  I'll read Person 7's part, and please read

12  Mr. Fogle's part.

13  A.  "So I have a proposition for you.  And it's something I

14  would pay you very well if you were able to help."

15  Q.  "Okay.  What is it?  Let me know."

16  A.  "Do you have access to any young girls?  Like 15 or 16?"

17  Q.  "Why, baby?"

18  A.  "Cause it's what I crave!" with an exclamation point.  "I

19  would hook you up nicely if you did."

20  Q.  "How much?"  Because, "I have a cousin who is 15."

21  A.  "What does she look like?  If she's good looking I would

22  give you 300 and her the same.  Well?"

23  Q.  "Let me see."

24  A.  "Okay.  What does she look like?"

25  Q.  "Hey."

1  A.  "Hey there.  So what do you have for me?"

2  Q.  "I can do that for you in AM.  Still want me to come

3  back?"

4  A.  "What time in the a.m.?"

5  Q.  "Maybe 7.  Want a pic of her."

6  A.  "How do I know she's only 15?"

7  Q.  "She has ID."

8  A.  "What grade is she in?  I wanted bareback like with you."

9  Q.  "Grade six.  She can come with me tonight.  You ready?"

10 A.  "No."  It, "needs to be later."

11 Q.  And that's the end of that conversation; is that right?

12 A.  Correct.

13 Q.  Finally, you have Exhibit 4?

14 A.  Yes, sir.

15 Q.  And is this text messages between Jared Fogle and Minor

16 Victim 13 in New York City?

17 A.  It is.

18 Q.  These are the conversations that relate to the charges in

19 Count 1 of the indictment; is that correct?

20 A.  Yes, sir.

21 Q.  Count 2 of the indictment.

22         Starting on November 3rd, 2012, again, you read

23 Mr. Fogle's part and I'll read Minor Victim 13's part.

24 A.  Yes, sir.  "Nice talking to you!  My name is Jay.  I'm at

25 the Plaza Hotel...Fifth Avenue and Central Park," West.

1  "That's the address that's on the hotel phone.  I'm in room

2  628.  On the room my full name is Jared."

3  Q.  I think you may have said, "Central Park West."  It says,

4  "Central Park South"?

5  A.  Oh, I apologize.  "Central Park South."

6  Q.  "Can you give me a call?  Thanks."

7  A.  "Okay!"

8  Q.  "Please hurry.  I'm sorry to rush but I feel underdressed.

9  Should be there by 12:15.  Running late, waiting on a train,

10  I'm so sorry.  Please call me.  Call me."

11  A.  "Hi!  It's Jay.  I saw you at the Plaza Hotel last night.

12  Just wanted to say again how great it was spending some time

13  with you.  And I have a business proposition for you possibly

14  two so text me back when you can."

15  Q.  Now, in between those texts was a six-hour break; is that

16  right?

17  A.  Correct.

18  Q.  And that's when he had sexual activity with Minor Victim

19  13?

20  A.  That's correct.

21  Q.  Okay.

22          "Hey good morning.  Sorry, I'm getting up, how are

23  you?"

24  A.  "I'm good!!  How are you doing today?"

25  Q.  "I am well."

1    A.   "Good!!!  I really enjoyed seeing you."

2    Q.   "Me too.  I'm glad I made your trip a little better."

3    A.   "Thanks!  So you know how I like the underage thing from

4    last night...wanted to see if you knew of any for me and I

5    would pay you very well for the introduction.  And if not, no

6    worries...just figured I would ask."

7    Q.   "I can look into it.  Not sure, used to work with a few

8    girls that were underage, will see if they're still around."

9    A.   "Awesome!!!  If you could check that would be great...how

10   young do you think you could find?"

11   Q.   "I don't know, I'm gonna call the owner as we are still

12   good friends and see what's around, then talk to the girls

13   myself.  Want the full story.  He usually has 16-year-olds."

14   A.   "Okay!  Please let me know what you find out.  The younger

15   the better!!!  LOL."

16   Q.   "Will look into it.  Not making any promises."

17   A.   "I'm really happy I met you."

18   Q.   Then a smiley face.  Then --

19   A.   "Are you driving to" -- I'm sorry.  Go ahead, sir.

20            "Are you driving to Denver or flying?"

21   Q.   "Not sure if I'm going.  No luck with that thing you asked

22   me to look into.  Sorry."

23   A.   "Okay.  Thanks for trying!"

24   Q.   "You're welcome."

25   A.   "Can't wait to see you again!!"

1   Q.   "LOL okay."

2   A.   "Do you allow more than one pop?"

3   Q.   "Yes."

4   A.   "So I coulda popped a couple of times last instead of just

5   going to bed?  LOL."

6   Q.   "LOL.  Maybe."

7   A.   "Just maybe?"

8   Q.   "Not everyone goes twice.  Usually only after I've seen

9   you a few times."

10  A.   "Oh, okay...I would love it if you would give me that

11  honor with you!"  Smiley face.

12  Q.   "Maybe next time."

13          That was concluding November 4.  Then skipping now

14  to December 27, 2012, it starts again; is that right?

15  A.   Yes, sir.

16  Q.   Please read that.

17  A.   "Hi!  This is Jay.  You came and saw me at the Plaza Hotel

18  near Central Park in early November.  Wanted to make sure this

19  was still your number."

20  Q.   "Yep.  It is, I'm on New York till Feb."

21  A.   "Are you moving somewhere else after that?"

22  Q.   "I'm not sure as of yet."

23  A.   "I should be in NYC sometime soon.  I can't wait to see

24  you again!!  Are you still growing your bush out?"

25  Q.   "Yep.  Let me know when."

1  A.  "Any luck in finding me a young girl too?  I will

2  really...make it worth your while if you can."

3  Q.  "No not really.  I'll look again."

4  A.  "Okay.  Please do.  Girl or guy actually would be fine."

5  Q.  "Okay."

6  A.  "Do you have pics you can send me of yourself?  It will

7  tide me over till I," can, "see you."

8  Q.  "Yeah I'll e-mail them."

9  A.  "Okay.  Do you want me e-mail address or will you send

10 them to my phone?"

11 Q.  "Oh sent them to your e-mail.  Nyorksoon?"

12 A.  "Which e-mail address do you have?"

13 Q.  "Nyorksoon."

14 A.  "That's not me.  LOL.  Mine is jaredtravel@hotmail.com."

15 Q.  "Somebody gonna have a happy morning.  Sent them."

16 A.  "Ha ha ha!!  They haven't come through yet.  I got both of

17 your e-mails but there was nothing attached to them...just

18 blank e-mails.  Can you try to resend?  Thanks."

19 Q.  "I don't know what went wrong will try again one more

20 time."

21 A.  "Just got it now!!!  Wow.  Amazing!!!  We did bareback,

22 right?  I'm trying to remember."

23 Q.  "Yeah.  I'll text you in the a.m. going to bed okay?"

24 A.  "Okay.  Have a good night.  Let me know...if you need any

25 airline tickets.  I have a ton of frequent flier miles.  I

1  know you wanted to go to Denver.  Hey you!  It's Jay again."

2  Q.  Did you listen to the testimony of Dr. Bradford?

3  A.  I did.

4  Q.  He diagnosed pedophilia directed at females; is that

5  correct?

6  A.  Yes.

7  Q.  There are references in these chats from Mr. Fogle's phone

8  of attraction to boys, as well; is that right?

9  A.  Correct.

10  Q.  Are you familiar with some recordings that were done by

11  Person 1, an adult in Florida, who was cooperating with an

12  investigation at that time?

13  A.  Yes.

14  Q.  These recordings were between about 2007 and 2009; is that

15  right?

16  A.  Correct.

17  Q.  In those recordings, did Mr. Fogle indicate he was

18  interested in sexual activity with both young boys and girls?

19  A.  Yes, sir.

20  Q.  And these were preteens; is that right?

21  A.  Yes.

22  Q.  Now, in the course of the investigation, did you and the

23  other agents seek to determine whether that occurred in

24  Florida at any point?

25  A.  Yes.

1  Q.  With what result?

2  A.  We found no evidence that it actually occurred.

3  Q.  And with regard to sex with preteens, let's say in foreign

4  countries, did we find an example of that actually having

5  occurred?

6  A.  We found evidence of a trip, but of no sex with a minor

7  occurring in a foreign country.

8  Q.  And with regard to what occurs on that trip, what we have

9  are adult prostitutes --

10 A.  Correct.

11 Q.  -- being visible in videos, correct?

12 A.  Correct.

13 Q.  So as matters stand at the moment, the sexual activity

14 that Mr. Fogle is known to have done involves Minor Victims 13

15 and 14 insofar as we've identified a specific person; is that

16 right?

17 A.  Correct.

18 Q.  And have you and the other agents made great efforts to

19 try to find anyone else that can be located?

20 A.  Yes, sir.

21 Q.  And that included talking to the various other people who

22 contacted the government in the investigation, Person 2,

23 Person 3, Person 4, and so forth?

24 A.  That's correct.

25 Q.  Now, let me ask you some questions about Russell Taylor.

1  In the course of the investigation, did you look at the

2  relationship between Mr. Fogle and Mr. Taylor?

3  A.  Yes.

4  Q.  And in the course of that work, did you find out whether

5  Mr. Fogle met any of the minor victims from Mr. Taylor's

6  production?

7  A.  Yes.  He met at least three of them socially on a couple

8  of different occasions.

9  Q.  And who were those?

10 A.  Minor Victims 3, 4, and 5.

11 Q.  And nothing improper happened --

12        THE COURT:  What kind of social events?

13        THE WITNESS:  A holiday get-together for one of

14 them, like a cookout; and at a downtown restaurant for dinner

15 for another one.

16        THE COURT:  Thank you.

17 BY MR. DeBROTA:

18 Q.  No sexual activity occurs at these events; is that right?

19 A.  Correct.

20 Q.  They are, more or less, public events?

21 A.  Yes.

22 Q.  Okay.  Mr. Fogle didn't have any contact with Minor

23 Victims 1 and 2; is that right?

24 A.  Correct.

25 Q.  Now, with regard to his understanding of all of those

1  people, he does know that Mr. Taylor is producing videos

2  involving people he's related to and their friends; is that

3  right?

4  A.  Yes.

5  Q.  As well as some people Mr. Taylor knows?

6  A.  Yes.

7  Q.  Without getting into the specifics, Your Honor.

8        And the course of events starts with Minor Victim 1

9  and goes all the way with Mr. Taylor to Minor Victim 12; is

10  that right?

11  A.  Correct.

12  Q.  But is it the case that Mr. Fogle did not receive the

13  material involving minor victims -- the minor victims who were

14  boys?

15  A.  That's correct.

16  Q.  And the final child, Minor Victim 12?

17  A.  Correct.

18  Q.  And you know that in part from the interviews, but also

19  from the forensic evidence?

20  A.  That's correct.

21  Q.  When the material was produced involving minor Victim

22  12, there are not text messages where Mr. Taylor sends it to

23  Mr. Fogle?

24  A.  That's correct.

25  Q.  And you would have expected that had that occurred?

1  A.  Yes.

2  Q.  With regard to the material that is sent from Mr. Taylor

3  to Mr. Fogle, did that occur in a number of different ways?

4  A.  It did.

5  Q.  Can you describe those?

6  A.  Yes.  Mr. Taylor provided Mr. Fogle with a thumb drive.

7  He also provided Mr. Fogle with access to Taylor's computer

8  where he could view child pornography.  There were also images

9  sent from Mr. Taylor's phone to Mr. Fogle's phone through text

10 messages.

11          THE COURT:  Do you mean he actually gave him his

12 computer?

13          THE WITNESS:  Yes.  They frequently traveled

14 together.  And while on their trips, he would literally give

15 Mr. Fogle his computer with his child pornography on it so

16 Mr. Fogle could view it.

17          THE COURT:  Okay.

18 BY MR. DeBROTA:

19 Q.  That meant that the sort of risk of carrying the material

20 around was principally done by Mr. Taylor?

21 A.  Was on Taylor, yes, sir.

22 Q.  Okay.  Now, in the case of Minor Victim 5, was a picture

23 of Minor Victim 5 -- two pictures, actually -- sent to

24 Mr. Fogle while both were in Evansville, Indiana?

25 A.  Correct.

ODIER – DIRECT/DeBROTA                120

1  Q.  Can you describe that?

2  A.  Yes.  Over a period of time in February of this year,

3  there was text conversations, and then two images were sent of

4  Minor Victim 5 nude or partially nude, including one where her

5  pubic, or genitalia, area was exposed.  Her head was cut off.

6  In the thread, Mr. Fogle identified Victim 5 by name even

7  though you couldn't see her head.

8  Q.  And that would be indicative of having seen the parent

9  video of that before; is that right?

10  A.  Correct.  That was a screen shot of a video that was --

11  that Mr. Taylor had produced months previous.

12  Q.  Okay.  When that particular video was produced, was it

13  over a weekend at Taylor's current residence?

14  A.  Yes.

15  Q.  And was that close in time to when there was a gathering

16  at a restaurant with Minor Victims 3, 4, and 5, as well as

17  Mr. Fogle and Mr. and Mrs. Taylor?

18  A.  Yes.  That image or that video was produced within about a

19  48-hour window of when Mr. Fogle would have met Minor Victim

20  5, yes.

21          MR. DeBROTA:  Okay.  I have no further questions at

22  this time, Your Honor.

23          THE COURT:  Thank you.

24          MR. MARGOLIS:  No questions, Your Honor.

25          THE COURT:  No cross?

*ODIER - DIRECT/DeBROTA*          121

1          All right.  Thank you very much.  You may return to

2   your seat.

3          (Witness excused.)

4          THE COURT:  Okay.  Who is going to make the argument

5   on behalf of the defense?

6          MR. DeVOOGHT:  Judge, I'm going to cover -- let me

7   turn on my microphone.

8          Your Honor, I'm going to cover five of the -- five

9   of the 3353 (sic) factors, and --

10          THE COURT:  You may.  Why don't you come up to the

11   lecturn.

12          MR. DeVOOGHT:  And, Your Honor, just for the sake of

13   efficiency, I'm going to cover five of the factors.

14   Mr. Margolis is going to cover four.  The five that I'm going

15   to cover are the sentencing guidelines, the nature and

16   circumstances of the crime, the need to reflect the

17   seriousness of the offense, to promote respect for the law,

18   and to provide just punishment for the offense, deterrence,

19   and the last will be the notion of disparate sentences.

20          THE COURT:  You may.

21          MR. DeVOOGHT:  Your Honor, I first want to start

22   that any discussion of any of these nine factors is not to

23   excuse Mr. Fogle's despicable conduct.  We're here, though --

24   we have his conduct, his conduct has been admitted to.  He's

25   pled guilty to that conduct.  And now we're trying to figure

1  out what's a sufficient, but not greater than necessary,

2  sentence for that conduct.

3          And as your Court -- as this Honor knows, we look at

4  the different factors.  And one of those factors is the

5  sentencing guidelines.  And we're not up here to condemn as a

6  general matter the sentencing guidelines.  The sentencing

7  guidelines, in the vast majority of cases, are an effective

8  and just guidepost for a court.

9          But with particular respect to Count 1, the child

10  pornography, Your Honor, this section is uniquely flawed.  And

11  as we discussed in our brief, and I won't go through all the

12  arguments, these aren't the arguments that I can take credit

13  for, Judge.  These are arguments that objective entities or

14  groups of individuals have noted repeatedly.  And those

15  criticisms ring true here.

16          The first is the Sentencing Commission.  The

17  Sentencing Commission's, as Your Honor knows, sole goal is to

18  make these as just and as fair as possible.  They have no skin

19  in this game other than trying to get it right.  They also

20  have a unique perspective that none of us have, that they

21  study all of those guidelines from both the forest and the

22  trees.  Their job is to look at all of those, assess their

23  viability, assess their effectiveness.  And it's the

24  Sentencing Commission that, in large part, has led a number of

25  criticisms of the guideline enhancements with respect to

1  Count 1.

2          The other entity that has led the charge in this

3  criticism are the district court judges around this country,

4  Your Honor.  As we cited in our brief, it's a shockingly high

5  number.  69 percent of your colleagues, 440 of 639 judges,

6  said that the nonproduction offense guidelines, and

7  particularly the enhancements, resulted in sentences that were

8  just too harsh.  And that number has played out consistently,

9  Your Honor, when you look at the sentences.  It's after

10  *Booker*, Your Honor, when the guidelines returned to their

11  advisory state.  The number of guideline --

12          THE COURT:  Is that true just on the possession and

13  not the distribution and receipt?

14          MR. DeVOOGHT:  Your Honor, it is true on all

15  nonproduction.  That's right, nonproduction offenses,

16  69 percent of nonproduction offenses.  And, actually, Your

17  Honor, you raise a great point, because this is not -- that

18  study did not show that we have a judiciary that condemns all

19  of the guideline provisions with the child pornography,

20  because only 30 percent of those same judges versus 69 percent

21  found the guidelines for production offenses, which is not

22  what we have here with respect to Mr. Fogle.

23          THE COURT:  What about when there's a conspiracy --

24          MR. DeVOOGHT:  Your Honor --

25          THE COURT:  -- with the producer?

1           MR. DeVOOGHT:  Your Honor, well, first of all --

2           THE COURT:  Isn't that unique to this case --

3           MR. DeVOOGHT:  Your Honor --

4           THE COURT:  -- as opposed to any of the others you

5  cited in your brief?

6           MR. DeVOOGHT:  Well, Your Honor, what I would say,

7  first of all, is this is not a conspiracy to produce.  This is

8  not a conspiracy to produce, it's simply not.  The government

9  used the words in their brief that there were materials that

10  Taylor kept from Mr. Fogle.  And that's a really interesting

11  observation, because if you have a conspiracy -- there's no

12  dispute that he was aware of the production, or at least

13  aspects of the production, and his passivity was pathetic.

14  There's no question about that, his knowledge of the

15  production.

16           But there's no assertion by the government

17  whatsoever, if you were to go through their brief, that he had

18  any role, any active role whatsoever in the production.  And

19  they haven't charged him with production, Your Honor.  He was

20  aware of it, but that is different.  His crimes are of receipt

21  and displaying it on one instance in a locked hotel room to an

22  individual -- look, it's pathetic conduct, but it's not

23  production.  And it falls within the category where 69 percent

24  of your colleagues have said these sentences are too harsh.

25           And my point is that 30 percent of your colleagues

1   have drawn that exact line Your Honor is referring to.  But

2   Mr. Fogle's crimes, as pathetic as they are, they fall in the

3   line they are nonproduction offenses.  Mr. Taylor has been

4   charged with production because he produced.

5           And Mr. Fogle's passivity was pathetic, but it was

6   not evidence nor was there any evidence -- a laudable

7   investigation, 160,000 text messages they looked at, 5.6

8   terabytes of evidence -- of information.  That's as much

9   information as the Library of Congress gets a month.  When you

10  think about just the sheer volume of material that these

11  agents and officers went through, it's commendable, but it

12  showed no evidence whatsoever of him -- and to quote their own

13  brief, of him being in or having to help --

14          THE REPORTER:  I'm sorry.  You need to slow down.

15          MR. DeVOOGHT:  -- being in or help produce, Your

16  Honor.  He simply was not a part of it.  And so we are on this

17  line of the crimes that the government has said there's

18  evidence of and that they've chosen to charge him with, and to

19  which he has rightly pled guilty.

20          And, Your Honor, the district courts, as you know,

21  Your Honor, growing up as a lawyer, when you read the opinions

22  in cases involving evidentiary objections, and the Seventh

23  Circuit rightly always says it's the district courts, we give

24  them tremendous discretion, because they're on the front line,

25  they are there.

1          And my point, the Sentencing Commission and the

2     district court judges are uniquely positioned, more so than

3     any advocates, to see impact of these guidelines.  And that's

4     why when 69 percent of your colleagues -- that's why, to me,

5     that observation is so powerful.

6          And, Your Honor, the overarching criticism has

7     been -- and the reason that this section with respect to the

8     child pornography count is so uniquely flawed is because it's

9     not like other provisions in the guidelines.  Other provisions

10    in the guidelines are based on empirical studies, observation

11    of national impact.  And these, as we note in our brief, were

12    largely driven by congressional directive.

13         And that's Congress' right, but the criticism that

14    you end up having is when you don't have guidelines driven by

15    empirical data and thoughtful analysis, is you end up with

16    what we have here, which is a blunt instrument, a blunt

17    instrument that doesn't gauge the relative culpability of

18    individuals, all individuals getting the same enhancements.

19         And, Your Honor, the fact of the matter is, it's not

20    just the Sentencing Commission, it's not just 440 of your

21    colleagues; it's the Department of Justice.  The Department of

22    Justice itself wrote a letter where it said it agreed that

23    looking at the first enhancement I'm talking about here, the

24    use of a computer, it should be done away with, because it

25    doesn't gauge relative culpability.  And we should have an

1    alternative that does.  Similarly with the number-of-images

2    enhancement.  The exact same thing is true, that you have --

3    you have a chorus of criticism, not from advocates, but from

4    the government, from the Sentencing Commission, and from

5    district court judges.

6             And, Your Honor, the flaws have devastating impacts.

7    When you look at the enhancements -- again, Mr. Fogle's

8    conduct was despicable.  We're not here defending his conduct,

9    but when we're looking at whether or not these guideline

10   enhancements end up with a sentence that fits the crime,

11   that's when looking at the notion of a blunt instrument that

12   doesn't gauge relative culpability -- it has a dramatic

13   impact, just those three enhancements.  Nine offense levels

14   result from that, which adds 5.5 to seven years on his

15   advisory guideline range.

16            And when you look at those three, the proof isn't

17   going through them.  The use of the computer, Your Honor,

18   there are individuals who are using their computer to drive

19   the commercial distribution, the trafficking, or participating

20   in these on-line communities.  Mr. Fogle, he looked at child

21   pornography.  He -- but he -- in the child pornography count,

22   he used his phone and a computer like a VCR and a television.

23   He was not out there driving the commercial distribution of

24   child pornography.  He just wasn't.

25            Again, was his conduct pathetic?  Yes.  But there --

1   and the problem with this guideline enhancement, it treats

2   every single defendant -- Your Honor has noted that in *Lowe v.*

3   *U.S.*, that -- a criticism that the Seventh Circuit has

4   acknowledged; and *U.S. v. Price*, is that these guideline

5   enhancements arguably apply to every single child pornography

6   nonproduction case.

7           And the same is true in the number of images.  The

8   number of images -- and that one in particular here, Mr. Fogle

9   was pathetic, he was passive, and he stood by.  But he, unlike

10  so many defendants Your Honor and other judges have seen, he

11  was not out there affirmatively collecting this child

12  pornography.  He was not -- he didn't -- he was not

13  affirmatively out there collecting this child pornography

14  himself.  He did not request certain of these images, and he

15  did not request the volume of images.

16          There's no question, no question, that he ended up

17  receiving more than 600 images, but he is not like other

18  defendants where he is out there warehousing these massive

19  amounts of child pornography for his own use; and yet he's

20  still subject to the same five-level enhancement.  And that's

21  a devastating enhancement.

22          The final, and maybe most important, Your Honor, is

23  the age of the children.  And this is one where, as the

24  government has said -- and this is that quote, Your Honor.

25  There has been a lot of discussion of conspiracy, but to be

1  clear, there is no conspiracy to produce.  And it's the

2  government that says, "Taylor kept the rest of the material

3  from Fogle."  "Kept the rest of the material from Fogle."

4          And among that was Victim 12, who is the

5  nine-year-old.  He did not receive -- of the material that was

6  produced by Mr. Taylor, he did not receive the material of

7  those younger victims.  Again, the material he received is

8  ridiculous and it's pathetic, but the problem is, the age of

9  the children, this under 12, he did not affirmatively request

10 this disgusting material.

11         Even when he received the thumb drive, Your Honor,

12 that, yes, contained some of the worst images of

13 six-year-olds, there's no evidence that he requested that.

14 There are no text messages saying -- just like there are the

15 pathetic text messages talking about a 14- or 15-year-old girl

16 on Count 2, there are no text messages, that we're aware of,

17 of him asking for images of a six-year-old.  And he looked at

18 that --

19         THE COURT:  It doesn't matter whether he requested

20 it or just --

21         MR. DeVOOGHT:  Well, Your Honor --

22         THE COURT:  -- got it and opened it and looked at

23 it.  What's the difference?

24         MR. DeVOOGHT:  Well, Your Honor, there's absolutely

25 a critical difference.  It goes to the gauging of one's

 1  relative culpability.  Your Honor has sentenced defendants

 2  that we'll talk about who are out on the Internet --

 3          THE REPORTER:  You've got to slow down.

 4          MR. DeVOOGHT:  Okay.  Sorry.  Lots to cover, and I

 5  get enthusiastic.

 6          Your Honor, there are defendants that you have seen,

 7  and other judges have seen, that we'll talk about, that were

 8  affirmatively out on the Internet trolling for specific

 9  images, specific images of age groups, specific images of

10  sadomasochistic acts against those young children; and those

11  individuals are getting similar enhancements as Mr. Fogle.

12  And it is that -- when it goes to relative culpability.  And

13  that's why the Department of Justice has joined the chorus of

14  the Sentencing Commission and district court judges to say

15  that it is too blunt of an instrument.

16          And I would argue you've heard several of these for

17  exactly this type of scenario, that it's all pathetic conduct,

18  Your Honor, it's all pathetic conduct.  But we're trying to

19  figure out, on a spectrum of pathetic conduct, where it falls

20  out.  And these enhancements don't give Your Honor, if you

21  take them wholesale, any ability to do an independent relative

22  culpability analysis among that pathetic conduct.

23          And it can't be a one-size-fits-all.  That's the

24  whole point of 3553, is that our sentences are not a

25  one-size-fits-all, no matter how disgusting, no matter how

1   pathetic the conduct.  That's not -- that's not the charge

2   that we all undertake.

3           And so, Your Honor, that's really the discussion

4   with respect to the guidelines, that those three enhancements

5   are particularly devastating.  And you can differentiate

6   Mr. Fogle's albeit pathetic conduct from a vast number of

7   other defendants who have been way more culpable with respect

8   to the child pornography count, and they get the exact same

9   enhancement, and their guideline ranges are impacted exactly

10  the same.  And we would respectfully submit that that

11  undermines the value of the weight that those guidelines

12  should be accorded here.

13          Your Honor, the second -- and this really dovetails,

14  and so I'll be very brief on this point, but the second point

15  regards -- relates to the nature and circumstances of the

16  crimes.  And, obviously, that relates, because I've just

17  talked a little bit about relative culpability.  Again, it's

18  pathetic conduct, and no one is here to defend it, but when

19  you look at 3553, obviously all of us are charged with what is

20  that sufficient, but not greater than necessary, sentence?

21  And there are still -- in that pathetic conduct, there are

22  still important observations to be made and we would

23  respectfully ask Your Honor to consider as you're figuring

24  your sentence.

25          And with respect to Count 1 in the child

1   pornography, the first, of course, is, as the government's

2   extensive and laudable investigation shows, there was no

3   sexual contact with respect to Mr. Taylor's -- the victims he

4   recorded, no sexual contact or activity of any kind at any

5   point.  That is just fact.  And that is a baseline -- you

6   know, is it pathetic that that's where we're starting with?

7   Yeah.  But that's where we are, and it's an important point,

8   because it differentiates him from many other defendants.

9           The second, Your Honor, again, as we said, it is --

10  the government has agreed that he had no role in the

11  production.  If he did, he should have been charged, and he

12  would have been charged.  But the government's extensive and

13  laudable investigation showed no active role in production.

14          Passivity, it's terrible.  It's part of the reason

15  he should and is paying restitution, as Mr. Margolis will talk

16  about.  Was he aware now of the damage he did?  Absolutely.

17  But passivity is different than active role and production.

18  It just is, and it matters.

19          Third, Your Honor, this reference to conspiracy to

20  receive and distribute.  Mr. Fogle pled guilty because it is

21  true that he showed one individual on one occasion the thumb

22  drive.  And that individual was an individual he was involved

23  in a romantic relationship in a locked hotel room.  And,

24  again, is it pathetic?  Yes.

25          But, Your Honor, when you think about other

1  instances of distribution, Mr. Gardner, who you sentenced to

2  72 months, Mr. Gardner admitted to this Court that he was

3  using the peer-to-peer software actively so that he could

4  share and collect child pornography on-line.

5      There's no such evidence Mr. Fogle was doing that

6  sort of sharing.  He had this one pathetic instance where he

7  displayed.  And it's despicable and inexcusable, but it is not

8  like Mr. Gardner, it's just not.  And that matters when we

9  think about his conspiracy to receive and distribute.  There's

10  distribution and then there's distribution.  And it matters

11  the nature and circumstances of his one instance displaying

12  that child pornography.  It's -- you know, it's bad conduct

13  amongst worse conduct, but that matters when we're trying to

14  figure out the extent of the sentence.

15      The other point, Your Honor, the government, rightly

16  and appreciatively, has acknowledged it's clear that he didn't

17  see the child pornography with respect to at least four of

18  these 12 victims.  We believe it's closer to six, but we can't

19  affirmatively prove it going through all 160,000 messages.  He

20  doesn't recall receiving with respect to two, but he's

21  certainly not contesting.  You know, there's been no factual

22  dispute among the parties, but it's at least four.

23      And, significantly, it's the one -- the ridiculous

24  images Mr. Taylor took of a nine-year-old.  There's just no

25  evidence, and the government has rightly and readily

1   acknowledged that.  So, again, is it ridiculous that he

2   received what he did?  Yes.  Of 14-, 15-, or 16-year-olds?

3   Yes, it is.  But was it a nine-year-old?  No, it was not.  And

4   we just ask Your Honor to consider that in fashioning his

5   sentence as compared to other defendants' sentences who have

6   engaged in other conduct.

7           Your Honor, also in terms of the nature of the

8   Taylor material, again, it's frankly not a fun job to have to

9   acknowledge these distinctions, but they are important in

10  fashioning his sentence.  He is only recalling one instance

11  where there was one minor involved in a sex act other than a

12  display of their genitals.  And, again, is the other

13  diabolical and should not be excused?  Of course.  But, Your

14  Honor, when you think about the cases Your Honor has seen,

15  other judges in this district have seen, and the nature of the

16  material the defendants are out actively collecting and

17  seeking, that is not the material -- that is not the material

18  that Mr. Fogle received from Mr. Taylor.

19          There is passivity and then there's passivity.  He

20  was not receiving image after image of sexual activity between

21  Mr. Taylor and these victims.  And thank God.  Thank God.  And

22  he's not asking for a medal or applause for it, but simply to

23  point out a fact of distinction and consideration for Your

24  Honor.

25          The last, Your Honor, is the commercial pornography.

1  And that's truly maybe the most disgusting, because it has the

2  images of kids as young as six years old involved in sex acts,

3  unlike the material that he received from Mr. Taylor and that

4  he knew Mr. Taylor was producing.  All I would note there is,

5  again, there's no evidence, that we are aware of, that

6  Mr. Fogle ever requested that level of disgusting material

7  involving six-year-olds, involving sex acts with

8  six-year-olds.  We respectfully submit there's no evidence of

9  such a request.

10       And he received that thumb drive and he looked at it

11  three times and then he destroyed it.  And, again, it's

12  inexcusable and it's pathetic, but when you look at other

13  defendants, Your Honor, who are out there actively collecting

14  this specific type of information, they are -- and images,

15  they are getting the same enhancement as Mr. Fogle.  And they

16  are different defendants, and they should be treated

17  differently.

18       On Count 2, there is no question that he had engaged

19  in commercial sex acts with a 16-year-old and a 17-year-old,

20  no question, and he should be punished for it.  I would say,

21  Your Honor, though, he is not like other defendants.  There

22  are worse.  That doesn't make him better.  Again, this is not

23  offered in the spirit of self-congratulations, but when Your

24  Honor is considering things like disparate sentences and

25  nature and circumstances of offenses, he is not like

1 Mr. Hensel, who received 135 months, which is more than the
2 government is asking for.

3          Mr. Hensel pretended to be 14 years old, trolling
4 the Internet, talking to a 12-year-old about video games;
5 lured her to a hotel room, where he coerced her into sex.
6 Now, that is in no way, in no way, I want to be as clear as I
7 possibly can, undermining the seriousness of Mr. Fogle's
8 conduct and having sex with a 16-year-old and 17-year-old, but
9 it is not the same as Mr. Hensel, who got 135 months.  He did
10 not pretend to be something he wasn't.

11          And we heard those disgusting text messages today
12 trying to seek out a 14-year-old or 15-year-old or
13 16-year-old.  Those are there.  I think two things:  One,
14 thank God it didn't happen.  So, Your Honor, yes, did he try
15 in those instances?  Yes.  But it did not happen, it is not a
16 part of his criminal conduct, it's not.

17          And, secondly, he didn't resort to the tactics of
18 Mr. Hensel.  Again, not offered as a point of
19 self-congratulations, simply a differentiation from a
20 defendant that the government -- for a defendant who got 135
21 months less than the government is seeking here.

22          And, finally, with respect to those defendants, as
23 the government pointed out in their brief, the age of consent
24 in Indiana is 16.  And that does not excuse his conduct, but
25 there are -- there are different ages here.  There's the

1   Mr. Hensels of the world and the Mr. Fogles, and they should

2   be treated differently.

3           The last thing I would say, Your Honor, is that with

4   respect to the evidence of his crimes, there's a tremendous

5   amount of, frankly, fanfare in the court of public opinion

6   about these terrible tapes and the phone sex.  And they're

7   disgusting and, you know, they are what they are.  There's no

8   getting around that.  But, as Mr. DeBrota and his agent

9   alluded to, they investigated the heck out of those

10  audiotapes, the heck, to make sure that none of those actions

11  were true, and that it was just phone sex.  And their

12  thorough, laudable examination found no evidence that any of

13  those sex acts occurred.

14          And, Your Honor, I would just ask you to treat

15  Mr. Fogle, again, the way you treated Mr. Gardner.

16  Mr. Gardner did not engage in phone sex.  Mr. Gardner was the

17  defendant, Your Honor, who, as the government's sentencing

18  memo shows, that -- not in this case, but in that case, he

19  typed out messages talking about how he had recently had sex

20  with minor children.  But it turned out it's similarly -- it's

21  maybe texting sex or sexting or whatever, Your Honor, but the

22  fact of the matter was, it turned out not to be true, the

23  government acknowledged it wasn't true, and he received 72

24  months.

25          And so we just ask Your Honor to consider the

1   stupid, disgusting phone sex for what it was, in what

2   Mr. Fogle thought was a consensual relationship.  In all

3   candor, he would tell you himself he was talking to women he

4   had had sex with.  And as disgusting as it is, he wanted to

5   have sex with them again.  So he wasn't telling them anything

6   that he thought they weren't responding to or that they didn't

7   want to hear.  And as twisted as that is, it goes to the

8   nature of the conversation, that they were engaging in phone

9   sex.  And nothing confirms that more than the government's

10  examination -- the government's own investigation.

11          Your Honor, the next factor I want to talk about is

12  the need to reflect the seriousness of the offense, to promote

13  respect for the law, and to provide just punishment.  There's

14  really just two points that I would like to make here, Judge.

15  The first is, there's often, as Your Honor knows, a stigma

16  attached to the notion of a minimum sentence.  A defendant,

17  you know, is accused of and pleading guilty to these awful

18  charges, and he's seeking the minimum sentence.  Well, it's

19  true that Mr. Fogle is seeking 60 months, because he believes

20  that when you consider all these factors, that is a sufficient

21  sentence.

22          But it's important to know why that's the minimum.

23  And it's the minimum because it's the result of a flawed

24  statutory framework that draws an arbitrary -- an arbitrary

25  line between possession and receipt.  And, again, I wish I

1  could take credit for that argument, but I can't, Your Honor,

2  because I'm not the one that thought of it.  The one that

3  thought of it is Judge Posner and other judges around this

4  country.

5          As Judge Posner said in *U.S. v. Richardson*,

6  possessors, unless they fabricate their own child pornography,

7  are also receivers at some point in time.  And I just ask Your

8  Honor to consider that when you're thinking about, "Oh, this

9  is the minimum sentence, the minimum sentence can't possibly

10  be sufficient."  It's only the minimum because of a flawed

11  framework as observed by your colleagues in this circuit,

12  colleagues not, with all respect, known necessarily, Judge

13  Posner, for being particularly lenient or someone that just

14  discards the guidelines or statutory frameworks.

15          The second point, Your Honor, is one that was made

16  by U.S. Probation in their report.  And, again, I wish I would

17  have thought of it, but I didn't.  But U.S. Probation, like

18  the Sentencing Commission and like the district court judge,

19  they are in a unique position.  And the U.S. Probation office

20  is in a unique position because they meet with each defendant,

21  as Your Honor knows.  They spend more time with the defendant,

22  in some ways, than a lot of court personnel and other folks,

23  and they have direct interviews, they look them in the eye.

24  And they also look at other defendants who have committed the

25  exact same crimes.

1        And as Your Honor knows, in paragraph 121 -- again,

2   these aren't my words.  These are the U.S. probation officer's

3   words.  They tell Your Honor, in considering factors that

4   might suggest providing a sentence below the guidelines or

5   outside the guideline range, to consider that Mr. Fogle has

6   already faced and will continue to face for the rest of his

7   life unique severe consequences.

8        "The defendant has suffered collateral consequences

9   greater than that of a 'typical' defendant facing sentencing

10  for similar offenses.  In addition to the loss of his income

11  and marriage, he has lost his community reputation and

12  anonymity of the details of the offense.  He is a public

13  figure known worldwide.  Regardless of the Bureau of Prisons

14  facility to which he is designated, he will be recognized, and

15  the details of his offenses will be known.  Thus, the time

16  served in prison may be more stressful than that of other

17  inmates whose identities and offenses details are not known to

18  others."

19       Now, there's no question, Your Honor, that those

20  consequences are the result of his selfish, pathetic conduct,

21  but when you are sentencing each individual, Your Honor, the

22  charge of 3553 -- obviously, no two defendants are the same.

23  That's why analogies to cases are never perfect.  And when

24  Your Honor is considering what is just punishment, we would

25  simply ask you to consider there are unique consequences that

1  Mr. Fogle will face for the rest of his life, that other

2  defendants will not face.

3         Probation is telling Your Honor its opinion that

4  time served in prison is going to be harder for him than for

5  other defendants who committed the exact same offense.  And so

6  when we're differentiating and we're finding the sentences

7  tailored to Mr. Fogle and appropriate for Mr. Fogle, we would

8  respectfully ask Your Honor to consider those facts and those

9  consequences, because that's punishment that other folks,

10  other individuals and defendants who have committed these

11  crimes, they are simply not going to face.

12         Your Honor, the next factor I would like to talk

13  about is the need to afford adequate deterrence to criminal

14  conduct.  I could not agree more that this type of conduct has

15  to be deterred, both counts.  There's no debate, both

16  specifically and generally.  But, Your Honor, when you look at

17  the unique circumstances of this fact, 60 months is more than

18  adequate to effectuate specific deterrence and general

19  deterrence.

20         Mr. Fogle has destroyed his life, Your Honor.  He

21  did it to himself.  I don't feel any sympathy for what he did.

22  He did this to himself.  But the fact of the matter is, he

23  knows he burned down everything he worked to build for the

24  last 18 years.  And he's going to know that for the rest of

25  his life.  And it has been the ultimate swift kick in the

1   behind.

2         You have seen evidence today of the steps he has

3   taken to focus on trying to get healthy, but all those steps,

4   regardless, when he -- this is -- his punishment is not going

5   to stop when he gets out of prison.  And 60 months is more

6   than enough for this man to know he's never going to do this

7   again.

8         In terms of general deterrence, Your Honor, as we

9   put in our brief, no one wants to be Jared Fogle.  He is a

10  laughing stock, he is a pariah, and he did it to himself.  So

11  there doesn't need to be sympathy there, but he did this to

12  himself.  No one wants to be him.

13        Anyone who would be thinking with this sort of

14  conduct, looking at him -- he doesn't need to get more than 60

15  months in prison for someone who is medically able to resist

16  engaging in this type of conduct -- to think twice about

17  committing this type of conduct.  It's just not necessary.

18  Anyone with the Internet or the television is going to -- has

19  watched him destroy his life and is going to see him go to

20  prison and lose everything.  And those are consequences he

21  brought on himself.  But when you're thinking about the need

22  of deterrence, Your Honor, 60 months is enough to effectuate

23  those goals.  There's just no question.

24        And, finally, Your Honor, the last topic that I want

25  to address, hopefully a little more slowly, is the need to

1   avoid unwarranted sentencing disparities.  Your Honor, I'll be

2   the first one to admit, every case is different, every case

3   has unique circumstances.  But we cited three cases for Your

4   Honor in the brief, and I won't go through them all, that are

5   instructive, because those are instances where individuals

6   received sentences far less than what Mr. Fogle's advisory

7   guideline range is.  And so -- and they are instructive in a

8   number of ways.

9          The only one I want to mention is *Horner*.  *Horner* is

10  a case Your Honor had.  If you remember he plead guilty to one

11  count of possession.  Again, that distinction between

12  possession and receipt, it really rings hollow in this case,

13  as well, when you look at Mr. Horner's conduct.

14         THE COURT:  He didn't travel --

15         MR. DeVOOGHT:  Your Honor, but that --

16         THE COURT:  -- and have sex with children.

17         MR. DeVOOGHT:  Respectfully, Your Honor -- well,

18  first of all, Mr. Fogle had sex with minors, 16- and

19  17-year-olds, that's right; but, Your Honor, second of all, as

20  Your Honor knows, Count 1 is driving this guideline range.

21  He's at a 33.  If all we had was Count 2 and sex with

22  children, if that's all we had, the starting point for

23  acceptance of responsibility would be a 28.  He would be down

24  to 25.

25         THE COURT:  But we have both.

1          MR. DeVOOGHT:  But that -- but, Your Honor, in terms

2     of the relevant conduct, when you look at Mr. Horner's

3     conduct, he had aggravating conduct Mr. Fogle does not have.

4     For example, Your Honor, unlike Mr. Fogle, this individual is

5     out there searching on the Internet for child pornography for

6     15 years, 15 years.  Even if you go all the way back to 2007,

7     when Mr. Fogle is engaging in phone sex, that's still just

8     over half the time this individual is out on the Internet

9     specifically seeking out child pornography.  And, Your Honor,

10    not just child pornography.  As Your Honor will recall, the

11    government pointed out, Your Honor, that he was specifically

12    seeking out prepubescent children engaged in hardcore sex

13    acts, including sadistic and masochistic conduct.

14          The truly vial material that is out there, it wasn't

15    given to him on a thumb drive.  And should Jared Fogle have

16    gone to authorities when he got the thumb drive?  Of course.

17    But he didn't spend 15 years seeking out over 600 images of

18    young children being -- complete acts of violence, not even

19    acts of sex, just acts of pure violence against them.  That's

20    not Mr. Fogle.  That's Mr. Horner.  And he got 70 -- he had 70

21    months, Your Honor.  And a big distinction there, Your Honor,

22    is his guideline range was only 20 -- his offense level was

23    only 28, again because of that line drawn between possession

24    and receipt.

25          But ask yourself, Your Honor, what is different --

1   setting aside the sex acts, what is different between

2   Mr. Horner's possession when he's on the Internet searching

3   through these images for 15 years and Mr. Fogle receiving a

4   thumb drive with images on it or getting them on his phone?

5   One course of conduct is clearly worse than the other, but yet

6   his offense level is 33 and Mr. Horner's is 28.

7           Your Honor, similarly, those are the key components

8   with respect to Mr. Horner, those three.  I think the only

9   other one is that the government, in its sentencing memo with

10  Mr. Horner, said that he actively sought and amassed his own

11  personal collection.  Now, I understand, I think the

12  government could easily say Mr. Fogle didn't have to because

13  he had Mr. Taylor.  That's what I would say if I was the

14  government.  But he is still different than Mr. Horner.  He

15  did not amass over 15 years of personal collection of child

16  pornography.

17          And you're right, Your Honor, he committed these two

18  crimes.  But when you look at the aggravating facts of

19  Mr. Horner's case, child pornography case, versus Mr. Fogle's

20  child pornography count, it at least calls into question how

21  the charge driving the guideline range, responsible for that

22  guideline range, that Mr. Fogle's conduct arguably is much

23  less severe.

24          And now my colleague, Mr. Margolis, will address

25  additional factors.

1          THE COURT:  Okay.

2          MR. MARGOLIS:  Your Honor, the hour is late.  I'll

3    be brief.  And I will attempt to speak more slowly than

4    Mr. DeVooght did.

5          Your Honor, first with respect to the history and

6    the characteristics of the defendant, you know a great deal

7    about him, and Ms. Ivie did a wonderful job of laying out his

8    background, so I'm not going to dwell on that, but I will make

9    a couple of points with respect to the other guideline issues.

10         And the first is the need to protect the public from

11   further crimes of this defendant.  And I know there was some

12   examination, or cross-examination, with respect to the greater

13   ease with which a person could reoffend in engaging in child

14   sex as opposed to trolling around for child pornography, but I

15   would respectfully submit, Your Honor, not for the Subway Guy.

16   Your Honor, we were followed by a helicopter from his place of

17   bond to the courthouse.

18         He is -- he's -- it took these incredible,

19   disgusting, brutal acts of violence across the Atlantic Ocean

20   to push him off the front page of the city's newspaper on

21   Sunday.  As Mr. DeVooght said, nobody wants to be Jared Fogle.

22   He is one of the most despised figures in America.  And the

23   likelihood that, even if he wanted to engage in this kind of

24   behavior down the road, he would be able to, I think, is just

25   palpably ridiculous.  It's not grounded in reality.

1          But what is grounded in reality is his understanding
2    and recognition of the crashing and burning of his life.  He
3    knows he's going to prison, okay?  And he's prepared to do
4    that.  He's seen the overestimated wealth, whatever he had,
5    nothing like what the newspapers reported, dissipate.  He has
6    no income, he has no prospect of income.  He's lost his wife,
7    he's lost the children that he really does love.  He hasn't
8    seen them for months now, and not going to see them for maybe
9    years and years and years.  The likelihood that this man, who
10   has gone through this, is going to get out of prison and find
11   a way to commit a crime again so he can die in a prison cell,
12   it's nil.  There's zero chance.
13          What he's done, as you heard a little bit from
14   Dr. Bradford, and more from Dr. May, is demonstrate a
15   steadfast commitment to try to get well, to try to dig out as
16   best he can.  And that goes to the point of the need to
17   provide him needed medical care in the most effective manner
18   possible.  Jared knows he needs treatment.  He has responded
19   extraordinarily well to Dr. May.
20          And however the treatment continues between
21   inpatient and outpatient for probably the rest of his natural
22   life, there is a need, and he sees that need, and he has a
23   burning commitment to get that right.  And we heard that in
24   spades from Dr. May.  He has said many, many times to us, "I
25   want to get myself well."

1          I will say thank you to the Court and thank you to

2     the government, thank you to Probation, for allowing Mr. Fogle

3     to be evaluated by the world's best and to be treated by the

4     nation's best, and to follow up treatment in Lexington,

5     Kentucky --

6               THE COURT:  Why didn't he do that --

7               MR. MARGOLIS:  Pardon me?

8               THE COURT:  -- years ago?

9               MR. MARGOLIS:  You know, your Honor, it is

10    interesting.  What Dr. Bradford said to me is -- the three of

11    us sat around that little table after Jared's examination

12    before he came home from Ottawa.  He looked at Jared and said,

13    "You know, if I could have met you seven years ago, I would

14    have put you on Zoloft and this wouldn't have happened."  Now,

15    his dates were a little off, okay?  But if he had known, if

16    Dr. Bradford had known, he could have fixed this guy, or at

17    least got him on the road to recovery, and we would not be

18    here today.  Why he didn't see that -- and you will hear it

19    from him, Your Honor, you will in a couple of moments --

20              THE COURT:  Okay.

21              MR. MARGOLIS:  -- why he didn't see it, why he was

22    so selfish, why he was so self-absorbed, why he was quick to

23    understand the horrible things going on in Taylor's home

24    eventually when his life came crashing down.  And it took him

25    a couple of days and a week or whatever to really internalize

1    and understand, because he tried to do it, he made his best

2    efforts, with Dr. May's advice and counsel and guidance, to

3    understand the horrible things he did with those young girls

4    in New York, as well.  He had no concept of how out of control

5    he was.

6            And as Dr. Bradford, you know, opined, in effect --

7    and this is no excuse, Your Honor, I swear to you, Judge

8    Pratt, I'm not making an excuse -- the reality is, he traded a

9    horrible food addiction for a horrible sex addiction and all

10   sorts of corollary related terrible, terrible things that

11   followed along with it.

12           I wish he would have realized long ago what problem

13   he had, and we wouldn't be sitting here today and he wouldn't

14   be followed by a helicopter and seeing his life crash and

15   burn.  For whatever series of reasons, he didn't.

16           But, Your Honor, he gets it now.  It's late, but he

17   gets it now.  The very first day that Andy DeVooght and I met

18   this guy and he came to us and said, "I would like you to

19   represent me," he came to us and said, "I'm sick and I want to

20   get well.  I know I'm going to prison, and I deserve it.  I

21   want to make a clean breast of things and tell you

22   everything."  And, ultimately, he told the government

23   everything, which he did for hours and hours and hours

24   truthfully, candidly, openly.  We wouldn't have been allowed

25   to go to Ottawa or Lexington, Kentucky, or Aurora, Colorado,

1    if he hadn't been straight with the government from day one.

2         And the thing that really struck me, Your Honor, and

3    I think struck Mr. DeBrota, who has seen it all, is that the

4    very first time I met this guy, he said, "I want to make

5    amends.  I don't know who, I don't know how.  I want to pay

6    restitution to try to make this right."  He was not digging

7    out.  This is long before any discussion with the government

8    ever began.

9         So that the very first substantive discussion I had

10   with Steve DeBrota in his office, I was able to sit down and

11   say, "Oh, and, by the way, in addition to him opening up with

12   me -- and I will tell you what I hear, and then you will hear

13   it from him directly -- he has already pledged to put down a

14   million dollars in my law firm escrow account.  To the extent

15   that you tell us there's victims and we push ahead with this,

16   he wants to make it right."  That came out of his mouth

17   volunteered, Your Honor, not pressured by the government.

18   Now, I'm confident Mr. DeBrota would have gotten there anyway

19   in space, but the point is he did it on his own.

20        So as late as it came, as long as it took, as his

21   life is crashing down all around him, he realized, "I'm sick,

22   I'm going down.  I would like to get it right."  And then,

23   because the government gave us the opportunity to begin to

24   take those very first steps, he took huge steps, showed

25   complete, total commitment to try to get his life back in

1   order as best he can.

2           He will never -- he will never, ever be able to

3   fully make amends and turn this around.  We know that.  But he

4   will go to prison and he will try to get well, and he will do

5   his level best for the rest of his life to continue to make

6   those amends.  And for that, Your Honor, I ask you to give him

7   the due and appropriate consideration and fashion a sentence

8   that is just, that allows him to get well as quickly as he

9   can.  Thank you, Your Honor.

10          THE COURT:  Thank you, Counsel.

11          Are you okay, David?

12          Mr. DeBrota -- oh, I'm sorry.  Mr. Fogle, did you

13  want to make a statement?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  Come on up to the lecturn.

16          THE DEFENDANT:  Where do I even try to begin, Your

17  Honor?  For most of my adult life, I have been in the

18  spotlight, trying to be a positive role model for others, that

19  they, too, could become healthier and live a better and more

20  rewarding life.  Most people think that that all changed

21  upside down after my home was raided by law enforcement, and

22  even more so when I pleaded guilty to these charges related to

23  my horrible conduct that I sit here in front of you to answer

24  to.

25          But I feel this actually changed much longer ago.

1    Somewhere along the line, I went from being raised with good

2    solid morals and values to living the life of deception, lies,

3    and complete self-centeredness.  My life had completely

4    spiraled out of control on so many levels.  I had become

5    dependent on alcohol, pornography, and prostitutes.  The

6    victims that I have harmed as a result of my decisions will

7    carry a huge burden for them the rest of their lives.

8              At the time, I truly did not think through what I

9    was doing, nor did I understand the consequences of my

10   actions.  In the past month, during my treatment with Dr. Rick

11   May, I have learned much about my horrible actions and also

12   inactions.  Every time an underage minor is viewed, they

13   continue to get re-victimized.  This can lead to depression,

14   anxiety, inability to trust others, and potentially even lead

15   to suicidal thoughts.

16             I have also learned so much about the underage

17   minors with whom I have paid to have sex with.  At the time, I

18   felt that, because I was paying them, that it was somehow

19   okay.  Well, it wasn't okay whatsoever.  Not only is it

20   illegal, of course, but these minors are engaging in

21   activities for specific reasons.  Many come from broken

22   families, were victims of abuse or worse, were forced into the

23   sex trade by pimps.  These thoughts never crossed my mind when

24   I engaged with them.

25             My actions allowed them to be further victimized,

1    and for that I will be forever remorseful.  Not a day will go

2    by that I don't think about them and what I did to take away

3    and impact their lives.  I truly hope that the restitution can

4    positively play -- can positively play some role in changing

5    the course of their lives, although I am painfully aware that

6    I have taken things from them that can never be fully

7    remedied.

8            The members of my family are also victims of my

9    reprehensible acts.  I absolutely devastated my wife.  She has

10   and will have to continue to endure what I did for years to

11   come, long after our divorce is final.  She is now going to be

12   forced to be a single mother, which is something that I truly

13   never intended to happen.  My young son and daughter, although

14   too young to understand what I have done, will have to live

15   with this terrible burden of my actions.

16           THE COURT:  You gave your wife almost $7 million,

17   though, so she will be okay.  You may continue.

18           THE DEFENDANT:  All of this because I chose to act

19   in a completely inappropriate and irresponsible manner.  I

20   love my children so very much, and not being able to see them

21   grow up makes my heart absolutely sink.  I will someday -- I

22   will someday have to explain to them what I did, and that will

23   be one of the hardest conversations of my life.  They didn't

24   deserve to be brought into any of this.

25           I owe a huge apology to the people who supported me

1  and my positive messages these past 15 years.  You believed

2  me -- you believed in me and what I stood for.  I truly regret

3  that I've hurt you, that I've hurt so many of you.  It gave me

4  such a wonderful feeling to be a positive role model for

5  healthy eating and lifestyle change in my former life.

6       I want to get myself healthy and still try to help

7  others, although I realize that I can never change my

8  deplorable past choices.  I so regret that I let so many of

9  you down.  And that is my intent, to learn from this

10  experience so that I never, ever do these things again.

11       Your Honor, I wish that I had been able to realize

12  these problems that I had years ago, I truly do.  I could have

13  addressed them in a positive, appropriate way before I

14  violated these victims.  I take full and absolute

15  responsibility for what I have done and, more importantly, the

16  harm that I have caused the victims and their families.

17       My intent, both during incarceration and upon

18  release from prison, is somehow to continue to help people in

19  a productive way, whether it's helping inmates further their

20  education or helping other sex offenders change their lives

21  for the better, or even educating mental health workers about

22  deviant sexual behavior, I want to make a positive impact.

23  Your Honor, I want to redeem my life, I want to become a good,

24  decent person, and even better father, and to truly help

25  others.  Thank you.

1              THE COURT:  Thank you, Mr. Fogle.

2              All right.  Mr. DeBrota, the court reporter is okay.

3              They're asking for -- to get to 60 months, I would

4    have to go down eight levels on the guidelines.  What do you

5    think, Mr. DeBrota?

6              MR. DeBROTA:  To get to 60 months, you would have to

7    be at a total offense level of -- you would have to be at

8    least 25, down from 31.

9              MR. DeVOOGHT:  33.

10             THE COURT:  33.

11             MR. DeBROTA:  So, mathematically, I think that's

12   correct, mathematically.

13             THE COURT:  About eight levels?

14             MR. DeBROTA:  Yeah, that's eight levels.

15             May it please the Court, two things first.  We filed

16   a sentencing memo that very carefully laid out a detailed

17   factual chronology of what we think Mr. Fogle did for well

18   over a five-year period of time, accounting for the

19   information from persons 1, 2, 3, and 4, and you've also heard

20   today information relating to 5, 6, and 7, and then more

21   elaboration of what happened with Minor Victim 13.  I know

22   the Court likes to see pleadings like this ahead of time.  The

23   defense filed an extensive one, as well, so I'm not going to

24   belabor what I've already argued carefully in writing.

25             But we described how these are fundamentally two

1   different crimes, both very serious crimes.  The child

2   pornography offense has a certain guideline computation.  As a

3   matter of statutory analysis, it's a less serious crime.  Its

4   statutory maximum penalty is 20 years.  The commercial sexual

5   activity with a minor is a 30-year felony.  It's a higher

6   grade of felony.  There's a difference in their mandatory

7   minimums, which is more an accident of history than anything

8   else, but the sort of starting point of the analysis are two

9   fundamentally separate crimes combined in Mr. Fogle's life to

10  be what the Court has to consider now as a package together.

11          In terms of understanding the impact of all of that,

12  which I'm going to touch on, the Court also has, filed under

13  seal, some information from the victims, the ones that decided

14  that they could put themselves in a position to feel like they

15  could talk to you about that.  I think there are three of

16  them.  We asked all of them if they wanted to do that, and

17  consistent with what I've seen over a 20-some years of these

18  cases, a lot of times the victims in these cases don't want to

19  talk about it.  They just want to go on with their lives.

20  It's very stressful.

21          In this particular case, as you see in one of those

22  letters under seal, the devastating harm to the victims in the

23  homemade material is evident from what you've been told.  I

24  think they have the right to have that kept under seal and

25  have it be confidential, but there shouldn't be any doubt that

1   there is serious harm here based on what happened in

2   Mr. Taylor's life and in his house.  And all of that could

3   have been prevented if his co-conspirator, Mr. Fogle, had done

4   something about that instead of wanting to get the result of

5   it.

6          So with the understanding that the Court has that

7   material, what I'm going to do first is talk about the 3553

8   sentencing guideline arguments and then down into the

9   statutory analysis.  The sentencing guidelines in this case

10  combine two different activities and apply in a way that I

11  think is distinguishable from some of the cases you've been

12  given as a comparator.  But, as a general matter, some of the

13  academic critique that has been put out there in the

14  sentencing guidelines is, as applied to this case, just noise.

15         There is no question that accounting for the fact

16  that the commercial child pornography had victims down to age

17  six is an appropriately significant consideration in this

18  case.  That material was material that was obtained on the

19  Internet by Mr. Taylor, given to Mr. Fogle as part of the

20  conspiracy between the two of them to distribute and receive

21  material there.

22         Mr. Fogle took that material, that's on a thumb

23  drive, and showed it to a person in a hotel room, not

24  Mr. Taylor.  And that was done in the context of sexual

25  activity.  This was fueling his sexual fantasies.  So holding

1   him accountable for it, somebody under 12, is squarely what

2   the evidence here shows.

3           And, also, since it's a conspiracy case, he is

4   properly held accountable for what Mr. Taylor is doing with

5   him.  And there's no question Taylor gave him child

6   pornography involving quite a number of preteen minors on that

7   thumb drive.  The youngest is six.  There's plenty.

8           Now, when you get into the homemade material, yes,

9   he didn't know about the nine-year-old, Minor Victim 12, but

10  that's not the question the guidelines are asking.  The

11  question is:  Were any of the victims in that crime under age

12  12?  And, clearly, they were.  And that's a fair

13  consideration.

14          Now, the Sentencing Commission began holding all

15  kinds of hearings around 2011 on these guidelines.  I know

16  about that.  I personally participated in it.  I was one of

17  the DOJ witnesses, and I talked about the guidelines there.

18  And I actually argued that the under-12 enhancement ought to

19  have more levels for really young kids.  It doesn't apply to

20  this case.  But I do not agree that there is a broad consensus

21  that it's, you know, irrelevant that you have really little

22  kids in a child pornography case.  I think that should be a

23  higher penalty, and I think that makes logical sense.

24          The other way we could do it would be talking about

25  the harm, okay?  But in sentencing hearings, we don't get in

1   there and litigate what exactly happened to each victim.

2   Instead, we make a characterization, based on them being under

3   12, there will be more harm.  And that's a fair

4   scientifically-based realization that all of us probably

5   arrive at anyway, even apart from the science.  It does matter

6   that they are little kids.

7           Now, also the use of the computer enhancement.  At

8   times, people have wondered about whether or not that's really

9   serving a useful function.  As a matter of the history of the

10  guidelines, the Sentencing Commission set the base offense

11  level with the assumption that that would apply almost all the

12  time, because a lot of federal crimes are going to cross state

13  lines and a lot of that is going to be a computer or Internet

14  communications and so forth.  So that's why the base offense

15  level is 22, not 24.  So the realization that it's going to

16  apply most of the time is exactly what the guidelines

17  contemplated.  Many courts have not noticed that, and I don't

18  know why, but that's how that flies.

19          But I think a better question is, and I think this

20  is also what we said in Congress, was let's ask how this

21  defendant used these computers and the Internet.  What we have

22  here is we have child pornography coming from the Internet in

23  the commercial material, we have it being stored on computers,

24  carried over state lines and countries, and we have it texted

25  from Mr. Taylor to Mr. Fogle, okay?

1           And when we're talking about setting up the child

2    prostitution, you now have four different examples of text.

3    That's a computer, that's interstate commerce, that's the

4    Internet, and everything, the phone system.  That's how he's

5    finding the child prostitutes, by getting at adult

6    prostitutes.  That's the criminal tradecraft.  So all of those

7    reasons are aggravating factors tied to computer use.  This is

8    not computer as container.  It's not like these are just, you

9    know, pieces of paper in a briefcase printed off a laser

10   printer, it's not that.  This is fundamentally just as much an

11   on-line crime as it was a brick-and-mortar crime.

12          In addition, the homemade material was produced

13   using hidden cameras on a system in Mr. Taylor's house that

14   then is going to propagate, through computer data to other

15   places, more computers.  So all of that is a fair

16   consideration.  If the guidelines were redrafted, we might ask

17   a different question.  Is there a significant use of a

18   computer in this case?  And there is.  If that was the

19   question, we would easily pass that test.

20          Now, the number-of-images enhancement was exactly

21   what I testified about in the Sentencing Commission.  And the

22   defense bar basically said, "Look, computer storage media has

23   gotten bigger.  The number should be higher than 600 now."

24   And they argued for a much higher number.  Fantastically,

25   someone even stood up and said most child pornography cases

1   have 400,000 images, which we didn't agree with.  And I don't

2   think that's this Court's experience.

3          In this case, as we do the analysis on the

4   guidelines, you count videos as 75 images.  This is in the

5   thousands of images counted that way.  This is not close to

6   600.  And everyone who has looked at the evidence on the

7   defense side would agree with that proposition.  I think

8   Mr. Margolis just selected it.  But the idea is, we're scaling

9   harm by counting the number of images.

10         If we had done it another way, we might ask what

11  that would have been, and we would have counted victims, okay?

12  If we do that, he's not in better shape.  He has at least

13  eight of the victims he's seen, and there are many more in the

14  commercial child pornography.  And if he is held responsible

15  for his co-conspirator, you're up to 12.  And the two minor

16  victims he actually is in the room with clearly would count,

17  too.  But we don't ask that question that way.

18         So when people criticize the way the guidelines

19  decide to arrive at an advisory range, they often don't

20  provide an alternative way of getting us to the same point.

21  That realization is today, in 2015, why I think, in part, the

22  Sentencing Commission has yet to change anything.  So after

23  some hearings, years have passed, courts have gone on, and

24  they've found ways of doing individualized sentencing that

25  pretty much puts aside the broad critique that triggers some

 1   of the analysis that says these guidelines are fundamentally

 2   flawed.

 3           THE COURT:  So were there over -- were there

 4   thousands of images?

 5           MR. DeBROTA:  There's at least 400 videos, and times

 6   75 gets you in about the three-plus thousand range.  There's

 7   over 400 videos.  It's not close to three -- it's not close to

 8   600.  And that's not talking about duplicates or anything.  So

 9   the number of images, the computer use, and the age all make

10   logical sense.

11           Another enhancement that distinguishes this case

12   from what would be entitled to the mandatory minimum, though,

13   is the pattern-of-exploitation-of-minors enhancement.  The

14   activity in Count 2 is causing a five-level increase to Count

15   1.  And that's a very significant increase, because he had

16   sexual contact with a 16- and 17-year-old six times, and he

17   attempted it more.  Any two of those would have caused that to

18   happen, let alone six.  So that's a proper consideration.

19   There's no reason to take that fact out of the case as a broad

20   critique of the guidelines.

21           Now, when you put it all together, the child

22   pornography does end up being the more serious crime and

23   advisory range, but the other crime is still a 28, okay?  And

24   in that calculation of the other crime, you basically include

25   each victim separately and you get to a 28.  Then that's

1   marrying over to the original computation with the pattern of

2   exploitation and putting together the entire body of things.

3          I do not think there is a widely-accepted judicial

4   consensus that there is a flaw in the trafficking guidelines

5   relating to commercial sex trafficking of minors.  I don't

6   believe that's a fact.  So that piece of the case does not

7   have the academic critique that goes on on the child

8   pornography side.

9          Now, to the extent that I addressed a couple of

10  other specific arguments, the Department of Justice's position

11  on number of images and use of a computer in no way would

12  encompass what's going on in this particular case.  This is

13  not what we were talking about there.  It is the case that the

14  Department of Justice has taken positions on some amendments,

15  but that hasn't won the day.  Congress hasn't agreed, the

16  Commission hasn't agreed.  And, frankly, that's some years

17  ago.

18         When you talk about where we end up, we end up with

19  an advisory range of 135 to 168 months, and our recommendation

20  is squarely in the middle of that, at 151 months.  The

21  recommended term of supervised release in the guidelines is

22  life, and that's our recommendation, as well.

23         But if we looked at an alternative formulation, we

24  can consider that, and as I go to the next thing I'm going to

25  say, I'll be happy to do that, but it's clear, from the law,

1  the starting point is:  What is the advisory computation?  And

2  the parties agree on that, and nobody has shaded anything

3  here.  That is a straight-line computation.  That's just what

4  happens.  So, regardless of the critique and the overall

5  statutory structure of the guidelines, there is no question,

6  it is what it is, that's the right range, considering the

7  crimes that, you know, we have in front of us here.

8          Okay.  To the degree that the Court is being asked

9  to decide that the guideline range should be ignored because

10 Congress passed it for political reasons, we do not agree you

11 should consider that.  I think that has separation of powers

12 concerns.  We do not think that is proper consideration in the

13 U.S. Court to question the motives of Congress in passing a

14 mandatory minimum or in arriving at a different sentencing

15 computation.

16         We've made this point a few times in the past,

17 but -- and certainly if it is a proper consideration, we would

18 ask you not to do so.  We don't have a way of deciding if a

19 law was passed for political reasons versus a regular

20 procedure, and certainly doing that inquiry would involve

21 something that we shouldn't be doing.  It's entitled to the

22 deference of a duly enacted law or a regulation.

23         Now, if you talk about the distribution in this case

24 as a matter of the nature and circumstances of the offense, it

25 matters a great deal that this is Zeroday distribution of

1 produced material by Mr. Taylor.  Jared Fogle absolutely knew

2 who many of these victims were.  He knew where they would be,

3 they would be with Mr. Taylor.  He knew what was going to

4 happen, and he started knowing about that in 2011.  Okay, he

5 absolutely knows what's going to happen to the person he's at

6 a restaurant with.  He's not a part of the production, but he

7 knows he's going to get the result.

8 　　　　　And if we could have charged him with producing that

9 material, we would have.  The fact of the matter is, Taylor is

10 doing it on his own.  He's giving the result to Mr. Fogle.

11 Does he have moral culpability?  Absolutely.  Can we charge

12 him with the crime of production?  No.  He's getting it after

13 the fact, and he's getting it enthusiastically.

14 　　　　　In the case of that one victim we're talking about,

15 Minor Victim 5, he will recognize her nude torso with her head

16 off, like cut off in the picture, months later by text

17 message.  That means he had to pay a lot of attention to that

18 material.  And he gets the ability to do that because Taylor

19 is bringing it around when they're traveling.  His employee

20 essentially took the risk of carrying this stuff over borders

21 instead of Mr. Fogle.

22 　　　　　That Zeroday production -- and then it's Zeroday

23 distribution, rather, to Mr. Fogle is an aggravating factor we

24 think is part of the justification for a sentence just like

25 we're asking for, in the middle of the guideline range.

1          Also, the harm to the victims is very personal.

2  It's not just something where he can rationalize, as he has at

3  the time, that nothing is really going on, it's just he's

4  taking advantage of it, Taylor is going to do this anyway.

5  The fact of the matter is, he can prevent it.  And he can

6  certainly stop encouraging Taylor to do it, because when these

7  two men are together, they're exchanging the rationalization

8  that this is okay by the exchange of the material.

9          And that is why this is not the *Gardner* case.  This

10 is not peer-to-peer file distribution, random distribution to

11 someone you've never met on a network.  This is not making the

12 files available to strangers.  This is making the files

13 available to your close friend, business associate, colleague,

14 and traveling partner, who shares your fetishes.  That's what

15 this is.  And that made Taylor infinitely more dangerous than

16 he might have otherwise been.

17         Later on in this case, we're going to ask for a very

18 substantially higher sentence on Mr. Taylor, because in every

19 respect, he's a monster.  But he's a monster that this man

20 helped cause, and he could have prevented it, he could have at

21 least caged.  And that is a factor not found in any of the

22 other cases used for comparison.  And, frankly, it's rare,

23 okay?  So that -- put that together, and a guideline sentence,

24 we think, is an appropriate measure of that activity.

25         We think it's important that the criminal activity

1    here was a long-standing and persistent pattern of behavior

2    from 2011 to April of '15.  This defendant, when he was

3    dealing with prostituted minors, makes the initial inquiry in

4    the four examples to the Court.  He is making the entree here.

5    This is not being offered to him.  He's seeking it out.  He's

6    offering finder's fees.

7            What he's seeking out, what he is fanaticizing

8    about -- and I'm not sure why Dr. Bradford doesn't see this.

9    What he's fanaticizing about, what he wants to do, is squarely

10   like what he actually did.  He actually at one point says he's

11   more interested in young than the secondary sexual

12   characteristics that he's discussed with Dr. Bradford.  It's

13   in that text.  That's important, because Bradford has

14   concluded he's not a pedophile because of those secondary

15   sexual characteristics, in part.  He's made a mistake.  He

16   should have read the texts, and he didn't.

17           He should probably have considered a little more the

18   recordings of the communications with person 1 in Florida,

19   too, because he says, "heterosexual weak pedophilia."  Well,

20   there's boys in there, too, and there is in the chat.  There's

21   more to this story than Dr. Bradford got in the five hours.

22           What we have is a long-standing pattern where we can

23   say, what does he want to look at, talk about, fantasize to,

24   meet, collect, and value?  If you look at a lot of pictures

25   every day of Boston Red Sox, I'll bet you're not a Yankees

1   fan.  But we have a pattern of behavior here that goes for

2   five years, that tells us what he's really interested in

3   doing, and what he's done.  Put that together, this is not

4   aberrant behavior.  This was a consistent course of conduct.

5   It's not an isolated lapse in judgment.  This is a pattern of

6   behavior, very low impulse control, very serious conduct, very

7   personal, hard to rationalize.

8           We think it's interesting that he doesn't have any

9   cognitive distortions.  Many people you would see with

10  pedophilia would have them.  He does realize what he's doing.

11  He's not rationalizing this.  That's worse.  That's more

12  dangerous.

13          The Court asked the question, why get -- why not get

14  treatment before?  The same dollar that gets you access to

15  world class doctors could have been spent earlier on world

16  class prevention or intervention.  It doesn't happen.  Why?

17  Because he's getting feedback, positive feedback, from his

18  course of conduct.  He's hypersexualized, he's having a great

19  time.  And he does it four or five years, and that didn't stop

20  him.  He can't control his demons.  I hope someday he can, but

21  the track record right now, we only know how well he can do

22  once he's caught and once he's under court supervision, once

23  the Probation Office is there, and once he has long meetings,

24  100 hours, with Dr. May.

25          The victims in this case, Your Honor, are where the

1  case begins and where it really ends.  The point of the

2  exercise here was to try to find as many as we possibly could.

3  And we described in detail in the pleading how we went about

4  doing that.  These victims have lost their privacy, they've

5  lost their self-confidence, they've lost their sense of self

6  and their sense of well-being.  There's a terrible power to

7  the personal betrayal of the conspiracy in Count 1.

8          With regard to the prostituted minors, they did not

9  have easy lives.  Both of them were victims in a previous

10  case, involving a violent pimp, of human trafficking.  Now,

11  Mr. Fogle didn't know that, but the fact remains that's the

12  kind of lives they've had.  They didn't have family support.

13  They essentially don't have families at that time, and they

14  are very young.  The harm and damage to them is incalculable.

15          By the time the case was over, we located ten

16  children ultimately, and four former children, now adults, and

17  we put them in a position where they got some help and they

18  got some measure of justice.  That's the best we can do.  We

19  think we've held him responsible for what we can prove, and

20  that's what the sentencing decision should be based upon.  We

21  can tell the Court we don't think there is more to the story,

22  but what there is here is enough to provide a sobering measure

23  of just how bad all this was.

24          Now, in understanding what the future is, if we're

25  talking about individual deterrence of this man or general

1  deterrence and just punishment, we know that the offenders in

2  these cases watch the results.  Some of them even filed

3  motions with you describing why they felt he should get

4  different time based on what they got, just an example.  But

5  at the end of the day, these offenders are watching what we're

6  doing and what the courts are doing, and they're making a

7  decision to either get help or not, or go on with what they're

8  doing and offending.  So the deterrence does matter with

9  special force in these cases.  And many courts have commented

10 on just that, and so has Congress.  We agree with that

11 assertion.

12         If you talk about history and character, there's

13 nothing in this man's history or character to explain why he

14 was at greater risk of doing any of these things than normal.

15 He comes from a good family, he's educated.  He has the

16 financial resources to not do these things, to get help.

17 Instead, he is going to spend tens of thousands of dollars on

18 prostitutes over a long-standing and persistent period of

19 time.  He sought out the risky behavior with those minors,

20 including unprotected sex with minors.  Unprotected sex, okay?

21 And at the end of the day, that low impulse control doesn't

22 say good things about his ability to get his behavior on

23 track.

24         It should all work out if everything is in a perfect

25 world, but we don't live in a perfect world.  It hasn't worked

1    out for the victims in this case.  I'm sure not all of them

2    are happy.  I'm sure they would all like a higher sentence.

3              What we're recommending here is 151 months and

4    lifetime supervised release.  The reason why is

5    straightforward.  That's right in the middle of the advisory

6    range.  We think that range was correctly calculated.  We

7    think it accounts for the criminality we can actually prove.

8    It's not holding him accountable for things we think he didn't

9    do or fantasies, but it is a fair resolution to two serious

10   crimes brought together in the sentencing of one individual.

11   And that's the best we can do for those victims.

12             So we would ask the Court to do that, to impose a

13   sentence in this range; and a fine consistent with the

14   advisory range, as well; and to approve the restitution scheme

15   we've put together at the moment, where each of the victims is

16   entitled to the $100,000 he agreed to pay, allowing the

17   government to complete that payment process -- as the Court is

18   aware, we have three yet to accomplish there -- and to put

19   those victims in a position where they can get the help that

20   they desperately need to try to move forward in an environment

21   where they have very little to no peace of mind.  For them,

22   this isn't anything but a terrible reality.  It's not a

23   fictional story, it's not entertainment.  And it's going to be

24   a long time before they're over all of this, and that needs to

25   be accounted for in his sentence and Mr. Taylor's sentence.

1   This is half the story, but just the first half of the story,

2   Your Honor.  Thank you.

3            THE COURT:  Okay.  Thank you.

4            All right.  My court reporter needs five minutes.

5   We'll take a five-minute break and then the Court will

6   pronounce its sentence.

7            THE COURTROOM DEPUTY:  All rise.

8            (Recess at 12:58, until 1:09.)

9            THE COURT:  We are back on the record.

10            And, Mr. Fogle, would you and your counsel come up

11   to the lecturn?

12            (Counsel and defendant approach the podium.)

13            THE COURT:  And did you have any rebuttal, very

14   brief rebuttal?

15            MR. MARGOLIS:  No.  No, Your Honor.

16            THE COURT:  Okay.  All right.  The Court is prepared

17   to state what the sentence in this case will be.  And,

18   Counsel, you will each have a final opportunity to state any

19   legal objections before sentence is finally imposed.

20            Pursuant to the Sentencing Reform Act of 1984, it is

21   the judgment of the Court that the defendant, Jared S. Fogle,

22   is hereby committed to the custody of the Bureau of Prisons,

23   to be imprisoned for a term of 188 months on each of Counts 1

24   and 2, to be served concurrently.  This sentence is a variance

25   based on the history and characteristics of the defendant, as

1    well as the nature and circumstances of the offense.

2          The defendant shall immediately pay restitution, if

3    he has not already, in the amount of $100,000 to each victim,

4    1 through 14, for a total of $1,400,000.

5          The defendant shall pay to the United States a fine

6    of $175,000.  The Court finds that the defendant does not have

7    the ability to pay interest and waives the interest

8    requirement.  The defendant shall notify his probation officer

9    of any material change in economic circumstances that might

10   affect his ability to pay the fine.

11         In lieu of forfeiture of property, the defendant

12   shall pay to the United States $50,000.

13         Supervised release is required by statute.  Based on

14   the serious nature of the offense and to assist the

15   defendant's reintegration into society upon release from

16   imprisonment, the Court is imposing a lifetime of supervised

17   release for each of Counts 1 and 2 to be served concurrently.

18         While on supervised release, the defendant shall not

19   commit another federal, state, or local crime; shall not

20   possess a firearm, ammunition, destructive device, or any

21   other dangerous weapon; shall cooperate with the collection of

22   a DNA sample; shall refrain from any unlawful use of a

23   controlled substance; and shall comply with the requirements

24   of the Sex Offender Registration and Notification Act as

25   directed by his probation officer.

1          The defendant is suspended from drug testing

2    mandated by the Crime Control Act of 1994 based on the Court's

3    determination that the defendant poses no risk of future

4    substance abuse.

5          Further, the defendant shall comply with the

6    conditions of supervised release.  And I'll go ahead and read

7    them into the record.  The defendant must report to his

8    probation officer in the district to which he is released

9    within 72 hours of release from the custody of the Bureau of

10   Prisons.  This condition is imposed as an administrative

11   requirement of supervision.

12         He shall not leave the judicial district without the

13   permission of the Court or his probation officer.  And he

14   shall report to his probation officer in a manner and

15   frequency directed by the Court or probation officer.  He

16   shall answer all inquiries by the probation officer and follow

17   the instructions of the probation officer.  All of these

18   conditions are imposed as administrative requirements of

19   supervision.

20         The defendant shall notify his probation officer of

21   any change of residence or employer.  This condition is to

22   assist the probation officer in monitoring the defendant and

23   for protection of the community.

24         The defendant shall permit his probation officer to

25   visit him at home or elsewhere based upon -- and shall permit

1   confiscation of any contraband observed in plain view.  This

2   condition is to assist his probation officer in the protection

3   of the community.

4          The defendant shall not meet or communicate or

5   otherwise interact with a person to whom the defendant knows

6   to be engaged or planning to be engaged in criminal activity

7   or whom the defendant knows to have been convicted of a felony

8   unless granted permission to do so by the probation officer.

9   This does not include family members.  The Court is imposing

10  this condition to reduce the risk of recidivism and provide

11  for the public safety.

12         The defendant shall notify his probation officer

13  within 72 hours of being arrested or having any official law

14  enforcement contact.  This condition is imposed to assist his

15  probation officer in monitoring the defendant and protection

16  of the community.

17         As directed by the probation officer and as

18  contained in his plea agreement, the defendant shall notify

19  third parties of the nature of his conviction and confirm his

20  compliance with the notification requirements.  He shall

21  submit to the search of his person, vehicle, office/business,

22  and residence, including computer systems and Internet-enabled

23  devices whenever the probation officer has a reasonable

24  suspicion that a violation of the conditions of supervision or

25  other unlawful conduct may have occurred or be underway

1  involving the defendant.  Other law enforcement may assist as

2  necessary.

3       The defendant shall submit to the seizure of any

4  contraband that is found and should forewarn other occupants

5  or users that the property may be subject to search.  The

6  Court is imposing these conditions due to the nature of the

7  instant offense, and this will allow the probation officer to

8  monitor the defendant's compliance with his supervised

9  release.

10      The defendant shall consent, at the direction of his

11  probation officer, to having installed on his computer the

12  hardware and software monitoring as stated in the plea

13  agreement.  He shall participate in a program of treatment for

14  sexual disorders, including periodic polygraph examinations as

15  directed by his probation officer and as stated in the plea

16  agreement.

17      He shall not possess any obscene material, child

18  pornography, or erotica, or nude images of minors as stated in

19  his plea agreement; and shall not have any unsupervised

20  nonincidental communication, activities, or visits with any

21  minor children unless approved by the Court or approved by the

22  person having custody of that child, as stated in the plea

23  agreement.  And the Court noted for the record earlier that

24  this would not include the defendant's biological children.

25      The defendant shall not be employed in any position

1    or participate as a volunteer in any activity that involves

2    unsupervised meetings, nonincidental communication,

3    activities, or visits with minors except as disclosed to his

4    probation officer.  The Court is imposing this condition to

5    ensure the safety of the community given the nature of these

6    offenses.

7            And if there are any outstanding location monitoring

8    fees that were accrued while on pretrial supervision, the

9    defendant is to pay those fees.  The Court is imposing this

10   condition to ensure that all outstanding fees are paid.

11           The Court is -- the defendant is further ordered to

12   pay the special assessment of $200.  Payment of the fine and

13   special assessment are due immediately and are to be made

14   directly to the Clerk, United States District Court for the

15   Southern District of Indiana.

16           The sentence that the Court intends to impose is a

17   one-level upward variance from the applicable guideline range

18   based on the 3553(a) factors.  In particular, the Court has

19   considered the perverse nature and circumstances of the

20   offenses.  The Court has considered the defendant's lack of

21   criminal convictions, his characteristics, the need for the

22   sentence to reflect the very seriousness of this offense, to

23   promote respect for the law, to provide just punishment, and

24   to provide adequate deterrence to criminal conduct of this

25   nature by others who might try to do similar things, as well

1    as provide the defendant with time for adequate treatment.

2         Jared Fogle is a 38-year-old gentleman before the

3    Court for sentencing for conspiring with his business

4    associate, Russell Taylor, to distribute and receive child

5    pornography and for traveling in interstate commerce to engage

6    in illicit sexual conduct with minors.

7         To begin, the Court is mindful that a sentence

8    should be sufficient, but not greater than necessary, to

9    accomplish the goals of sentencing.  Federal judges do not

10   sentence based on emotions or public sentiment or the judge's

11   personal beliefs or philosophies.  Instead, the Court must

12   impose a sentence viewed in the context of the policy goals

13   and empirical data of the United States Sentencing Commission

14   as determined by the advisory sentencing guidelines.  The

15   Court, however, is not bound by the guidelines, because they

16   are advisory in nature.

17        Upon consideration of the 3553(a) factors, the Court

18   has determined that the guideline range does not sufficiently

19   account for the scope of the defendant's criminal conduct, and

20   this case warrants an above-guideline sentence.

21        This defendant was obsessed with child pornography

22   and having sex with minors.  He fantasized about it in

23   telephone conversations.  He frequently expressed his desire

24   to have sexual relations with children.  He acted on it when

25   he sought out and traveled to have sex with minors.

1          The Court is to consider the history and

2    characteristics of the defendant.  Mr. Fogle seemingly had it

3    all.  Unlike many offenders, Mr. Fogle never experienced any

4    form of abuse or neglect, and he himself was never a victim of

5    child molest.  Rather, he was very privileged.  His father was

6    a prominent and is a prominent physician; his mother a

7    teacher, who later stayed at home to raise her children.  His

8    parents instilled appropriate morals and values in all of

9    their children, including this defendant.

10          The defendant had the determination and willpower to

11   overcome a weight problem.  As a junior in college, he lost an

12   incredible amount of weight while eating at a Subway

13   restaurant.  And when the restaurant became aware of his

14   story, it reached out to him and he became their spokesman.

15   What a gift to have such a professional windfall fall into

16   your lap.

17          During the times when he committed these crimes,

18   Defendant had a wife, he had two children, he had countless

19   opportunities to travel the world, and a net worth in the

20   millions of dollars.  According to letters from the

21   defendant's family and friends, he appeared to be loving,

22   caring, and generous.  He frequently spoke to school children

23   to encourage healthy diet and exercise.  But Mr. Fogle was

24   living a double life and, for many of those years, engaged in

25   a web of deception and depravity.  The seriousness of these

1  offenses cannot be overstated.

2          With respect to the distribution and receipt of

3  child pornography, the conspiracy, these offenses are not

4  victimless crimes inasmuch as the images involve sexual abuse

5  of real children.  The receipt and distribution of this

6  material perpetrates a great deal of harm to the victims who

7  are forever haunted with the fact that their images have been

8  visualized and sometimes traded over the Internet and through

9  the two people in this conspiracy.

10          Again, unlike many child pornographers, Mr. Fogle

11  admits that Victims 1 through 12 were boys and girls who were

12  secretly videotaped by his employee, Mr. Taylor.  This

13  defendant conspired with Mr. Taylor to receive and, on one

14  occasion, distribute the homemade child pornography.

15          Some of the depictions the two shared were of

16  children exposing their genitals and others were of these

17  children engaging in sexually explicit conduct.  This

18  victimization occurred for nearly four years, from March 2011

19  until January 2015.  On multiple occasions over this time

20  period, Mr. Fogle received the child pornography of these

21  children.

22          And what is most alarming to the Court is that

23  Mr. Fogle knew many of these children, he knew their names, he

24  knew that some were relatives of Mr. Taylor.  And he accepted

25  the opportunity to associate with these children during social

1   events.

2        The use of computer storage media in this case was

3   significant.  Mr. Fogle knew that his friend and associate was

4   secretly producing child pornography in his current and former

5   residences in Indianapolis, and he failed to report

6   Mr. Taylor's conduct to authorities.  Instead, over a period

7   of four years, he chose to benefit from the production by

8   obtaining and accessing a significant amount of the material.

9        As the government has argued, if Mr. Fogle had

10  promptly reported what he knew of Taylor's activities, Taylor

11  would have been caught and the child pornography involving

12  later victims, including the nine-year-old, would not have

13  been produced.

14       In addition to the homemade child pornography,

15  Mr. Fogle also collected child pornography through the

16  Internet.  The unidentified victims depicted in this

17  pornography were as young as six years old.  This pornography

18  was found on Mr. Fogle's computers, his storage devices, thumb

19  drives, cameras.  And at least two images of child pornography

20  were in text messages from Taylor, were found on Mr. Fogle's

21  cell phone.  The defendant's collection of material included

22  hundreds of videos and photographs, which account for over 600

23  images.

24       Child pornographers often argue that they are only

25  curious or they were fanaticizing and would never actually

1   harm a minor or a child, and that is not true here.  Fogle

2   acted on his attraction to children.  He engaged in Internet

3   social networking, such as Craigslist, and traveled in

4   interstate commerce for the purpose of engaging in commercial

5   sexual activity with minor children.

6          Between 2010 and 2013, he traveled from Indiana to

7   New York City to have sex with minors, including Victims

8   Number 13 and Number 14.  The defendant repeatedly asked

9   Victim Number 13 to arrange for him to participate in

10  commercial sex acts with children as young as 14 years old.

11  Mr. Fogle used his wealth and fame to entice and impress these

12  victims.

13         We heard today that he spent over $12,000 a year on

14  prostitutes.  He took Victim Number 13 to the Plaza Hotel in

15  New York City for sex acts, and on at least three occasions

16  when she was 16 years old; and engaged in illicit sex acts

17  with Victim Number 14 when she was 16 years old.

18         He went to great lengths to engage in commercial sex

19  acts with underage minors.  He bought and offered plane

20  tickets.  He reserved and paid for the hotel rooms, made

21  arrangements for the commercial sex acts, and engaged in

22  commercial sex acts with minors, and solicited a digital image

23  of a minor engaged in sexually explicit conduct from one of

24  the prostituted minors.

25         He sought to use these prostituted minors to find

1   other children with whom he could have sexual contact and

2   continually communicated with the prostituted minors in his

3   attempts to find even younger children for sex.  He specified

4   that he wanted children ages 14 and 15.  In Exhibits 1, 2, 3,

5   and 4, that were admitted into evidence at this hearing, in

6   explicit language, the defendant repeatedly sought out boys

7   and girls and indicated, "The younger the better."

8           While Mr. Fogle did not introduce these girls to

9   prostitution, he continued their victimization in this

10  underground world.  We learned today from the government that

11  these children were victims of a violent sex trafficking pimp.

12  Children involved in prostitution is a form of commercial

13  sexual exploitation, and these children are often victims of

14  sex trafficking, and that's exactly what occurred in this

15  case.

16          Under the federal law, the prostitution of children

17  is considered a form of human trafficking.  Sex trafficking is

18  a lucrative industry where criminals traffic children just as

19  they would traffic drugs and other illegal substances.  That

20  Mr. Fogle fostered this form of abuse for several years with

21  minor children is a serious crime, and that Mr. Fogle states

22  that he did not even realize the implications of his actions

23  is very alarming.

24          Child sex crimes are among the most egregious and

25  despicable of societal and criminal offenses, and Congress has

1  called for serious punishment for persons who knowingly

2  victimize children.   The Court finds no reason to depart or

3  vary downward from the guidelines as Defendant's counsel have

4  requested.

5        The Court has heard testimony from the defendant

6  that he has a diagnosis of hypersexuality and mild pedophilia,

7  and the experts hired by defendants have stated that he

8  will -- they believe he will respond well, and he has been

9  responding well, to medication and treatment, and they don't

10 believe he's likely to reoffend.

11       But I agree with the government.   The doctor based

12 his opinion on Mr. Fogle saying that his interest was with

13 children 16 and 17 years old.   Mr. Fogle did not tell -- or

14 maybe the doctor didn't listen to the tapes to realize that

15 the defendant has stated that the younger, the better.   He

16 repeatedly sought out these 14- and 15-year-old girls.   He

17 admits, the doctor does, that the visual stimulation tests

18 show that the defendant was more attracted to younger children

19 than to the teenagers.   And, importantly, in this country,

20 there's no such thing as mild -- being a mild pedophile.

21 That's not a diagnosis accepted in the DSM.

22       It is admirable that Mr. Fogle sought treatment

23 following his arrest, and, to his credit, he's taking

24 medication to reduce his sexual urges.   But the Court notes

25 that this defendant had the means to obtain treatment since

1    the onset of his deviant sexual behaviors, and he did not seek

2    treatment until after he was arrested.  And he did not seek

3    treatment years ago, he did not seek treatment following the

4    arrest of his co-conspirator, Mr. Taylor, in April of 2015.

5    Rather, he first sought treatment upon advice of counsel

6    following his arrest in September of 2015.  Dr. May indicated

7    that this defendant, as most sex offenders, needs treatment

8    for up to ten years, and the Court agrees.

9         One of the goals of sentencing is to provide an

10   offender with correctional training through treatment and to

11   assist him in abstaining from new criminal behavior.  Due to

12   the nature of the offense and this defendant's acts relating

13   to child pornography and traveling to engage in sex with

14   minors, it is necessary that he participate in sex offender

15   treatment while in prison to assist in the development of

16   internal controls to his deviant sexual impulses, thoughts,

17   and behaviors.  The Court, as counsel have requested, will

18   recommend that the Bureau of Prisons designate a facility

19   where Mr. Fogle can continue treatment.

20        The Court considers the 3553(a) factors to avoid

21   unwarranted sentencing disparities.  With respect to the

22   alleged disparity and the sentences of defendants in Exhibits

23   A and B, the circumstances of those defendants is very

24   different.  This is A and B that you had in your sentencing

25   memorandum.

1          Defendant A, I think that might have been

2     Mr. Horner, was a binding plea agreement, which the Court

3     accepted, in part, because this defendant had been raised by a

4     mentally ill mother, a physically abusive father.  He had been

5     molested beginning when he was seven years old.  He was

6     charged only with the possession, and his collection was less

7     than 100 images.

8          The defendant in Exhibit B was also sentenced solely

9     and charged only with possession.  He did not distribute or

10    receive or conspire to distribute and receive child

11    pornography.  He did not travel in interstate commerce to

12    engage in elicit sexual conduct with minors.  And, notably,

13    neither Biddle nor Dittiway traveled in interstate commerce or

14    socialized with their victims of their child pornography.

15         The Court next considers the need to protect the

16    public from further crimes of the defendant and to afford

17    adequate deterrence to others who might commit these same

18    types of offenses.  The level of perversion and lawlessness

19    exhibited by Mr. Fogle is extreme.  As early as 2007,

20    witnesses from Florida, Georgia, and Washington state have

21    proffered that Fogle repeatedly discussed his interest in

22    engaging in commercial sex acts with minors.  This was four

23    years before he began receiving pornography from Mr. Taylor.

24         He discussed with adult prostitutes in Virginia,

25    Missouri, and Nevada his interest in paying them a finder's

1  fee to provide him with access to minors for commercial sex

2  acts.  He stated that he was sexually attracted to children as

3  young as eight years old, and he did this only after engaging

4  in illegal commercial sex acts with these women to ensure that

5  they were not police officers, because, other than the

6  prostitutes in Las Vegas, Nevada, prostitution is still

7  illegal in this country.  The defendant admits to paying for

8  commercial sex with adults on hundreds of occasions.

9          The conduct that Mr. Fogle has engaged in has been

10  taken very seriously by Congress.  And the Court believes it

11  should impose a substantial term of imprisonment, not only to

12  provide just punishment, but to adequately deter others from

13  committing similar acts.

14          The Court has considered the relevant factors

15  presented by the defendant and given them appropriate weight.

16  The Court rejects Defendant's arguments that the guideline

17  range for distribution or receipt of child pornography is

18  overstated when viewed in the context of this case and the

19  policy goals of the Sentencing Commission.

20          The Court recognizes Mr. Fogle's remorse and

21  believes that it's genuine.  And the defendant's offense level

22  was reduced by three levels for his acceptance of

23  responsibility and saving the victims from having to testify

24  at a trial.

25          The defendant appears to be sincere in his quest for

1 treatment.  And I agree and believe that he is painfully

2 aware -- he is now painfully aware of the harm that he's

3 caused his victims.  The Court recognizes that he has paid

4 $1.4 million in restitution, even for victims who he says he

5 did not view pornography of, but I'm sure he made that

6 agreement because of the conspiracy.  But this restitution is

7 the appropriate thing to do, especially considering the fact

8 that Mr. Fogle, at the time he committed these offenses, was a

9 multimillionaire, and he clearly has the means to easily pay

10 restitution to his victims.

11          The Court also gives Defendant credit for the

12 positive impact he may have had on others when speaking

13 regarding diet and exercise and healthy lifestyle.

14          With all due respect to the probation officer, the

15 Court rejects that it should vary downward because he is

16 famous and his notoriety may make it extra stressful when he

17 is in prison.  This defendant's celebrity cuts both ways.  He

18 will likely get special protection when he goes to the Bureau

19 of Prisons.  It is because of his fame and notoriety that he

20 was able to perpetrate some aspects of these crimes.

21 Additionally, other celebrity criminals in this district were

22 not awarded downward variances for this reason, and other sex

23 offenders.  One that comes to mind is Jerry Sandusky, who was

24 never awarded a mitigated sentence for the extra hardships

25 that surround their celebrity.

1          The Court considers the defense argument regarding

2     the character of the child pornography that this defendant

3     possessed contemporaneously with his conviction.  Some of it

4     was of nude children exposing their genitals, and not all of

5     it involved lascivious sex acts.  However, what aggravates the

6     character of the pornography is that this defendant actually

7     knew the children in the homemade pornography.  The youngest

8     victim -- even though he didn't view this.  But because he

9     didn't report Mr. Taylor, a nine-year-old was -- produced

10    homemade pornography.  The oldest was about 16.  Mr. Fogle

11    knew their names, he actually socialized with them at

12    charitable events -- I'm sorry, at social events, and had the

13    opportunity to engage in a more explicit form of fantasy.

14         The guidelines do not account for the number of

15    victims, they do not account for the effect on the victims.

16    One of the victims sent a letter to the Court, and the Court

17    is going to keep this very neutral.  This is from this

18    victim's mother.  "My daughter has been impacted so hard

19    throughout all of this.  She can hardly function and live

20    normally as of late, and it is only getting worse.  The stress

21    and mental state finally took its toll on her and she was

22    contemplating suicide.  She now lives on sleep medication,

23    anxiety medication, and depression medication at the age of

24    now 16.  None of the victims or their families will ever be

25    the same.  This has changed their lives forever.  I could have

1  lost my daughter a couple of weeks ago if she would have went

2  forward with her suicide thoughts and put it in action from

3  the personal turmoil that she now lives daily."

4          The length of time that this went on is also not

5  accounted for in the guidelines.  As the Court stated earlier,

6  Mr. Fogle's perversion began in 2007, way before he met

7  Mr. Taylor in 2011, and went on until 2015, the time that he

8  was arrested and his home was raided.

9          The advisory guideline calls for a sentence of

10  between 135 and 168 months.  The government has agreed to

11  recommend a sentence no greater than 151 months.  Considering

12  the 3553(a) factors set forth in this hearing, a one-level

13  upward variance sentence in the range of 154 to 188 months is

14  appropriate, and a sentence of 188 months, which is only 20

15  months above the advisory guideline range, the Court finds to

16  be reasonable in this case.

17          A fine of $175,000, which is within the advisory

18  guideline range, is ordered.  While Mr. Fogle has agreed to

19  pay restitution to the identified victims of this offense,

20  there are still unidentified victims in the images of

21  commercial child pornography that he received from Mr. Taylor.

22  Criminal fine payments are deposited in a fund which aids

23  crime victims throughout the United States, including victims

24  of sexual offenses.  This fine is ordered to benefit victims

25  of current and future crimes.  Additionally, the imposition of

1  this fine may allow the defendant to participate in prison

2  industries.

3          Supervised release is required by statute.  Based on

4  the serious nature of the offense and to assist this

5  defendant's reentry into society, the Court is going -- has

6  ordered the lifetime supervision.

7          In addition to the mandatory conditions required by

8  statute, the Court has indicated the other conditions of

9  supervision.  And, defense counsel, do you have any objection

10 to any of the conditions of supervised release?

11         MR. MARGOLIS:  No, Your Honor.

12         THE COURT:  Do you, Mr. DeBrota?

13         MR. DeBROTA:  No.  And we would waive any further

14 elaboration of that into the record.  I think you've

15 adequately supplied a basis as part of the overall comments.

16         THE COURT:  Do you agree?

17         MR. MARGOLIS:  Yes, Your Honor.

18         THE COURT:  Thank you.  All right.  Counsel, those

19 are the reasons the Court intends to impose the stated

20 sentence.  Government, do you know of any reason, other than

21 those already argued, why sentence should not be imposed as

22 stated?

23         MR. DeBROTA:  I do not, Your Honor.

24         THE COURT:  And, defense, do you know of any

25 reasons, other than those already stated --

1              MR. MARGOLIS:  No, Your Honor.

2              THE COURT:  -- other than you're disappointed, that

3     sentence should not be imposed as stated?

4              MR. MARGOLIS:  No, Your Honor.

5              THE COURT:  The Court now orders the sentence

6     imposed on the defendant, Jared Fogle, as stated.

7              Mr. Fogle, you have a right to appeal your

8     conviction if you believe your guilty plea was somehow

9     unlawful or involuntary or if there's some other fundamental

10    defect in the proceedings that was not waived by your guilty

11    plea.  You also have a right to appeal your sentence if you

12    believe it is contrary to law.

13             With few exceptions, any notice of appeal must be

14    filed within 14 days after written judgment is entered in your

15    case.  If you cannot afford the filing fee or cannot afford to

16    pay a lawyer to appeal for you, a lawyer would be appointed to

17    represent you in the appeal.

18             Now, you can either -- if you intend to appeal, you

19    can either tell me now, and the clerk of court will prepare a

20    notice of appeal for you immediately; or you can tell your

21    lawyers within the next 14 days, and they will make sure they

22    get the appropriate paperwork filed.  Do you understand your

23    appellate rights?

24             THE DEFENDANT:  Yes, ma'am.

25             THE COURT:  And do you want to discuss that with

1  your lawyers before you make a notice?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Okay.  And for the record, he said,

4  "Yes."

5          Are there any other matters to take up for the

6  government?

7          MR. DeBROTA:  No, Your Honor.

8          THE COURT:  Any other matters for the defense?

9          MR. MARGOLIS:  Yes, Your Honor, if I might.  I know

10 the Court said it's going to recommend that Mr. Fogle receive

11 sex offender treatment during his prison time, and we thank

12 you for that.  We would ask you, also, to recommend that he

13 receive -- get into the RDAP program, because we think that's

14 appropriate, as well, not for drugs, but obviously for alcohol

15 abuse.

16         And we very much request, and I hope you will abide

17 by this, to recommend the institution of Littleton, Colorado,

18 because we have been told by people who know that that has the

19 best sex offender program in the system.  And I'm told by some

20 folks if you put in the words, "strongly recommend," that

21 might have an additional impact with the designating folks

22 over at the BOP.

23         THE COURT:  All right.  You have no objection to

24 either of those recommendations, do you, Mr. DeBrota?

25         MR. DeBROTA:  No, Your Honor.  We do want him

1    remanded in custody, but where the BOP puts him in their

2    recommendations, I would defer to that combination on that

3    point.

4              THE COURT:  All right.  The Court is going to make a

5    recommendation that the Bureau of Prisons designate -- will

6    strongly recommend, if you put that in there, that the Bureau

7    of Prisons designate the facility at Littleton, Colorado; that

8    the defendant be allowed to participate in the RDAP alcohol

9    program and receive sex offender treatment.

10             All right.  The final issue is remand.  The

11   government is asking for remand?

12             MR. DeBROTA:  We are, Your Honor.

13             THE COURT:  Do you want to respond?

14             MR. MARGOLIS:  We spoke of this before, Your Honor.

15   Mr. Fogle has demonstrated, I think quite strongly, that he is

16   not a flight risk.  I would ask that he be allowed to have

17   another, whatever the time period is within which the Bureau

18   of Prisons will designate, hopefully Littleton, to continue

19   his intensive treatment with Dr. May.  And that would be our

20   request.

21             THE COURT:  Okay.  All right.  I'm going to grant

22   the government's request.  I think for the safety of the

23   defendant, as well as the community and those victims, this

24   one little girl is suicidal, that the appropriate thing in

25   this case would be to remand the defendant to the custody of

1   the United States Marshal.

2            Are there any other matters for the government?

3            MR. DeBROTA:  No, Your Honor.

4            THE COURT:  Anything else, Defendant?

5            MR. MARGOLIS:  No, Your Honor.

6            THE COURT:  And, defense counsel, you did an

7   excellent job, you were very thorough, but this was a tough

8   one.

9            MR. MARGOLIS:  Thank you, Your Honor.

10            THE COURT:  Okay.  The defendant is remanded to the

11   custody of the marshals, and we are adjourned.

12            THE COURTROOM DEPUTY:  All rise.

13            (Proceedings adjourned at 1:43 p.m.)

14

15                    CERTIFICATE OF COURT REPORTER

16       I, David W. Moxley, hereby certify that the

17   foregoing is a true and correct transcript from

18   reported proceedings in the above-entitled matter.

19

20

21

22   /S/ David W. Moxley                   November 30, 2015
     DAVID W. MOXLEY, RMR/CRR/CMRS
23   Official Court Reporter
     Southern District of Indiana
24   Indianapolis Division

25